## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
--------------------------------------------------- x
In re:                                               :
                                                     :
BUFFETS HOLDINGS, INC.,                              :
a Delaware corporation, et al.,¹                     :
                                                     :
        Debtors.                                     :
--------------------------------------------------- x
```

Chapter 11

Case No. 08-10141-(____)

Joint Administration Pending

## DECLARATION OF A. KEITH WALL IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, A. KEITH WALL, do hereby declare, under penalty of perjury, that:

1.   I have held the position of Executive Vice President and Chief Financial

Officer of Buffets, Inc. ("Buffets"), a corporation duly organized under and existing pursuant to

the laws of the State of Minnesota, since January 31, 2006, and I am an officer, manager and/or

director of each of the above-named debtors.  In my capacity as such, I have detailed knowledge

of and experience with the business and financial affairs of Buffets and its affiliates, who are

debtors herein, including Buffets's direct parent, Buffets Holdings, Inc. ("Buffets Holdings"), a

corporation duly organized and existing pursuant to the laws of the State of Delaware, and

Buffets' direct and indirect subsidiaries, including HomeTown Buffet, Inc., OCB Restaurant

Company, LLC, OCB Purchasing Co., Buffets Leasing Company, LLC, Ryan's Restaurant

Group, Inc., Buffets Franchise Holdings, LLC, Tahoe Joe's, Inc., HomeTown Leasing Company,

---

¹        The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Buffets Holdings, Inc. (4018); Buffets, Inc. (2294); HomeTown Buffet, Inc. (3002); OCB Restaurant Company, LLC (7607); OCB Purchasing Co. (7610); Buffets Leasing Company, LLC (8138); Ryan's Restaurant Group, Inc. (7895); Buffets Franchise Holdings, LLC (8749); Tahoe Joe's, Inc. (7129); HomeTown Leasing Company, LLC (8142); OCB Leasing Company, LLC (8147); Big R Procurement Company, LLC (5198); Ryan's Restaurant Leasing Company, LLC (7405); Fire Mountain Restaurants, LLC (8003); Ryan's Restaurant Management Group, LLC (6739): Tahoe Joe's Leasing Company, LLC (8145); Fire Mountain Leasing Company, LLC (7452); Fire Mountain Management Group, LLC (7299).  The address for all of the Debtors is 1460 Buffet Way, Eagan, MN 55121.

066956.1001

LLC, OCB Leasing Company, LLC, Big R Procurement Company, LLC, Ryan's Restaurant Leasing Company, LLC, Fire Mountain Restaurants, LLC, Ryan's Restaurant Management Group, LLC, Tahoe Joe's Leasing Company, LLC, Fire Mountain Leasing Company, LLC and Fire Mountain Management Group, LLC (each a "Debtor," and collectively, the "Debtors").

    2.    As Buffets' Executive Vice President and Chief Financial Officer, I am one of the officers of the Debtors responsible for devising and implementing the Debtors' business plans and strategies, overseeing the Debtors' financial, operational and legal affairs, and supervising the maintenance of their books and records. In addition, in my capacities as the Executive Vice President and Chief Financial Officer of Buffets and an officer, manager and/or director of each of the other Debtors, I have been involved in the Debtors' restructuring process (the "Restructuring Process"), including, inter alia, (i) participating in the development, negotiation and implementation of various strategic alternatives for restructuring, reducing or modifying the Debtors' indebtedness, (ii) managing professionals engaged by the Debtors in connection with the Restructuring Process, (iii) supervising the preparation of documentation needed to implement the Restructuring Process, and (iv) consulting on a regular basis with the Debtors' other officers and executives, and members of the Debtors' Boards of Directors or their equivalent, with respect to the foregoing.

    3.    Today (the "Petition Date"), the Debtors filed voluntary petitions (the "Petitions") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), in an effort to preserve and maximize the value of their chapter 11 estates.

    4.    The Debtors intend to operate their business and to manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

5.     I am advised by counsel that this Court has jurisdiction over these chapter 11 cases pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in the United States Bankruptcy Court for the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409.

A.     *Overview of the Debtors' Businesses and History.*

6.     The Debtors comprise the nation's largest steak-buffet restaurant chain and the second largest restaurant company in the family dining segment of the restaurant industry.  The restaurants principally operate under the names Old Country Buffet®, Country Buffet®, HomeTown Buffet® (collectively the "Buffets brand"), Ryan's® and Fire Mountain® (collectively the "Ryan's brand").  The Debtors also own and operate eleven Tahoe Joe's Famous Steakhouse® restaurants ("Tahoe Joe's").

7.     The Debtors were early innovators of the "scatter bar" – a buffet format believed to reduce the waiting time of customers' access to food, thereby enhancing the dining experience and increasing table turns.

8.     Buffets was founded in 1983 to develop buffet-style restaurants under the name Old Country Buffet®.  In October 1985, Buffets successfully completed an initial public offering with seven restaurants, and by 1988 had 47 company-owned units and nine franchised units.  In September 1996, Buffets merged with HomeTown Buffet, a similar publicly-held scatter-bar, buffet-style restaurant company established and developed by one of Buffets' co-founders.  The merger of Buffets and HomeTown Buffet added 80 company-owned restaurants in 11 states and 19 franchised restaurants in eight states, bringing the total number of restaurants to 346 company-owned restaurants and 24 franchised restaurants in 36 states as of December 31, 1996.

9.    On October 2, 2000, Buffets Holdings – an entity organized by investment funds affiliated with Caxton-Iseman Capital, LLC ("Caxton-Iseman Capital") – acquired Buffets in a buyout from its public shareholders.

10.    On November 1, 2006, Buffets, through a wholly-owned subsidiary, merged with Ryan's Restaurant Group, Inc. ("Ryan's") - a similar restaurant concept to Buffets with more than 300 steak-buffet restaurants operating primarily in the Southeastern United States – in a cash transaction valued at approximately $834.0 million, including debt that was repaid at closing. Under the merger, Buffets' wholly-owned subsidiary merged with and into Ryan's with Ryan's remaining as the surviving corporation. As a result of the Merger, Ryan's became a wholly-owned subsidiary of Buffets and operates as a separate division of Buffets.

11.    Also on November 1, 2006, Buffets and Ryan's entered into a sale leaseback transaction (the "Sale Leaseback Transaction") with certain affiliates of Fortress Investment Group LLC (the "Fortress Affiliates"), involving approximately 275 Ryan's restaurants and seven Buffets restaurants. The Sale Leaseback Transaction documents provide that Buffets and Ryan's, as applicable, conveyed the land (or, in certain cases, underlying ground leases) and related improvements with respect to those properties to the Fortress Affiliates or their assignees and simultaneously leased those properties back pursuant to unitary and individual leases, each for an initial lease term of approximately 20 years. The purchase price for the portfolio of sale leaseback properties was approximately $566.8 million, a portion of which was used to fund the Ryan's merger.

12.    As a result, in part, of the Ryan's merger, as of January 15, 2008, the Debtors had 615 company-owned steak-buffet restaurants operated under the Buffets and Ryan's brands, 11 Tahoe Joe's Famous Steakhouse® restaurants and 16 franchised locations collectively

operating in 42 states. All of the Debtors' steak-buffet restaurants serve lunch and dinner seven days a week, and the Buffets brand restaurants and most of the Ryan's brand restaurants offer breakfast on Saturdays and Sundays. Approximately two-thirds of the Debtors' restaurant facilities are freestanding units and one-third are located in strip shopping centers or malls. On average, each of the Buffets brand restaurants served approximately 6,700 customers per week in fiscal 2007, while each Ryan's brand restaurant served approximately 5,300 customers per week in fiscal 2007. In the aggregate, the Debtors' restaurants serve approximately 3.8 million customers per week.

13.    The Debtors recently completed a full integration of the Ryan's brand operations into the Buffets brand operations, which the Debtors believe will further optimize operational efficiencies and, in turn, increase the Debtors' profitability. Specifically, the Debtors have completed consolidation of all corporate-level departments (such as human resources, legal, tax and real estate), payroll and benefits processes, financial and accounting systems and purchasing initiatives. The Debtors are currently consolidating certain store operations, store-level best practices, menu and promotional strategies and marketing synergies. Through each of these initiatives and others, the Debtors are attempting to maximize efficiencies throughout their businesses. The Debtors believe that the full integration of the Ryan's brand operations will result in the Debtors' realization of the full value of the Ryan's brand merger and will improve the Debtors' bottom line.

14.    As of January 15, 2008, the Debtors employed over 36,000 employees. Except for approximately 585 corporate employees, nearly half of which work at the Debtors' corporate headquarters in Eagan, Minnesota, the Debtors' employees work at the Debtors' restaurants.

B.    *Corporate and Debt Structure.*

15.    Buffets Holdings, a Delaware corporation, is a holding company that wholly owns Buffets, a Minnesota corporation, which is the Debtors' principal operating entity and the primary obligor on the Debtors' prepetition secured bank debt and unsecured bond debt. Buffets, in turn, is the direct parent of the Debtors HomeTown Buffet, Inc., OCB Restaurant Company, LLC, OCB Purchasing Co., Buffets Leasing Company, LLC, Ryan's Restaurant Group, Inc. and Buffets Franchise Holdings, LLC (collectively, the "Direct Buffets Subsidiaries"), through which various restaurant functions are operated. Each of the other Debtors is indirectly owned by Buffets through one of the Direct Buffets Subsidiaries or a subsidiary thereof. A chart showing the corporate organization of all of the Debtors is annexed hereto as Exhibit A.

16.    Buffets is a borrower under a secured credit facility with Credit Suisse, as a lender and administrative agent, and certain other lender-parties (collectively, the "Prepetition Secured Lenders") thereto dated November 1, 2006, as amended on March 13, 2007 and as further amended by a Forbearance Agreement and Second Amendment to Credit Agreement dated as of January 7, 2008 (the "Forbearance Agreement") (the credit agreement, as amended, shall hereinafter be referred to as (the "Credit Facility").

17.    The Credit Facility is comprised of a term loan in the original principal amount of $530 million (the "Term Loan"), a primary revolving credit facility (the "Primary Revolver") in the original principal amount of $40 million, and a secondary letter of credit facility in the amount of $70 million (the "Secondary Revolver"). As of January 15, 2008, the outstanding amounts due under the Term Loan, Primary Revolver and Secondary Revolver were approximately $524 million, $40 million and $70 million (comprised of approximately $16.3

million in borrowings and approximately $53.7 million in letter of credit obligations), respectively. The obligations of Buffets under the Credit Facility are guaranteed by each of the other Debtors.

18.    In addition to the Credit Facility, pursuant to an indenture dated as of November 1, 2006, Buffets issued $300 million (original principal amount) of 12.5% senior unsecured notes (as amended from time-to-time, the "Senior Notes") due November 1, 2014. Interest on the Senior Notes is due semi-annually on January 1st and July 1st. As of the Petition Date, the Debtors had not made the interest payment under the Senior Notes due on January 2, 2008 in the amount of approximately $18.75 million. Payment of the Senior Notes is guaranteed by most, if not all, of the other Debtors.

19.    In addition to the foregoing, upon information and belief, the Debtors also have approximately $55 million in ordinary course trade debt that was unpaid as of the Petition Date.

C.    *Events Leading to the Debtors' Bankruptcy Filing.*

20.    A variety of external economic factors have led to a decline in the Debtors' operating performance. The Debtors believe that the leading adverse factor has been a marked decline in discretionary spending among the Debtors' core customers. This has resulted from higher gasoline and energy costs, increased debt service loads due to rate increases on adjustable rate mortgages, lower consumer confidence and the general economic downturn. Discretionary consumer spending has been further hampered by the sharp decline in readily available credit. This has followed the collapse of the sub-prime mortgage market, stagnation of home valuations, and lower available home equity due to previous consumer refinancing efforts. Together, these factors have significantly depressed consumer spending in the family dining

segment and negatively impacted the Debtors' guest counts at their restaurants. Additionally, the

Debtors' performance has been impacted by increases in the minimum wage, food costs and

energy costs. The decline in guest counts, together with increased operating costs, have

negatively impacted the Debtors' performance. These issues have significantly hampered the

Debtors' ability to service their non-trade-related debt and caused a current liquidity strain.

21.     In recent months, the Debtors have diligently evaluated, in consultation

with their professionals, a number of options to address the Debtors' current financial issues.

These efforts have included sharing information with and engaging in discussions with the

Debtors' secured lenders, bondholders and stockholders with the goal of consensually

restructuring the Debtors' balance sheet to bring it into line with the Debtors' current debt

servicing capabilities. In connection with those efforts, the Debtors entered into the Forbearance

Agreement in an effort to allow sufficient time to negotiate a consensual restructuring with their

creditor constituencies and to help ensure that the Debtors would have debtor-in-possession

financing in place in the event a bankruptcy filing became necessary. Thereafter, the Debtors

continued sharing information with and talking to the Prepetition Secured Lenders and certain

holders of the Senior Notes. However, further deterioration in the Debtors' liquidity necessitated

the commencement of these cases before substantial progress could be made on a restructuring of

the Debtors' balance sheet.

D.     *First Day Motions*

22.     As a result of my first-hand experience, and through my review of various

materials and information, discussions with other of the Debtors' executives, and discussions

with the Debtors' outside advisors, I have formed opinions as to (a) the necessity of obtaining the

relief sought by the Debtors in their "first-day" applications and motions described below

(collectively, the "First Day Papers"), (b) the need for the Debtors to continue to operate effectively, (c) the deleterious effects upon the Debtors of not obtaining such relief, and (d) the immediate and irreparable harm to which the Debtors will be exposed immediately following the Petition Date unless the relief requested in the First Day Papers is granted without delay.

23.    I submit this Declaration in support of the Debtors' petitions and First Day Papers filed with the Court in connection with the commencement of these cases and described below.

24.    I participated in preparing and have reviewed each of the First Day Papers (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct. Such representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Papers.

25.    The relief sought in the First Day Papers will minimize the adverse effects of the instant chapter 11 cases on the Debtors and result in maximum creditor recoveries. I believe that the relief sought in each of the First Day Papers is necessary to enable the Debtors to operate effectively in chapter 11 as debtors in possession.

26.    As described more fully below, the relief requested in the First Day Motions was carefully tailored by the Debtors, in consultation with their professionals, to ensure that the Debtors' immediate operational needs are met and that the Debtors suffer no immediate and irreparable harm. I personally participated in the analysis that lead to the creation of each of the First Day Motions and assisted in the drafting and development of the relief requested

therein.  At all times the Debtors' management and professionals remained cognizant of the limitations imposed on debtors-in-possession and, in light of those limitations, the Debtors narrowed the relief requested at the outset of these cases to those issues that require urgent relief to sustain the Debtors' immediate operability.

a.    Motion for Joint Administration

27.    The Debtors believe that many of the motions, applications, hearings and orders that will arise in these chapter 11 cases will jointly affect each and every Debtor.  Under these circumstances, the Debtors believe that the interest of the Debtors, their estates, their creditors and other parties in interest would be best served by the joint administration of these chapter 11 cases for procedural purposes only.  The Debtors further believe that joint administration of these chapter 11 cases will ease the administrative burden on the Court and all parties in interest and will protect creditors of the respective estates against potential conflicts of interest.  For these reasons, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

b.    Application to Retain Epiq Bankruptcy Solutions, LLC

28.    By this Motion, the Debtors seek entry of an order authorizing the Debtors to retain Epiq Bankruptcy Solutions, LLC ("Epiq") as their claims, notice and balloting agent ("Agent").  Upon information and belief, Epiq is an experienced Agent and is frequently used by debtors in large chapter 11 cases, and I believe Epiq is well qualified to serve as Agent in these cases.  The employment of Epiq will also provide the Debtors with efficient management of the claims, noticing and balloting processes in these cases leaving the Debtors' management and professionals to focus on the Debtors reorganization efforts.

c.    Motion for Interim Order Deeming Utilities Adequately Assured

29.    By this motion, and to ensure continued provision of utility services (the "Utility Services") to the Debtors' headquarters and its over 600 restaurants, the Debtors seek entry of an order prohibiting utility companies (the "Utility Companies") from terminating services on account of pre-petition invoices, deeming the Utility Companies to be adequately assured of future payment, and establishing procedures to determine additional adequate assurance. The Debtors propose to establish a segregated account into which the Debtors will deposit a sum equal to 50% of the Debtors estimated monthly costs for Utility Services (collectively, the "Utility Deposit") and, additionally, have proposed procedures to address any request made by the Utility Companies for additional adequate assurance.

30.    Any disruption of Utility Services at the Debtors' business locations would cause irreparable harm to the Debtors' business operations and their estates. The successful operation of the Debtors' restaurants requires that the Utility Services be provided on a continual and uninterrupted basis. The Debtors have over 4,400 accounts with Utility Companies and have established a good payment history with virtually all of their Utility Companies. To the best of the Debtors' knowledge, they have no defaults or arrearages of any significance with respect to the Debtors' undisputed Utility Services invoices. However, any disruption of Utility Services could have a significant impact on the Debtors' business operation, revenues, customers and employees.

31.    For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

d.    Motion for Authority to Pay Certain Pre-Petition Taxes

32.    By this motion, the Debtors request authorization (but not direction) to pay certain taxes that the Debtors are required to collect from third-parties and hold for a period of time before remitting them to the appropriate taxing authorities (the "Trust Fund Taxes") and certain business and occupation taxes which the taxing authorities (the "Authorities") are authorized under state law to collect directly from the Debtors' individual officers and directors if such taxes remain unpaid (the "Business Taxes" and together with the Trust Fund Taxes, the "Taxes"). The Debtors seek authority to pay any Taxes that were accrued prepetition but were not in fact paid or processed prepetition, or were paid prepetition in an amount less than is actually owed, or to the extent any such payments made prepetition were rejected, lost or otherwise not received in full by any Authority. Further, there may be Taxes incurred or collected from sales and services provided prepetition that will come due shortly after the filing, which the Debtors seek authority to pay pursuant to this Motion. Finally, to the extent that any checks, drafts, deposits or transfers issued or initiated by the Debtors on account of prepetition Taxes have not cleared as of the Petition Date, the Debtors also seek an order directing banks and other financial institutions to honor and process such payments.

33.    The Debtors estimate that outstanding prepetition liabilities owing to the various Authorities for Taxes will not exceed approximately $16.7 million, exclusive of any Taxes that may have been paid prior to Petition Date but had not cleared as of the Petition Date. Some, if not all, of the Authorities may initiate an audit of the Debtors if the Taxes are not paid on time. Such audits will unnecessarily divert the Debtors' attention away from the reorganization process and result in unnecessary expenses. Moreover, if the Debtors do not pay such amounts in a timely manner, the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, seek payment from the Debtors' directors

and officers and pursue other remedies that will materially and immediately harm the estates. Moreover, many of the outstanding tax liabilities are for trust fund taxes that the Debtors have collected and hold in trust for the benefit of the Authorities. Therefore, such funds do not constitute property of the estate and could not otherwise be used by the estates.

34.    I believe that the Debtors' failure to pay the Taxes could have a material adverse impact on their ability to operate in the ordinary course of business and thus harm these reorganizations to the detriment of all constituents. Additionally, any attempts to collect the Taxes from the Debtors' officer and directors has the potential to divert the attention of those individuals away from the reorganization process. Therefore, I believe it is appropriate to pay, and the Debtors seek the authority to pay, in their sole discretion, the Trust Fund Taxes and the Business Taxes, including any penalties and interest thereon, if any, and any liability resulting from audits of prepetition Taxes, to the relevant Authorities in the ordinary course of business.

e.    <u>Motion to Approved Continued Use of Cash Management System</u>

35.    By this motion (the "Cash Management Motion"), the Debtors seek entry of an order (a) authorizing the continued use of their existing cash management system, (b) authorizing the continued use of their existing bank accounts and business forms, and (c) authorizing their deposit practices and waiving the requirements of section 345(b) in connection therewith on an interim basis. In connection with this relief, the Debtors respectfully request a waiver of certain of the operating guidelines established by the Office of the United States Trustee for the District of Delaware that require the Debtors to close all prepetition bank accounts, open new accounts designated as debtor-in-possession accounts, and provide new business forms and stationary.

36.    As described in detail in the Motion, the Debtors maintain a cash management and disbursement system in the ordinary course of their operations (the "Cash Management System"). To lessen the disruption caused by the bankruptcy filings and maximize the value of their estates in these chapter 11 proceedings, it is vital to the Debtors that they maintain their Cash Management System.

37.    The Debtors maintain current and accurate accounting records of daily cash transactions and submit that maintenance of this Cash Management System is vital to prevent undue disruption to the Debtors' business operations while protecting the Debtors' cash for the benefit of the estates. It is critical that the Debtors be able to consolidate management of cash and centrally coordinate transfers of funds to efficiently and effectively operate their large and complex business operations. Substantially disrupting their current cash management procedures would impair the Debtors' operations and ability to optimize their business performance.

f.    Motion for Authority to Pay Employee Wage and Related Items

38.    Pursuant to the Employee Wage Motion, the Debtors are seeking authority to honor and pay all pre-petition employee wages, salaries and other accrued compensation, and to continue to honor certain other policies, programs and benefits the Debtors provide to their employees in the ordinary course of business.

39.    The Debtors have a current workforce of approximately 36,150 employees nationwide. All but a few hundred of these employees work in the Debtors' 600-plus restaurants around the country as "crew" members (*i.e.*, servers, cashiers, food preparers, etc.) or as store- or area-level management. The vast majority of these employees rely exclusively on their full compensation, benefits and reimbursement of their expenses to continue to pay their daily living

expenses, and these employees will be exposed to significant financial difficulties if the Debtors are not permitted to pay the unpaid employee obligations. The Debtors believe that if they are unable to honor all such obligations immediately, employee morale and loyalty will be jeopardized at a time when such support is critical.

40.    The uninterrupted continuation of the Debtors' business is critically dependent upon a stable work force. The Debtors believe that any significant number of employee departures or deterioration in morale at this time will immediately and substantially adversely impact the Debtors' businesses and result in immediate and irreparable harm to the estates and their creditors. There is a real, immediate risk that if the Debtors are not authorized to continue to honor their pre-petition employee obligations in the ordinary course, the employees would no longer support and maintain the operations of the Debtors, thereby crippling the Debtors' business operations and instantly destroying the prospects of a successful reorganization. Consequently, the Debtors strongly believe that it is critical that they be permitted to pay their employees their pre-petition wages and continue with their ordinary course personnel policies, programs and procedures that were in effect prior to the Petition Date.

g.    Motion for Authority to Honor Customer Programs

41.    Pursuant to the Customer Programs Motion, the Debtors seek authority to continue honoring their marketing, sales and promotional practices, which are targeted to develop and sustain positive reputations for their restaurants in the marketplace (the "Customer Programs"). Although, in consultation with their professionals, the Debtors have concluded and believe that most of the Customer Programs constitute "ordinary course of business" practices and do not require court approval, out of an abundance of caution, the Debtors seek authority from the Court to honor their prepetition Customer Programs in the ordinary course of business.

42.    The Debtors believe that immediate entry of an order approving the Debtors' ability to continue to honor their Customer Programs is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  Approximately 3.8 million customers frequent the Debtors' restaurants each week.  The short-term and long-term success and viability of the Debtors' businesses are dependent upon the loyalty and confidence of their customers. The continued support of this constituency is absolutely essential to the survival of the Debtors' businesses and the Debtors' ability to reorganize.  Any delay in honoring the various Customer Programs or discontinuation of Customer Programs as a result of the commencement of these cases will severely and irreparably impair the Debtors' customer relations at a time when the loyalty and support of those customers are extremely critical.

43.    By contrast, honoring these prepetition obligations will require minimal expenditure of estate funds and will assist the Debtors in preserving customer relationships for the benefit of all stakeholders.  The Debtors anticipate that any cost of continuation of the Customer Programs will be satisfied primarily (if not exclusively) by the customers' continued patronage of the Debtors' restaurants, rather than by payment from the Debtors' estates. Accordingly, to preserve the value of their estates, the Debtors must be permitted, in the Debtors' sole discretion, to continue honoring the Customer Programs without interruption or modification.

h.    Motion for Authority to Pay Certain Critical Vendors

44.    By the Critical Vendor Motion, the Debtors seek authority to pay certain pre-petition claims of a very limited number of suppliers of fresh food products (the "Critical Vendors").  As noted above, the Debtors own and operate in excess of 600 restaurants that service approximately 3.8 million in locations across the country.  The food that the Critical

Vendors supply is the very lifeblood of the Debtors' businesses – without it, the Debtors could not operate their restaurants.

45.    To operate their restaurants, the Debtors rely on deliveries of produce, meats, other perishable food items, beverages and goods related to the preparation thereof, two to three times per week. Therefore, the supply of goods provided by the Critical Vendors supports the operations at any single restaurant for a matter of days, rather than weeks or months. Thus, even a one-day delay in food deliveries could severely disrupt hundreds of the Debtors' restaurants. Without a full supply of food and beverages, the Debtors would be extremely disadvantaged in a highly competitive market segment and would suffer an immediate erosion in customer, creditor and employee trust and confidence which would be difficult, if not impossible, to restore. For these reasons, the Debtors believe that the relief requested in the Critical Vendor Motion is necessary to avoid immediate and irreparable harm.

46.    I personally participated in the identification and selection of the approximately one dozen parties that the Debtors have determined are Critical Vendors. As discussed below, along with the Critical Vendor Motion, the Debtors have also filed a motion seeking authority to pay claims of providers of goods received by the Debtors within 20 days of the Petition Date in accordance with 11 U.S.C. § 503(b)(9) (the "Twenty-Day Claims Motion") as well as a motion seeking authority to pay the holders of claims under the Perishable Commendations Act of 1930, 7 U.S.C. §§ 499(i), et seq. (the "PACA Motion"). As a component of identifying their Critical Vendors, the Debtors carefully took into account that, if granted, a large portion of the claims held by the Critical Vendors will be paid pursuant to the Twenty-Day Claims Motion and a more modest portion of the Critical Vendor claims will be paid pursuant to the PACA Motion, if granted. Once the Debtors considered those factors, the Debtors further

considered the total payments that would be necessary to ensure the continued supply of critical goods to the Debtors, the Debtors' urgent need to continue to receive goods uninterrupted, their ability to find alternate sources, and the likelihood that a vendor would extend trade terms post-petition despite the Debtors' failure to pay such vendors pre-petition outstanding trade debt. Out of the hundreds of suppliers of fresh food products to the Debtors, they were able to identify approximately one dozen parties who (i) are vital to the Debtors' daily ability to operate, and (ii) would not likely agree to extend trade terms to the Debtors post-petition even if the relief afforded in the Twenty Day Claims Motion and the PACA Motion would permit payment of most, but not all of, their pre-petition claims (if granted). The Debtors additionally considered their ability to procure the needed goods from an alternate source, if any, and whether such alternate source, if one could be found, could provide the volume and quality required by the Debtors in sufficient time to meet the Debtors' daily needs.

47.    Based upon, all of the foregoing considerations, including the limitations imposed on the Debtors by the Bankruptcy Code, the Debtors carefully whittled down the list of their critically important food suppliers – the Critical Vendors – whose cessation of deliveries (even despite the relief that may be afforded under the PACA Motion and Twenty Day Claims Motion) could cripple a large number of the Debtors' restaurants and, therefore, result in immediate and irreparable harm to the Debtors' businesses. Accordingly, the Critical Vendors represent the minimum number of vendor constituents that the Debtors need on a go-forward basis without risking immediate jeopardy to their ability to operate (assuming the Twenty Day Claims Motion and PACA Motion are granted).

     i.    <u>Motion for Authority to Pay Claims Arising Under 11 U.S.C. § 503(b)(9)</u>

48.    By this motion (the "Twenty-Day Claims Motion"), and in order to obtain and ensure timely delivery from their suppliers and vendors of food, beverages and goods related to the preparation and service thereof (collectively, the "Goods"), and to help ensure the Debtors have access to post-petition trade credit from the suppliers of these vital Goods, the Debtors seek entry of an order authorizing payment in the ordinary course of prepetition claims of suppliers and vendors entitled to administrative priority under Bankruptcy Code sections 503(b)(9) and 507(a)(2) (such suppliers and vendors together, the "Priority Vendors") for those undisputed obligations arising from Goods received by the Debtors from such Vendors in the ordinary course of business within 20 days before the Petition Date (such administrative expense claims, "Priority Vendor Claims").

49.    If the Priority Vendors are not paid in the ordinary course on account of their Priority Vendor Claims, such Priority Vendors are unlikely to provide the Debtors with post-petition trade credit and may refuse to continue providing the Debtors with Goods after the Petition Date. Because the Debtors are in the business of operating over 600 restaurants that rely on necessary deliveries from the Priority Vendors of food, beverages and goods related to the preparation and service thereof multiple times per week, any delay or disruption in the continuous flow of Goods to the Debtors could result in an immediate shut down of the Debtors' restaurants.

50.    It is critical to the survival of the Debtors that they continue to receive the Goods from the Priority Vendors in the immediate future on an uninterrupted basis as well as throughout the reorganization process. The Debtors believe that without the relief requested in the Twenty-Day Claims Motion, many Priority Vendors may cease delivering Goods to the Debtors, which could have devastating consequences for the Debtors. In addition, by reserving

the right to require, as a condition to any payment to a Priority Vendor, that the Priority Vendor

enter into a trade agreement by which it must agree to deal with the Debtors on customary trade

terms, the Debtors anticipate they will be able to enhance their liquidity during these chapter 11

cases to the benefit of their estates and creditors.

        j.      <u>Motion for Authority to Pay Claims Arising Under P.A.C.A.</u>

      51.     Many of the goods (the "PACA Goods") supplied to the Debtors by their

vendors may be considered "perishable agricultural commodities," as such term is defined under

Perishable Agricultural Commodities Act of 1930, as amended ("PACA"). The Debtors believe

that many of their vendors of PACA Goods (collectively, the "PACA Claimants") will file

claims against the Debtors under PACA if their claims are not paid in full. By this motion (the

"PACA Motion"), the Debtors seek entry of an order authorizing the Debtors, in their sole

discretion, to pay certain prepetition claims of the PACA Claimants.

      52.     Preservation of the Debtors' relationships with the suppliers of fresh

produce is particularly critical due to the nature of the Debtors' restaurants and the highly

competitive nature of the Debtors' industry. Any disruption in the supply of fresh produce

would prove devastating and would greatly hinder the Debtors' ability to operate and efforts to

reorganize. Due to (a) the Debtors' desire to prevent any interference with their supply of PACA

Goods, and (b) the Debtors' recognition of the rights of the trust beneficiaries under PACA, the

Debtors seek to have this Court authorize payment of all PACA Claims that the Debtors in their

sole discretion determine to be valid.

      53.     Absent the requested relief, the Debtors could be subject to an avalanche

of actions from PACA Claimants seeking enforcement of their PACA Claims, which would

result in the unnecessary expenditure of funds by the Debtors in responding thereto.

Furthermore, in certain circumstances, pursuant to PACA, officers and directors may be held secondarily liable for amounts owed to a seller of applicable goods.

54.    The Debtors' operations require an uninterrupted supply of fresh produce from vendors. Any delays in satisfying PACA Claims could adversely affect the Debtors' ability to obtain fresh produce in the future, thereby undercutting the Debtors' competitive posture and their ability to successfully reorganize. The relief requested in the PACA Motion does not constitute the Debtors making payment on account of pre-petition claims, as PACA Claimants would be paid from non-estate property.

k.    Motion Confirming Administrative Expense Status for Certain Vendors

55.    By this motion, the Debtors seek entry of an order confirming that merchandise, equipment, supplies, products and related items (collectively, the "Goods") delivered post-petition or services (the "Services") provided post-petition are granted administrative status. Certain of the Debtors vendors and suppliers (collectively, the "Vendors") may be concerned that delivery of Goods or provision of Services post-petition pursuant to outstanding purchase orders will render such Vendors unsecured creditors of the Debtors' estates. Accordingly, the Debtors request that the Court enter an order confirming the administrative priority status of the Goods and Services delivered post-petition. The Debtors issue over 15,000 purchase orders per week. In the absence of the relief requested, the Vendors may require the Debtors to reissue outstanding purchase orders before delivering Goods and providing Services post-petition. Granting the relief requested in the motion will provide the necessary assurances to the Vendors and avoid the administrative burden on the Debtors of having to reissue or resubmit thousands of purchase orders.

l.    Motion for Authority to Continue Insurance Premium Finance Agreements

56.    By this motion (the "Premium Financing Motion"), the Debtors seek authority to continue performing under four Commercial Insurance Premium Finance and Security Agreements (each a "PFA" and collectively, the "Agreements") with Cananwill, Inc. ("Cananwill"). In total, the Debtors are financing $4,172,764.52 of various insurance policy premiums under the Agreements, which provide coverage for, among other things, property and liability risks on the Debtors' real and personal property, contamination of the Debtors' products, liability that may arise out of the Debtors' employment practices, and coverage for worker's compensation claims against the Debtors (the "Financed Policies").

57.    The Debtors next payment under the Agreements is due February 1, 2008 in the appropriate amount of $320,757.19 (the "February 1 Payment"). The Debtors seek interim relief to make the February 1 Payment, to the extent the Debtors determine, in their discretion, that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage, benefits or proceeds provided under the Policies. The Debtors seek this authority in recognition of the critical necessity of keeping appropriate insurance coverage in place, and out of concern that the passage of time while the Debtors seek and obtain the Court's authority for such a payment may have irreversible adverse consequences for the Debtors' coverage under the Policies.

58.    The Policies are essential to the preservation of the Debtors' businesses, properties and assets, and in many cases the coverage is required by various regulations, laws and contracts that govern the Debtors' business conduct. If the Debtors are unable to continue making payments under the Agreements, Cananwill may be permitted to terminate the Financed Policies. The Debtors would then be required to obtain replacement insurance on an expedited basis and at significant cost to the estates. If the Debtors are required to obtain replacement

insurance and to pay a lump sum premium for such insurance in advance, this payment may be the same or greater than what the Debtors currently pay to Cananwill under the Agreements. Even if Cananwill is not permitted to terminate the Financed Policies, any interruption of payments would severely and adversely affect the Debtors' ability to finance premiums for future policies.

59.    In view of the importance of maintaining the insurance coverage with respect to their business activities and the preservation of the Debtors' cash flow by financing their insurance premiums, the Debtors believe it is in the best interest of creditors in these chapter 11 cases for the Court to authorize the Debtors to honor its obligations under the Agreements. Any other alternative would likely require considerable cash expenditures and would be detrimental to the Debtors' chapter 11 efforts.

m.    The DIP Financing and Cash Collateral Motion

60.    Prior to the Petition Date, the Debtors' day-to-day business operations were funded from cash receipts received from operations and from borrowings under the Credit Facility. As security for the obligations under the Credit Facility, the Prepetition Secured Lenders assert security interests in and liens on (together, the "Prepetition Liens") substantially all of the Debtors' assets and cash ("Cash Collateral") generated from operations (together with Cash Collateral, the "Prepetition Collateral") and all proceeds and products derived from the Prepetition Collateral. Thus, the Debtors do not have any unencumbered cash with which to operate their businesses. In addition, as noted above, the Debtors do not have adequate availability under the Credit Facility to sustain their businesses and operations for an extended period of time. As a result, at this time, the Debtors have an immediate need for the use of Cash Collateral, without which they are unable to operate their businesses.

61.    However, the use of Cash Collateral alone will not sustain the Debtors' operations. Without additional liquidity in the form of postpetition financing, the Debtors' liquidity crisis will be exacerbated and accelerated, which will further impair their ability to operate their businesses as a going concern and significantly impair the value of the Debtors' assets to the detriment of all creditor constituencies. Furthermore, by obtaining postpetition financing, the Debtors will be in a position to preserve the value of their assets for the benefit of all creditors.

62.    To attempt to obtain additional liquidity and in connection with evaluating restructuring alternatives, the Debtors approached the Prepetition Secured Lenders for additional financing or to otherwise restructure the Credit Facility. However, the Prepetition Secured Lenders advised the Debtors that they were unwilling to lend additional funds to the Debtors in excess of the maximum amounts provided for under the Credit Facility, other than through a debtor-in-possession facility.

63.    With this in mind, prepetition, the Debtors endeavored to identify potential sources of financing, including unsecured and secured financing junior to, *pari passu* with, or senior to the Prepetition Liens. In light of the substantial amount of the Prepetition Secured Debt, the Debtors in consultation with their financial advisors and investment bankers determined that none of the potential lenders contacted would be willing to provide unsecured or junior financing given that the Debtors do not have any unencumbered assets, other than possibly from a party who already had a financial interest in the Debtors to protect, such as the holders of the Senior Notes. The Debtors engaged in discussions with certain of the holders of Senior Notes about providing debtor-in-possession financing and in fact received a proposed term sheet from certain of such holders a few days before the commencement of these cases. The term

sheet provided for a junior secured debtor-in-possession financing facility. Unfortunately, the proposed facility was not adequate to satisfy the Debtors' financing needs and resolve their liquidity crisis.

64.     In addition, in the days and weeks prior to the Petition Date, the Debtors, through their advisors, contacted a number of potential lenders with the capability of providing adequate financing of the size required by the Debtors. It is my understanding that none of the parties contacted were interested in providing such financing, either on a junior or *pari passu* basis. Additionally, I understand that no potential lender contacted by the Debtors' advisors was interested in providing an adequate stand alone financing facility, debtor-in-possession or otherwise, unless it would be able to prime the liens of the Prepetition Secured Lenders. Moreover, most, if not all, of such potential lenders were not willing to pursue discussions on a potential debtor-in-possession financing unless the Prepetition Secured Lenders would agree to a consensual priming. Based on these discussions, the Debtors, through their advisors, contacted the Prepetition Secured Lenders and were advised by the Prepetition Secured Lenders that they would not consent to being primed by a third party lender.

65.     After consultation with their advisors, the Debtors also determined that, if an acceptable financing arrangement could be reached with the Prepetition Secured Lenders, it was not in the best interest of the Debtors and their creditors to seek to prime the Prepetition Secured Lenders on a contested basis in light of the risk involved. As a result, the Debtors, with the assistance of their advisors, determined that finalizing their negotiations with Credit Suisse — the administrative agent for and one of the Prepetition Secured Lenders — on the terms of a debtor-in-possession financing facility presented the best option to satisfy the Debtors' financing needs.

66.    After consultation with their advisors, the Debtors have determined, in the exercise of their sound business judgment, that the proposed debtor-in-possession financing facility (the "DIP Facility") with Credit Suisse, as administrative agent (collectively with parties that may become lenders under the DIP Facility, the "DIP Lenders") is the best financing option available to the Debtors under the circumstances. The proposed terms of the DIP Facility are fair, reasonable, and adequate under the circumstances. First and foremost, as discussed more fully above, the Debtors, with the assistance of their advisors, have made a concerted, good-faith effort to obtain credit on the most favorable terms that are available. However, no potential lender was willing to provide an adequate stand alone financing facility unless the Prepetition Secured Lenders consented to the priming of the Prepetition Liens, which they would not do, or provide financing sufficient to repay obligations under the Credit Facility in full and provide additional adequate liquidity sufficient for the Debtors to pursue their restructuring.

67.    Against this backdrop, the Debtors, with the assistance of their advisors, carefully evaluated the proposed financing structure from the DIP Lenders, engaged in extensive negotiations with the DIP Lenders regarding the proposed terms, and worked with their various advisors to obtain the best possible terms from the Lenders. Eventually, the Debtors determined that the DIP Lenders' proposal was the best and at the present time only proposal suited to the Debtors' needs and agreed to the terms of the DIP Facility. In particular, the Debtors concluded that adequate alternative financing on terms more favorable than those being provided by the DIP Lenders under the DIP Facility is currently unavailable. In addition, with respect to the rollover of $300 million of obligations owed to the Prepetition Secured Lenders into a corresponding amount of the DIP Facility (the "Roll-up"), which will not occur until after the Court enters a final order approving such relief, the Debtors determined in the exercise of their

sound business judgment that agreeing to the Roll-up was appropriate under the circumstances of these cases in light of the unavailability of other adequate financing alternatives.

68.    Finally, the terms and conditions of the DIP Facility were negotiated by the Debtors and the DIP Lenders in good faith and at arm's length, and were instituted for the purpose of enabling the Debtors to meet ongoing operational expenses and implement a financial restructuring.

E. Conclusion

69.    In conclusion, for the reasons stated herein and in each of the First Day Papers filed concurrently or in connection with the commencement of these cases, including the Payment Motions, I respectfully request that each of the First Day Papers be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

A. Keith Wall
Executive Vice President and Chief Financial Officer,
Buffets, Inc.

# EXHIBIT A

**Corporate Organization Chart**

