UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                        .      Case No. 08-10141(MFW)
                              .
                              .
BUFFETS HOLDINGS, INC., .
  et al.,                     .      824 North Market Street
                              .      Wilmington, DE 19801
                              .
          Debtors.            .      January 23, 2008
. . . . . . . . . . . . ..           10:24 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Young Conaway Stargatt & Taylor,
                           LLP
                          By:  PAULINE K. MORGAN, ESQ.
                               JOEL WAITE, ESQ.
                               JOSEPH BARRY, ESQ.
                               JOHN DORSEY, ESQ.
                          The Brandywine Building
                          1000 West Street
                          17th Floor
                          P.O. Box 391
                          Wilmington, DE  19899


For the U.S. Trustee:     Office of the U.S. Trustee
                          By:  JANE M. LEAMY ESQ.
                          J. Caleb Boggs Federal Building
                          844 King Street
                          Suite 2313
                          Lockbox 35
                          Wilmington, DE  19801


Audio Operator:           Brandon McCarthy

Proceedings recorded by electronic sound recording, transcript
             produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (Cont'd.):

For Credit Suisse:          Duane Morris LLP
                            By:  RICHARD W. RILEY, ESQ.
                            1100 North Market Street
                            Suite 1200
                            Wilmington, DE 19801

                            Latham & Watkins, LLP
                            By:  MITCHELL A. SEIDER, ESQ.
                                 MICHAEL RINELF, ESQ.
                            885 Third Avenue
                            Suite 1000
                            New York, NY  10022

For the Bondholders:        Kramer, Levin, Naftalis &
                             Frankel, LLP
                            By:  KENNETH ECKSTEIN, ESQ.
                                 DAVID FELDMAN, ESQ.
                                 GORDON NOVAD, ESQ.
                            919 Third Avenue
                            New York, NY  10022

                            Pachulski, Stang, Ziehl, Young,
                             Jones & Weintraub, P.C.
                            By:  CURTIS A. HEHN, ESQ.
                                 LAURA DAVIS JONES, ESQ.
                            919 North Market Street
                            17th Floor
                            P.O. Box 8705
                            Wilmington, DE  19899

For HSBC:                   Nixon Peabody, LLP
                            By:  DENNIS DREBSKY, ESQ.
                            437 Madison Avenue
                            New York, NY  10022

For Island Real Estate:     Connolly Bove Lodge & Hutz LLP
                            By:  MARC PHILLIPS, ESQ.
                            The Nemours Building
                            1007 North Orange Street
                            Wilmington, DE  19801

APPEARANCES (Cont'd.):

For Various PACA Claimants:    Sullivan Hazeltine Allison LLC
By:  WILLIAM A. HAZELTINE, ESQ.
Wilmington, DE

McCarron & Deiss
By:  KATE ELLIS, ESQ.
4900 Massachusetts Ave., NW
Suite 310
Washington, DC  20016

For Fortress/Drawbridge:    Richards, Layton & Finger, P.A.
By:  MARK D. COLLINS, ESQ.
One Rodney Square
920 N. King Street
P.O. Box 551
Wilmington, DE  19899

For Levine Leitchman Capital  Saul Ewing LLP
Partners, Deep Value Fund:  By:  MARK MINUTI, ESQ.
222 Delaware Avenue
Suite 1200
Wilmington, DE  19801

For General Growth Management Ballard Spahr Andrews &
Centro Properties Group, and  Ingersoll, LLP
Federal Realty Investment    By:  DAVID L. POLLACK, ESQ.
Trust:    1735 Market Street
51st Floor
Philadelphia, PA 19103

For U.S. Food:    Saul Ewing LLP
By:  JEREMY WILLIAM RYAN, ESQ.
222 Delaware Avenue
Suite 1200
Wilmington, DE  19801

For Realty Income Corp.:    Stevens & Lee
By:  JOSEPH H. HUSTON, JR., ESQ.
1105 North Market Street
Wilmington, DE  19801

For Entergy:    Dorsey & Whitney, LLP
By:  ERIC LOPEZ SCHNABEL, ESQ.
250 Park Avenue
New York, NY  10177

1           THE CLERK:  All rise.

2           THE COURT:  Please be seated.  Ms. Morgan, good

3    morning.

4           MS. MORGAN:  Good morning, Your Honor.  Thank you

5    once again for agreeing to hear our first day hearings and for

6    giving us some time to try to work through some issues.  I

7    think the time was productive, although I can't say we're going

8    to have all of our issues resolved, but I think the time did

9    help.

10          THE COURT:  Okay.  I believe -- before get to the

11   items that are on the calendar, I believe you've gotten a date

12   from Judge Walrath's chambers for your next hearing.  Is that

13   correct?

14          MS. MORGAN:  Yes, we have, Your Honor.  February 13th

15   at 2.

16          THE COURT:  Okay.  And has the U.S. Trustee set a

17   date for the Committee formation meeting?

18          MS. MORGAN:  Yes, the 29th at 10.

19          THE COURT:  Very good.  Okay.

20          MS. MORGAN:  Okay.  Your Honor, as you know,

21   yesterday morning Buffets Holdings, Inc. and 17 affiliates

22   filed petitions for relief under Chapter 11 of the Bankruptcy

23   Code.  The petitions and first day motions are supported by the

24   declaration of Keith Wall who serves as the Executive Vice

25   President and Chief Financial Officer of Buffets, Inc. and an

1 Officer, Manager, or Director of each of the other debtors.

2 And Mr. Wall is in the courtroom in the first row.

3 We have also filed, as you know, several first day

4 motions which are included in your binder.  The last motion on

5 the calendar is the DIP financing motion, and in connection

6 with that motion we'll also be presenting the proffered

7 testimony, we believe, of Saul Burian from Houlihan, Lokey,

8 Howard, and Zukin.  Houlihan serves as our investment banker,

9 and Mr. Burian is also present in the courtroom in the first

10 row.

11 Your Honor, if acceptable to the Court, before we get

12 to the first day motions, I'd like to just -- I'll present a

13 brief background of the case --

14 THE COURT:  That would be helpful.

15 MS. MORGAN:  -- for those in the courtroom.

16 THE COURT:  That would be helpful.

17 MS. MORGAN:  The debtors comprise the nation's

18 largest steak buffet restaurant chain and the second largest

19 restaurant company in the family dining segment of the

20 restaurant industry.  The restaurants principally operate under

21 the names Old Country Buffett, Hometown Buffett, and those are

22 known as the Buffets brand in our papers.  Ryan's and Fire

23 Mountain, which we call the Ryan's brand.

24 The debtors have 615 company-owned steak buffet

25 restaurants under the Buffets and Ryan's brands, and we also

**J&J COURT TRANSCRIBERS, INC.**

operate 11 Tahoe Joe's Famous Steakhouse restaurants and have

16 franchise locations.  The company's headquartered in Eagan,

Minnesota.  It employs more than 36,000 employees nationwide.

The vast majority of whom work at the debtors' restaurants.

The restaurants operate in 42 states, and in the

aggregate those restaurants service approximately 3.8 million

customers each week.

As for the corporate structure, Buffets Holdings,

Inc., the lead debtor, is a Delaware corporation.  It wholly

owns Buffets, Inc., which is the debtors' principal operating

entity and the primary obligor on the debtors' pre-petition

credit facility as well as the unsecured bond debt.  Buffets,

Inc. is either the direct or indirect parent of each of the

other debtors.  And at the top of the organizational structure

is Buffets Restaurants Holdings, Inc., a privately held

Delaware corporation, which is not a debtor in these

proceedings and which owns substantially all the common stock

of Buffets Holdings, Inc.

As for the debt structure, Buffets is the borrower

under a $640 million secured credit facility with a lender

group led by Credit Suisse as administrative agent.  The pre-

petition secured credit facilities are comprised of a $530

million term loan, a primary revolver in the amount of $40

million, and a secondary revolver in the amount of $70 million.

THE COURT:  The $70 million piece is -- that was

**J&J COURT TRANSCRIBERS, INC.**

1  described as an LC piece.  Is that correct?

2          MS. MORGAN:  That's correct, Your Honor.

3          THE COURT:  What are the LCs used for?

4          MS. MORGAN:  The LCs used are for various vendor

5  requirements, Your Honor.  Amounts due under the pre-petition

6  facilities as of January 15th were approximately 634 million,

7  and those obligations are guaranteed by each of the other

8  debtors.

9          THE COURT:  Okay.

10          MS. MORGAN:  In addition to the credit facility,

11 there's a series of 12 and a half percent senior unsecured

12 notes issued by Buffet's, Inc. on November 1, 2006, and the

13 principal amount of those notes is 300 million.  We refer to

14 them in our papers as the senior notes.  Interest on the senior

15 notes is due semi-annually on January 1 and July 1.  The

16 payment due on January 1 in the amount of 18.75 million was not

17 made.

18          Other significant creditors of these cases are the

19 debtors' landlords, including certain affiliates of Fortress

20 Investment Group, LLC, who are parties to a sale lease back

21 transaction in November of 2006 involving about 275 Ryan's

22 Restaurants and 7 Buffets Restaurants.

23          Finally, the company estimates it has approximately

24 $55 million in ordinary course trade debt.  And I should point

25 out that the substantial portion of that debt is owed to

1  critical vendors and other vendors who supplied food and

2  beverages to the debtors' restaurants within the past 20 days

3  and who are of critical importance to the company.

4          The debtors employ a Just In Time Shipping System for

5  their food deliveries.  As you might imagine, customers expect

6  to have fresh food at the restaurants, and so deliveries are

7  made two to three times per week.  Because of that we don't

8  keep large supplies of food in the stores.  We generally only

9  have enough to service the restaurants for a few days at a

10  time.  So it will be critical, in the debtors' view, in its

11  restructuring to obtain first day orders including use of cash

12  collateral and DIP financing today to insure our vendors and

13  suppliers that we will be able to honor our obligations going

14  forward and to insure our customers that business will go on as

15  usual.

16          THE COURT:  One question.  And I don't want to get

17  you out of order on the discussion of the motions, but I did

18  see in the critical vendor motion that the debtors have

19  identified 12 entities that they consider to be critical.

20          MS. MORGAN:  That's right.

21          THE COURT:  Have you shared the identity of the

22  critical vendors with the U.S. Trustee or with your informal

23  committee or your lenders?

24          MS. MORGAN:  With all three, Your Honor.

25          THE COURT:  Okay.  Do you have -- I presume that that

1 is something that you would not want part of the public

2 record --

3          MS. MORGAN:  That's correct, Your Honor.

4          THE COURT:  -- but if you've got a list, I would like

5 to see it.

6          MS. MORGAN:  That's fine, Your Honor.  We can get

7 that for you.

8          THE COURT:  Okay.  That's fine.

9          MS. MORGAN:  Would you like that now or --

10          THE COURT:  Whenever you can get to it.

11          MS. MORGAN:  Okay.

12          THE COURT:  But why don't you proceed?

13          MS. MORGAN:  With respect to what has brought us here

14 today in the Bankruptcy Court, I guess first I want to address

15 some external factors affecting the company's operating

16 performance.  The leading factor has been a significant decline

17 in discretionary spending among the debtors' core customers.

18 The customers are facing, among other things, higher gasoline

19 costs, energy costs, increased debt service on their mortgages,

20 rate increases on their adjustable mortgages, lower home values

21 meaning lower equity, all of that leading to a decline in guest

22 counts at the restaurants.

23          In addition, the debtors' own operating costs have

24 gone up because of those same -- some of those same factors,

25 higher food costs, higher energy costs, and also higher labor

1  costs in the form of higher minimum wages throughout the

2  country.

3        Also, as you just heard, the company's highly

4  leveraged, carrying about $935 million in bank and bond debt

5  alone.  Pre-petition the debtors and their advisors had various

6  discussions with representatives and advisors to their secured

7  lenders, bondholders, equityholders, about a possible

8  restructuring of the balance sheet, and earlier this month the

9  debtors entered into a forbearance agreement with their pre-

10 petition lenders.  They were hopeful that entering into that

11 forbearance agreement would allow sufficient time to negotiate

12 a consensual restructuring perhaps outside of bankruptcy.

13 Unfortunately, some of the announcements we made, including

14 announcements about the missed bond payment, announcements of

15 entry into the forbearance agreement actually caused some of

16 our suppliers to tighten their supplies -- I'm sorry -- to

17 tighten their credit terms and caused some liquidity restraints

18 that led the company no choice but to seek and follow its

19 restructuring efforts through a Chapter 11 case.

20       Unless the Court has any questions about that, I'm

21 prepared to turn to the first day motions.  And before I guess

22 I even say that, I should let the Court know that we did

23 deliver a binder to the U.S. Trustee last Friday with

24 everything except the DIP, so we were able on Monday to have,

25 you know, a significant discussion about the first day motions.

1  Many of the orders that are already on file and in the binder

2  reflect comments from the U.S. Trustee.  There will be some

3  additional changes today that you'll hear about.

4         We did deliver the DIP financing documents to the

5  U.S. Trustee on Monday.  We had discussions with Ms. Leamy

6  since then, including late last night, so there will be changes

7  to the DIP order that you will see later.

8         We also sent notice of today's hearing by fax or e-

9  mail yesterday morning to our 40 largest creditors on a

10  consolidated basis, to counsel for Credit Suisse as

11  administrative agent under both the pre-petition and post-

12  petition facility.  We also served the motions and applications

13  on the Indentured Trustee for the bonds, on counsel for the

14  bonds who is represented in the courtroom -- I'm sorry -- for

15  an Ad Hoc Committee, I should say, of the bonds, and we also

16  served counsel for Fortress Investments.

17         THE COURT:  Okay.  Why don't we turn then to the

18  first day motions?  My practice -- and this is, of course,

19  without prejudice to any party's right to object or raise

20  issues on these motions -- is I'll identify at least a few of

21  these motions that I would regard as routine and would not

22  require a meaningful presentation, but I do want to know if

23  there have been any changes to the motions.  And, obviously, if

24  Ms. Leamy or any other party has issues on the ones that I

25  regard as routine, I'm happy to hear them.

1        And I'm working from my binder.  Binder Item Number

2   2, joint administration, I'll regard as routine.  Binder Item

3   Number 3 I regard as routine, although I looked at the terms of

4   the engagement, and it didn't seem to have the normal

5   objectionable things that we see from our claim servicer.  This

6   is Epic.  I assume this is the successor to BSI.  Correct?

7        MS. MORGAN:  That's correct, Your Honor, and I think

8   we did work out any issues before we got them into your binder.

9        THE COURT:  They know the drill.

10        MS. MORGAN:  Yes.

11        THE COURT:  Next item was -- Number 5 is cash

12   management which looked routine.  I expect there may be some

13   discussion of that when you talk about your financing.  Item

14   Number 6, the taxes motion, it's a big number, but again it

15   looked routine.  And Item Number 7, again a big number but

16   looked routine, and that's the insurance premium financing.  So

17   I would not require a presentation.  If there are issues or

18   changes with any of them, I'm happy to hear them.

19        MS. MORGAN:  Well, Your Honor, I was planning to

20   yield the podium to Mr. Barry, and I will, because there are

21   some changes, and he will address Item Number 4.  Before I do

22   that, I did want to again point out that all these are

23   supported by the declaration of Mr. Wall.  He is present in the

24   courtroom, available for questions by the Court, or cross

25   examination by any party.  We would ask that his declaration be

1  admitted as our direct evidence in support of all of these
2  first day motions --
3          THE COURT:  Very good.
4          MS. MORGAN:  -- if that's acceptable.
5          THE COURT:  I've reviewed the affidavit, and I will
6  accept it.
7          MS. MORGAN:  Thank you, Your Honor.  I will yield the
8  podium to Mr. Barry.
9          THE COURT:  Okay.
10         MR. BARRY:  Good morning, Your Honor.
11         THE COURT:  Good morning.
12         MR. BARRY:  For the record, Joseph Barry of Young,
13  Conaway, Stargatt, and Taylor on behalf of the debtors.  Your
14  Honor, the several items that you outlined, there actually have
15  been no changes to those orders.
16         THE COURT:  Okay.
17         MR. BARRY:  They are as presented in the -- with the
18  motions.  We've made a few interlineations just to include Your
19  Honor's name and the docket reference.  We do have clean
20  versions.  If we could, we'd hand up all of the orders at the
21  end of the hearing?
22         THE COURT:  Why don't we do that at the end?  We'll
23  hand up all the orders at the end.
24         MR. BARRY:  Very well, Your Honor.  Your Honor, Item
25  Number 4 is, of course, our motion to approve on an interim

**J&J COURT TRANSCRIBERS, INC.**

1  basis the adequate assurance procedures for utilities.  Your

2  Honor, pursuant to the exhibit, we do have over 44 hundred

3  utilities.  It's quite a list.  We do have over 630 restaurants

4  that we operate, which accounts for the majority of those

5  utilities, as well as our headquarters in Eagan, Minnesota.

6          Your Honor, as set forth in the Wall affidavit, the

7  debtors have generally established a good payment history, and

8  there are no significant arrearages with respect to any of the

9  utilities.  What the debtors are proposing, and I think it

10  makes even more sense now that we know that the second day

11  hearing is going to be on February 13th, that we deposit within

12  the 20-day period prescribed in 366 50 percent of the average

13  monthly usage, which I'm told is approximately $4 million.

14          Your Honor, these procedures, in my experience, are

15  routine in this jurisdiction, generally approved, and they

16  provide for a procedure whereby any utility, to the extent it

17  wants to, can come in and request additional adequate

18  assurance.  And I'd like to point out for the Court

19  specifically that there is no time limit in which they were --

20  they can do that pursuant to the 2005 amendments to Rule or

21  Code Provision 366.

22          Your Honor, we have heard from one specific utility

23  who did have a specific issue with respect to the utility

24  procedures, has made a request for additional adequate

25  assurance orally today, and I understand they may have some

1  issues with the procedures.  But again these are procedures

2  that are normally employed in these cases.  We think that the

3  50 percent deposit is more than sufficient to adequately insure

4  these utilities.  To the extent we can establish procedures

5  that would govern their further requests, we would ask that it

6  be entered.

7         THE COURT:  Okay.  Does anyone else wish to be heard

8  regarding the utilities motion?  Mr. Schnabel.

9         MR. SCHNABEL:  Good morning, Your Honor.  For the

10  record, Eric Lopez Schnabel of Dorsey and Whitney on behalf of

11  Entergy Corporation and certain of its operating affiliates.

12  Your Honor, it's not surprise that Entergy as a utility objects

13  to not only the form of adequate assurance that's being

14  proposed by the debtors but also procedurally.  And I think

15  what Entergy -- let me backtrack.  These procedures haven't

16  really standardized since the amendments.  I mean I've seen a

17  variety of different procedures.  The two weeks and the request

18  and the determination hearing, that's pretty standard, but

19  whether you have an opt out provision or not kind of depends on

20  who's filing the case or where the case is being filed.

21         So what -- for today's purposes, what we think makes

22  more sense is that since we have another hearing within the 30-

23  day period, we would agree -- stipulate that the two-week

24  deposit being made by the debtors' pursuant -- you know, as set

25  forth in the motion is a furnishing of adequate assurance under

1 366(b). We are not satisfied with it, and we've let the

2 debtors know that, but that means we are unable to take any

3 action for 30 days from yesterday. So with the hearing coming

4 up on the -- I think it was the 11th, was it?

5 THE COURT: Thirteenth.

6 MR. SCHNABEL: Thirteenth. We would still be within

7 that 30-day time period. So I think it makes most sense rather

8 than this Court being asked right now to make a factual finding

9 with regard to my client, which we object to --

10 THE COURT: Well --

11 MR. SCHNABEL: -- to just carve us out and put us on

12 for a hearing on this -- on the 13th.

13 THE COURT: I'm -- I guess technically I am making a

14 factual finding about your client, but as a practical matter,

15 we are where we are. They've made a proposal, and you don't

16 like it. I get it. So whether you manage to work out some

17 sort of deal with the debtors on or before the 13th, or you

18 file a one-page request that says we need more, don't we wind

19 up in the exact same place?

20 MR. SCHNABEL: Well, we do except for the fact that

21 if you look at the interim order, it enjoins us in excess of

22 the statutory limitations, which are for 30 days, and the only

23 way that we can terminate, which is a right that Congress has

24 given us, is if we follow certain procedures which would take

25 us out of the 30-day window. We don't agree to that today.

1  Maybe on the 13th we would depending on where we are in the

2  negotiations, so I think you have --

3  THE COURT:  But on the 13th this motion ceases to be

4  of force and effect.  At that point we would be arguing about

5  the request -- the debtors' request for a final order, and if I

6  sign that order, if you stand up and make this argument, my

7  guess is that that order -- and this is -- it would be in front

8  of obviously Chief Judge Walrath.  But if you stood up and said

9  we don't agree, then the final order, at least in the practice

10 of this Court, probably wouldn't bind you, but a separate

11 procedure would be established to govern a hearing on your

12 claim.

13 MR. SCHNABEL:  Well, Your Honor, I guess the point is

14 we're not -- this Court and most courts are not in the business

15 of readily entering comfort orders, unless there's a real need

16 for it.  And there's no 362 order being asked for this Court --

17 there's no interim orders to retain professionals being asked,

18 because it's not really needed.  And with respect to my client,

19 when I have -- when I can represent on behalf of my client that

20 we will not terminate within the 30 days of the filing, because

21 we will deem -- agree to deem -- stipulate to deem the two-week

22 deposit being put into a bank account to satisfy 366(b),

23 there's no longer any need for an interim order with respect to

24 us.  With others, I don't represent them.  But with respect to

25 us, yes.  So what is the harm in carving us out?

1          THE COURT:  What is the harm?

2          MR. SCHNABEL:  Well --

3          THE COURT:  You're stipulating to relief that they're

4  asking me to sign.  Is it a question about my signature

5  somewhere?

6          MR. SCHNABEL:  No, the -- if you want to -- I'm

7  stipulating that 366(b) has been satisfied.  I'm not

8  stipulating that we don't have a right to terminate on the 31st

9  day, and this order takes that right away, because --

10         THE COURT:  I understand.

11         MR. SCHNABEL:  -- I make the demand.  They have to

12 file a motion.  It has to be set up on for a hearing, and we

13 could be two months into the case.  So I'm not and my client is

14 not agreeing to that.  My client does not like that process.

15 My client likes the 30 days, which is why they've asked me, you

16 know, on very short notice to appear here today.

17         THE COURT:  Okay.

18         MR. SCHNABEL:  But if you carve us out, and you set

19 this on a final hearing with respect to us on for the 13th, we

20 have stipulated to a non-exercising termination rights under

21 366(b) and reserve our 366(c) rights.  The debtor has no harm,

22 and I don't think an interim order over our objection -- I

23 don't think there's a factual basis for it.

24         THE COURT:  Okay.

25         MR. SCHNABEL:  And I would like to avoid, you know,

full evidentiary -- you know, putting the witness on the stand.
I think that's the easiest way.  But, otherwise, that's what we
would ask to do.

                    THE COURT:  Okay.  Mr. Barry.

                    MR. BARRY:  Your Honor, I respectfully disagree with
Mr. Schnabel.  I don't think that the utility procedures that
we are requesting that the Court approve in this case, which
again, as we said in our papers, has been approved in multiple
post-2005 amendments to the Code.  I don't think that it
offends 366 in any way.  In fact, I think it gives effect to
363(c)(3), which provides that on a request of any party in
interest the Court can modify the adequate assurance request to
that utility as provided in Subparagraph (2).

                    So I think what the procedures really do is they give
effect to the totality of 363 -- 366 in a way that enables the
party to reasonably manage the amount that is to be provided as
adequate assurance.  Under -- I think under Entergy's theory
any party could call the debtor on the first day of the case
and say I want six months, and you have to give me six months,
and if you don't, then, you know, I can terminate service until
the Court has a hearing to consider any requests for adequate
assurance.  And I think that that is a -- I think that would
offend 363 -- 366.  I don't think it would give full meaning to
the statute, and I think -- again I think our utility
procedures adequately protect both the debtors and the

1  utilities in a manner consistent with 363 -- 366.

2          THE COURT:  Mr. Schnabel.

3          MR. SCHNABEL:  Your Honor, there's two points there.

4  I think, first of all, the ability under 366(c)(3) to modify

5  the amount is upon -- after notice in a hearing.  You can't do

6  that on one day.  I don't think -- there's no necessity for

7  that, because there's no irreparable harm, because I -- my

8  client can't terminate for 20 days, and we are stipulating that

9  we can't terminate for 30 days.  So they have an ability to

10 file a determination motion and get that heard within the 30-

11 day period.

12         One way we view 366(c)(3) is that if you think about

13 the old Code and the way it worked was utilities got zero.

14 They got an administrative expense claim, and they would file

15 to try to get some money out of the debtor.  We view this as

16 turning that -- turning those tables in that the debtor has to

17 give the utilities money and then can fight us to try to have

18 us give money back.  Obviously, that's a leverage play, but

19 Entergy's position is that the leverage has been -- to balance

20 things in some way there's been more given to us.  So I think

21 in terms of this order changing 366(c), we believe it does,

22 because of the timing of the adequate assurance motion carries

23 us past the 30-day period, and the Code does not say under

24 366(c)(3) that determination motion alleviates or removes the

25 utilities right to terminate for lack of adequate assurance

1  that satisfies it.  So that's Point 1.

2           Point 2, Judge, is, you know, this notion of a five-

3  or six-month deposit demand.  You -- my client is regulated.

4  We are not capable of making a six-month deposit demand on an

5  account such as the debtors.  There are state regulations and

6  laws that control the amount of demand we can and cannot make.

7  I think that's (1) legally impossible.  Even if it were, or

8  somebody were not regulated, which is not my client, or were to

9  violate its own regulations and make that demand, well, you

10 know, we are not going to do that.  We're making a two-month

11 demand.  It's very standard and typical.  That's what our

12 regulations provide for.  Again, I only represent me.  I'm not

13 asking this for anyone else.  So I think that six months is a

14 bit of red herring.  Frankly, if someone made a six-month

15 deposit, you know, the debtor could get in front of the Court

16 within five minutes and have an appropriate injunction.

17          THE COURT:  Well, I'm not that available.  Judge

18 Walrath may be more accommodating.

19          MR. SCHNABEL:  We need to ask Judge Walrath that.

20 But, you know, within a relatively short period of time, and

21 that's happened where you utilities are terminating

22 notwithstanding the Court's order.  I've had a debtor case

23 where that happened to me as a debtor.  So -- but my point is

24 I'm not here as an ombudsman for the utility companies.  I'm

25 here representing Entergy, and Entergy does not like the

1  procedures, because the procedures changes the timing, and I

2  think carving us out of the order and us -- our agreement that

3  we're -- that they have furnished adequate assurance, so that

4  we don't have a 20-day termination right --  you know, with the

5  hearing on the 13th, which is within the 30 days, preserves

6  everyone's rights, they're not harmed, and that's what my

7  client is asking for, since it's objecting to this order.

8          If you enter the order and things get pushed off, the

9  reality is I think you have made a factual finding with respect

10 to us on adequate assurance, and I don't you can on the record

11 before you have an affidavit that says good payment history.

12 Well, you know, the Code's pretty clear you can't consider

13 that.

14         THE COURT:  I have an affidavit that says good

15 payment history, and I have a debtor that's proposing to put $4

16 million in an account.

17         MR. SCHNABEL:  Well, we've had --

18         THE COURT:  It's both of those factors.  Right?

19         MR. SCHNABEL:  Well, they're not giving me $4

20 million.  They're giving us -- we're not receiving anything

21 which under 366(c) is different.  If you look at 366(b), it's

22 furnishing.  I think the debtors are furnishing some form of

23 adequate assurance.  Entergy is not receiving, which is what

24 366(c) says.  It doesn't say furnish.  It says receive.  We're

25 not receiving any form of adequate assurance.  I think that's

1  an important distinction, because I'm not receiving it.

2  They're still holding it.  You know, assurance of payment is a

3  deposit.  I'm not receiving a deposit, they're holding the

4  deposit, and I think that's the difference.  But it's a moot

5  point, because we can argue all about that on the 13th, and

6  their counsel would be affected with regards to Entergy, since

7  we're stipulating on the 366(b) portion.  So again I think the

8  carve out is either -- otherwise, I would want to cross examine

9  the affiant, because I don't they know what numbers are under

10  our accounts and whether -- you know, what are the exact dollar

11  amounts?  I haven't heard any evidence as to that.  I think

12  it's just easier to carve us out.

13        THE COURT:  I'm going to overrule the objection.  I

14  will grant the motion, and in so doing I will note that the

15  practice at an interim hearing in these cases is primarily to

16  establish a procedure.  The undisputed record in this case does

17  reflect that this debtor operates over 600 stores around the

18  country and has over 4,000 utility service providers.

19        As a practical matter, the Court can -- has no

20  difficulty concluding that the administrative burden of trying

21  to manage that without any sort of procedural assistance from

22  this Court consistent with what the Court has entered in many,

23  many, many other cases is -- would be overwhelming, and,

24  certainly, the Court is confident that given a hearing coming

25  up on the 13th for purposes of consideration of a final order,

1  that the rights of Entergy are not adversely affected.  I

2  recognize Entergy's offer to make a stipulation that

3  effectively provides for the relief that's being granted in the

4  interim motion, but as a practical matter, I don't think that

5  there's a meaningful distinction between the two, and I would

6  be prepared to enter the interim order.  So I am satisfied with

7  the record that's been established before me, and I will grant

8  the order.

9          MR. SCHNABEL:  Thank you, Your Honor.

10          MR. BARRY:  Thank you very much, Your Honor.  With

11  that, Your Honor, I'll cede the podium to Ms. Morgan.

12          THE COURT:  Very well.

13          MR. BARRY:  Thank you.

14          THE COURT:  Your Honor, I guess we're back to Item 8

15  in the binder, which is the debtors' motion for an order

16  authorizing them to pay wages, compensation, benefits in the

17  ordinary course of business to their employees and directing

18  the banks to honor checks presented for payment and fund

19  transfer requests the debtors may make.  Your Honor, 9 of the

20  18 debtors have employees, and the motion is on behalf of these

21  9 debtors to seek to honor all of the debtors' pre-petition

22  benefit programs as well as to pay pre-petition wages, salaries

23  in the ordinary course of business to their in excess of 36,000

24  employees.

25          Obviously, this is of particular importance to the

1  debtors.  The large portion of those 36,000 employees operate

2  the debtors' over 600 restaurants.  The crew employees perform

3  various functions necessary to continue the restaurants'

4  operations, and we also have corporate and restaurant

5  management employees to perform critical functions and to

6  oversee the operations of the restaurants.  The support and

7  dedication of those employees is obviously critical at this

8  time, and we need to make sure that our employees do not suffer

9  any unnecessary personal hardships in these cases.  Many of the

10 employees, Your Honor, are not highly compensated, so they are

11 living paycheck to paycheck, and, obviously, we want to have no

12 disruption to their personal lives as a result of these

13 filings.

14         In addition, Your Honor, of course, we think it would

15 be -- cause immediate and irreparable harm to our states if the

16 employees were not protected and, therefore, chose to leave the

17 debtors' employ in large numbers, because again we are trying

18 to communicate to the world that --

19         THE COURT:  Presumably with most of your inventory.

20         MS. MORGAN:  Perhaps, Your Honor.  Perhaps the buffet

21 would look a little leaner after that, yes.  Your Honor, I

22 think as we indicated yesterday, there's a variety of pay

23 cycles for the company's employees nationwide.  There are

24 various pay periods that occurred in the last few weeks and

25 days, so with respect to almost every employee, there are

amounts owed for pre-petition compensation.  The debtors

estimate that total to be $15.4 million.  And we can represent

on the record, we have represented to Ms. Leamy, that no

compensation paid pursuant to this order would exceed the

$10,950 limit in 507(a)(4).

THE COURT:  Yes, I had seen that representation in

Paragraph 25 of your motion, that you didn't believe anybody

was in excess, and I saw that you provided in the emergency

order that I signed yesterday --

MS. MORGAN:  Yes.

THE COURT:  -- that nobody's getting -- so Ms. Leamy

I assume is satisfied.  Nobody's going to get over the 10,950.

Right?

MS. MORGAN:  Yes, that's right, Your Honor.

MS. LEAMY:  That's correct, Your Honor.

THE COURT:  Very good.  Okay.

MS. MORGAN:  Your Honor, with respect to benefits,

again if Mr. Wall were to be called to testify, he would say

the benefit package provided to employees in the ordinary

course is also critical to the employees.  They are given such

things as vacation, paid time off, and those obligations alone,

Your Honor, are approximately $6.5 million.  That is unpaid

vacation to eligible employees, and that is again only

approximately $624 per employee.  In many states, Your Honor,

we are required to pay the vacation or paid time off upon

**J&J COURT TRANSCRIBERS, INC.**

termination.  We would like to continue that practice in the

ordinary course.  We do not anticipate at this time that there

will be, you know, a large number of terminations.  If -- but

if we do not have this aspect of the program honored, we're

concerned that employees will just simply take their vacation

now when we need them to be operating in the restaurants and

impressing our customers.  Mr. Wall would state that it's very

important for the company to honor all of the existing benefit

programs to its employees, and that they receive their accrued

vacation in accordance with company program.

With respect to other benefits, we provide holiday

pay, medical benefits, vision, and dental benefits.  We

maintain a 401k retirement plan for certain employees, and

there are other benefits described in the motion.  I call them

more minor, but they're not minor to the employees.  Many of

them do not cost the company large amounts of money, but they

are important to the employees, important components of their

package.  We would seek to continue to honor all of those in

the ordinary course.

THE COURT:  Okay.

MS. MORGAN:  The motion also includes a component

that asks for authority to continue to pay costs relating to

workers compensation programs.  The approximate monthly cost of

maintaining those benefits is $1.2 million.  Failure to

maintain them in states in which the debtors conduct business

**J&J COURT TRANSCRIBERS, INC.**

1  would result in lawsuits and administrative proceedings

2  including against the debtors' officers and directors.

3       The motion also seeks the authority to reimburse

4  employees for business and travel expenses they may have

5  incurred, and we have a very modest figure.  Our estimate is

6  that the amount outstanding is $195,000.

7       Finally, Your Honor, the motion seeks authority to

8  continue to take payroll deductions and other deductions for

9  such things as taxes, garnishments, child support, or optional

10 health benefits that the employees may choose.  Again, Your

11 Honor, if we cannot honor these or pay them, the employees will

12 suffer extreme hardship.  This would destroy morale,

13 potentially create a substantial turnover, which we believe

14 would cause immediate and irreparable harm to the debtors'

15 estates, and we ask that this motion be approved.

16      THE COURT:  Okay.  Does anyone else wish to be heard

17 regarding the employee motion?

18                  (No verbal response)

19      THE COURT:  I am satisfied with -- Ms. Leamy.

20      MS. LEAMY:  Good morning, Your Honor, Jane Leamy for

21 the United States Trustee.  Just for the record, there were

22 some revisions that the debtors agreed to make to the form of

23 order that was filed.  Specifically to incorporate limitation

24 and 507(a)(5) with the exception of the medical plans, and then

25 also an acknowledgment that nothing will permit a violation of

1 Section 503(c).  Thank you.

2          MS. MORGAN:  And, Your Honor, we do -- we have agreed

3 to include that language.  We have shown it to Ms. Leamy.  I

4 think she finds it acceptable.  Would you like a black line at

5 this time, or we'll just hand it up at the end the case?

6          THE COURT:  No, I understand the comments.  And does

7 anyone else wish to be heard regarding the employee motion?

8                    (No verbal response)

9          THE COURT:  I'm satisfied with the record before me

10 and the affidavit of Mr. Wall.  Again, the debtor has tens of

11 thousands of employees, many of whom I would expect live

12 paycheck to paycheck, and I think it is abundantly clear that

13 it is essential that this debtor maintain its payroll

14 obligations in order to preserve employee morale and to

15 preserve the enterprise.  So I will enter the order.

16          MS. MORGAN:  Thank you, Your Honor.

17          THE COURT:  Your Honor, Item 9 in the binder is the

18 debtors' motion to authorize the continuation of certain pre-

19 petition customer programs.  To be competitive in this market,

20 the debtors have adopted certain practices aimed at enhancing

21 their customer satisfaction including the nine programs that

22 are identified in Paragraph 17 of the motion.  I do not plan to

23 repeat them, but I will mention, for instance, the senior

24 discount, Your Honor.

25          THE COURT:  I've read them.  I assume that's a big

1  one.

2    MS. MORGAN:  It is a very big one for the company,

3  Your Honor.  The seniors are a very important component of our

4  customer base, and we do not want to disrupt them from using

5  their cards in the ordinary course.  We have gift cards which

6  are, you know, standard gift cards that you might find at a

7  department store.  Again, we don't really want people to come

8  and try to use the gift cards and be told that they can't.  We

9  think they would never come back.

10    We have an E Club, as mentioned in the motion.  Just

11 by someone agreeing to provide an e-mail address, it entitles

12 them to buy one, get one free promotions and a birthday dinner.

13 We have various direct mail and e-mail coupon offers.  And,

14 Your Honor, the company typically experiences a significant

15 increase after those direct mail things go out, so it's

16 actually quite a benefit to the creditors to have those things

17 continue in the order course.  I'm not sure if Your Honor has

18 any questions about the other programs.

19    THE COURT:  No.

20    MS. MORGAN:  We have again community passes, tour

21 vouchers, various things that we do on a store-by-store basis.

22 Again, we've developed these programs for a reason, to try to

23 nurture and maintain customer loyalty and have our customers

24 continue to come back to the restaurants, and we think failure

25 to honor these for even a brief time would jeopardize our

1  ability to successfully reorganize.  We ask that this motion be

2  approved, and we believe the benefits far outweigh any cost in

3  honoring a pre-petition obligation.

4          THE COURT:  Okay.  Does anyone else wish to be heard

5  regarding the customer programs motion?

6                  (No verbal response)

7          THE COURT:  Okay.  I will grant the relief requested.

8  Again, it's been the experience of this Court that these sort

9  of programs are not terribly expensive to a debtor, but failure

10 to honor them can taint a debtor's relationship with its

11 customers on a going forward basis in amounts that far exceed

12 the expense associated with the obligations.  So I'm satisfied

13 again with the record that's been established, and I will enter

14 the order.

15         MS. MORGAN:  Thank you, Your Honor.  Your Honor, Item

16 10 is the debtors' motion authorizing payment of pre-petition

17 claims of suppliers and vendors for goods delivered in the

18 ordinary course of business within 20 days of the petition

19 date.

20         THE COURT:  I received this morning and have reviewed

21 the informal Committee's response to -- consolidated response

22 to that motion, and I appreciate that the response was

23 consolidated.  The -- why don't -- obviously, there are

24 separate considerations and separate factual records with

25 respect to the --

**J&J COURT TRANSCRIBERS, INC.**

1          MS. MORGAN:  Really the three --

2          THE COURT:  -- the critical vendors --

3          MS. MORGAN:  Yeah.

4          THE COURT:  -- the PACA claims, and the 507 priority

5    claims.  What -- how do you want to proceed?

6          MS. MORGAN:  Well, Your Honor --

7          THE COURT:  Have you made any progress, or are --

8          MS. MORGAN:  I would say little.

9          THE COURT:  Okay.

10         MS. MORGAN:  These are critical to the debtors, and

11   the reason we set it up this way -- we could've set it up --

12   well, let me put it this way.  This particular motion,

13   503(b)(9), could've easily been in a critical vendor motion,

14   and we believe these vendors are critical.  These are again

15   suppliers of food, beverage, and things we need to serve food

16   and beverages to our customers.  But the Code gives special

17   treatment to those that delivered goods within 20 days of the

18   filing.  It allows them and affords them administrative

19   priority treatment.  Arguably, there is nothing more than needs

20   to be done with respect to that.  The Code -- if you have an

21   administrative claim, there's nothing in the Code that prevents

22   the debtors from paying it.  I think Judge Carey has mentioned

23   that in the Dora (phonetic) case.  Now this is a large number

24   for us.  It's $32.7 million is our estimation.  We understand

25   that's a big number.  As you heard earlier, we had our

suppliers constrict the terms, so we have many suppliers who actually have us on terms of 20 days or less, which is why this number is so large. We fully intend, and we set it up this way, both this motion and the critical vendor motion, to say that we are agreeing to pay your admin claim now, but in return we want terms, and we want terms as -- not as they existed last week but as they existed 120 days before. We want normal terms from our vendors. We are working with all our vendors and trying to encourage them to continue to provide us terms that would give us the flexibility we need.

I think the objection by the bondholders would seek to require us to have that trade agreement in hand before we make payment, and we fully intend to have that trade agreement in hand, but we would like the flexibility to make the payment. Again, in this particular motion it's allowed under the Code as an administrative claim if we need to to get needed deliveries to our restaurants. We cannot go for five days, as was the suggestion, that we come back on five days' notice and have another hearing. We would be closing restaurants. We have about one and a half days' worth of supply at most restaurants, and we can't, for instance, not have chicken one day. We have to have these deliveries, and it is critical to the debtors' restructuring effort that we can tell our suppliers and vendors that we are operating in the ordinary course. We're paying them in accordance with terms. Again, we hope them to be

1 reasonable terms.  We will do everything we can to make sure

2 that our vendors work with us.  It is not our desire to pay

3 more money than we need to pay, but we do need the flexibility

4 to insure that our restaurants receive the food and beverages

5 that our customers expect to have.

6         THE COURT:  Okay.  Why don't we do this?  I think the

7 most productive way to proceed, before we turn to the merits of

8 each of these motions, I think I'd like to hear from Mr.

9 Eckstein.

10         MS. MORGAN:  Thank you, Your Honor.

11         THE COURT:  Good morning.

12         MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

13 Eckstein of Kramer Levin.  I think, as Your Honor learned

14 yesterday, my firm is representing an informal group of

15 bondholders that had --

16         THE COURT:  About 80 percent.

17         MR. ECKSTEIN:  About 85 percent of the bonds that it

18 organized some time during November and had been working quite

19 acidulously over the last several weeks in an attempt to see

20 whether or not we could help put together either an out-of-

21 court restructuring or a restructuring that would've allowed

22 the company to have entered into Chapter 11 with at least the

23 terms of a restructuring plan in hand.  I regrettably --

24 notwithstanding significant efforts by all parties, that

25 opportunity was not afforded to us, and we find ourselves in

1  court today.

2        With respect to these motions, a couple of

3  observations.  First of all, Your Honor, I don't think we have

4  any fundamental disagreement with the company about the

5  significance of the trade to this company, and we understand

6  and appreciate that the most important thing for this company

7  to accomplish right now is to stabilize its relationship with

8  its vendors and to promptly restore normal trade terms.  And,

9  as debtors' counsel points out, the relief being sought today

10  is quite dramatic, and it's really a reflection of the recent

11  amendments to the Bankruptcy Code.  As we know, 503(b)(9) has

12  not been tested in that many significant cases before.  Today's

13  case, in fact, is going to raise a whole array of new issues.

14  I think we have not really encountered over the last several

15  years, because the last several years always really focused on

16  its post-petition interest and equity committees.  This is a

17  real bankruptcy case.

18        We understand that the most important way to

19  stabilize this company to provide comfort to the lenders and to

20  hopefully provide a valuable reorganized business is to

21  stabilize the trade.  With that having been said, the message

22  that my constituency wanted to communicate at the outset of

23  this case -- and we speak only as bondholders at this point.

24  There is no official committee that has had a chance to do the

25  type of work that the committee needs to do -- is to indicate

1 that if essentially two thirds of the pre-petition trade is

2 going to get paid in the first several days of this case, which

3 is what is contemplated, and if rather than simply

4 acknowledging an administrative claim under 503(b)(9) there is

5 actually going to be a payment made during the first several

6 days of the case, which is not what is contemplated by statute.

7 The statute does not contemplate --

8             THE COURT:  But it's certainly not prohibited.

9             MR. ECKSTEIN:  Not prohibited, but it's not

10 specifically contemplated.  If the cash is going to be

11 expended, and the company's going to incur the cost of funding

12 that cash up front and pay interest in that cash, that, at a

13 minimum, we want to create as compelling a dynamic as possible

14 to insure that the company is going to get back what we think

15 it earns, which is normalized trade terms.  And we'll be -- we

16 had proposed a structure which we would like to see put in

17 place, but ultimately, Your Honor, we are willing to allow the

18 company to do what it believes it has to do in order to insure

19 that the company does not at the end of the day miss a beat

20 from an operating standpoint.

21             THE COURT:  And I appreciate your candor on that

22 point, and I gathered that from your motion.  And I don't want

23 to minimize this, but -- minimize the role of the trade by any

24 stretch, but as a practical matter, this reorganization really

25 isn't about the trade.  I mean there's 900 some odd million

**J&J COURT TRANSCRIBERS, INC.**

dollars of secured and unsecured debt, and there's 30 some odd
million -- or I guess it's 50 some odd million of trade debt.
And I under -- and as a practical matter, I understand your
point about not permitting a debtor to make these payments who
are trying to limit as much as possible requiring them to
negotiate as much as possible, which I think with your vigilant
oversight they're going to one way or the other.

But let's talk -- and I'm going to ask Ms. Morgan the
same thing.  The dynamics of this business are different from
some other industries with -- that may have more inventory on
hand or more alternatives, and, plus, I think we also have the
point that I think you're really touching on.  It's the damage.
The -- how fragile a restaurant business or -- I mean the
seminal case, the <u>Miltenberger</u> case is about a hotel.  A hotel
or a restaurant closed for a day.  Very few good things
happened on a going forward basis.  And the same principal
applies even to a deterioration of service.  If some -- if ice
cream's not available, people start to wonder if I'm going to
come back here.

And so while I understand and appreciate the mechanic
-- and I think I've imposed it.  My colleagues have as well in
different cases -- it might be a little bit tricky here,
because again we all have experience with the food service
industry.  That's a tough business, and those people will not
deliver if you don't pay.

1          MR. ECKSTEIN:  We share Your Honor's sentiment.

2          THE COURT:  Sure.

3          MR. ECKSTEIN:  We understand, and that's why I

4    volunteered to Your Honor that we would like to see as rigorous

5    a structure as possible to have this company resume normalized

6    trade terms without delay.  And whatever the Court can do to

7    encourage that, we would be in favor of.  We obviously would,

8    at a minimum, ask the Court to insure that the bondholders

9    financial advisor, Alvarez and Marsal, certainly pending the

10   appointment of a committee, get regular, I think at this point,

11   daily communication with the companies.

12         We understand exactly what payments are being made,

13   what arrangements have been put into place with those vendors.

14   We have a good dialogue going on.  The information is conveyed

15   without it being shared, without it being disseminated widely,

16   but I think that knowing that there's a line of communication

17   going on between the company and Alvarez and Marsal at this

18   point would certainly be one way to at least give us the

19   comfort that we -- we're being kept apprised of what is taking

20   place.

21         And at this point in time we think that the challenge

22   is with the company and to the same extent with the trade to do

23   what's necessary to make sure that this company remains viable,

24   healthy business.  It is a very, very substantial business.

25   And, as I'll describe when we talk about the DIP, this is a

 1  business that has tremendous, tremendous resources and

 2  vitality, and our responsibility I believe in this case at the

 3  outset of this case is not to impair it.  So at the end of the

 4  day I think our position is we would ask Your Honor to impose

 5  the types of procedures that are designed on the one hand to

 6  give the trade the confidence and the encouragement it needs to

 7  support the company but at the same time to do everything

 8  necessary to insure that we have a resumption of normalized

 9  trade terms, and we have a communication flow from the company

10  as to how they're achieving it.

11          THE COURT:  Okay.  Thank you.

12          MR. ECKSTEIN:  Thank you.

13          THE COURT:  I understand.  Thank you.

14          MR. MINUTI:  Your Honor, may I be heard for just a

15  moment?

16          THE COURT:  Mr. Minuti.

17          MR. MINUTI:  Good morning, Your Honor.  Mark Minuti.

18  I'm here today for Levine Leitchman Capital Partners, Deep

19  Value Fund.  They are a member of the information committee.

20  They are a holder of 30 million of the senior notes in this

21  case.  They have obviously been an active participant in the

22  pre-petition committee, and I can assure Your Honor the client

23  is very knowledgeable and understands how fragile a restaurant

24  business is.  And, as Your Honor probably knows personally,

25  know all too well, and if you watched the news lately, you

**J&J COURT TRANSCRIBERS, INC.**

1 know, you wonder every day if your customers are going to come

2 back if there's any bump in service.  So we are extremely

3 mindful of that.

4          We support, obviously, the information committee's

5 position on this.  My client, Your Honor, will seek a position

6 on the Official Committee of Unsecured Creditors.  I appreciate

7 that the trade in this case need a voice, but I'm comforted to

8 at least hear Your Honor say that this case is not really about

9 them.  We've got motions before the Court that is going to take

10 -- if approved, are going to pay two thirds of those, and I

11 simply point out that it's all the more important, Your Honor,

12 that given if that is going to happen, that only increases the

13 percentage of the unsecured creditor pool that the bondholders

14 hold, and that's why I think it's critical that they be on the

15 committee.  I believe my client will be a constructive

16 participant if they're chosen, and we wanted to bring that to

17 Your Honor's attention.

18          THE COURT:  Okay.

19          MR. MINUTI:  Thank you.

20          THE COURT:  I appreciate that.  And I was sorry to

21 hear about the fire.

22          MR. MINUTI:  Thank you very much.

23          MR. MORGAN:  Your Honor, a couple things.  It is true

24 that the trade debt is a small portion of our overall debt,

25 however, today is very much about the trade, and in the coming

1 days and weeks we absolutely need to stabilize our trade. We

2 certainly understand the comments that counsel for the

3 bondholders have made. We tried to draft the motion with that

4 in mind, and we again -- I think the motion is drafted to state

5 that they are required to sign a trade agreement with us giving

6 us terms that were in effect 120 days before, and we fully

7 intend to try to make that happen. But again, Your Honor, we

8 would like the flexibility to do what we need to do to get food

9 in the stores again, and, if necessary, even if that means

10 paying an admin claim, or a claim that has been afforded admin

11 status under 503(b)(9).

12         THE COURT: Okay.

13         MS. MORGAN: We are fine with sharing information

14 with Alvarez, Your Honor. We would prefer not to do that

15 daily, but we could certainly do that twice a week and keep the

16 bondholders counsel in the loop until a committee is formed or

17 even thereafter.

18         THE COURT: Okay. We've been talking about these

19 motions globally, so we'll start then with --

20         MS. MORGAN: Yes.

21         THE COURT: -- in my binder it's Number 10. That's

22 the 503(b)(9) motion. Correct?

23         MS. MORGAN: Yes, Your Honor.

24         THE COURT: Okay. And the -- what's the total amount

25 that the debtors identify that would be subject to payment

1   under this motion?

2           MS. MORGAN:  Thirty-two point seven million.

3           THE COURT:  All right.  Does anyone else wish to be

4   heard regarding the Section 503(b)(9) motion?  Ms. Leamy.

5           MS. LEAMY:  Jane Leamy, for the record, on behalf of

6   the United States Trustee.  With respect to the 503(b)(9)

7   motion, Your Honor, in light of the amount that is sought, we

8   think it would be more appropriate to enter this specifically

9   on an interim basis to provide notice.

10          THE COURT:  Well, don't our local rules provide that

11  all first day orders, whether they say it or not, are interim

12  in nature?

13          MS. LEAMY:  I think the -- specifically, the local

14  rules provide that they're subject to reconsideration, and in

15  some instances some rules -- some orders do on a first day get

16  entered on an interim basis, and that --

17          THE COURT:  I understand.

18          MS. LEAMY:  -- is our request with respect to this

19  one.

20          THE COURT:  I understand.

21          MS. LEAMY:  Thank you, Your Honor.

22          THE COURT:  Okay.

23          MS. MORGAN:  Your Honor's correct.  I believe it's

24  Local Rule 9013 -- I can't remember the subpart -- that does

25  provide that these motions are subject to reconsideration.  We

1  would prefer the optics of not calling this an interim order.

2  Again, the entire idea is to try to convince our suppliers that

3  we are authorized to pay them, if necessary and if they provide

4  us terms.

5  THE COURT:  Okay.  Does anyone else wish to be heard

6  regarding the debtors' Section 503(b)(9) motion?

7  (No verbal response)

8  THE COURT:  All right.  Here's what we're going to

9  do.  I will grant the motion, and I will make a number of

10  comments.  I don't know whether you'll need to revise the

11  motion to reflect this in response to the comments from the

12  U.S. Trustee and from Mr. Eckstein, but I will grant the

13  motion.  The motion will be granted on an interim basis, which

14  I think is implicit in our local rules, but I believe that this

15  matter should be up for final consideration before Judge

16  Walrath at your hearing on February 13th.

17  And in so doing my reasoning for that is that this is

18  substantial relief.  I understand and entirely appreciate the

19  significance of this relief to this debtors' business, but

20  under the circumstances I don't want to put a Committee or

21  another party in the position of having to seek reconsideration

22  of the motion.  And given the amounts of money that are being

23  -- that are going to be spent under this, to the extent that

24  Judge Walrath wishes to consider it or review the matter, I

25  want to give her that opportunity.  So I want the order to

specifically provide that.

In so ruling though, I do note that it is the debtors' -- the debtors have represented that they will make whatever payments they believe are necessary, and so the fact that this order is interim doesn't serve as a limitation on the debtors' ability to make those payments that are necessary.

Second, with respect to the requests by Mr. Eckstein, I think that those are -- you're going to be working with a committee whether Mr. Eckstein represents it or another individual and whether it's the individuals that he currently represents or not in due course. So you've indicated that you're prepared to share that information with Alvarez and Marsal. I think that daily exchanges of information are appropriate. If that doesn't make sense from an administrative -- from an administrative viewpoint, then the exchange of information should be no less than every other day. And I presume that adequate and satisfactory confidentiality arrangements have been reached between Alvarez and Marsal and Mr. Eckstein's group and the debtors to enable that to occur without difficulty.

In addition -- and this doesn't get built into the order -- I'm confident that this would happen anyway, but it is my expectation, and I'm confident it will be Judge Walrath's expectation, that there will be meaningful communication between the debtor and Mr. Eckstein's group as well as I'm

1  confident you're going to be providing this same sort of

2  information to your DIP lenders.  So this is an ongoing

3  dialogue.  You have the relief that you are requesting, but I

4  think that given the nature of the relief that's requested and

5  the amounts that you're talking about, more communication and

6  more disclosure is preferable.  So I don't know how -- I don't

7  think you have to work that last part into an order.  Judge

8  Walrath is going to find out about it one way or the other.

9  And -- but I think that the balance of it, whether you

10 interlineate or whether we proceed on the -- with a revised

11 order under certification, I'm happy to proceed whichever way,

12 and we can cross that bridge when we get to the end of the

13 hearing.

14          MS. MORGAN:  Yes, Your Honor.

15          THE COURT:  But I will grant --

16          MS. MORGAN:  That's fine.  The communication is fine,

17 and we will work on the order.  I'm not clear right now sitting

18 -- standing here as to whether we can -- I hope we can quickly

19 do that maybe during the hearing.

20          THE COURT:  Sure.  Okay.

21          MS. MORGAN:  And we appreciate the Court's comments

22 that, you know, we will be potentially making substantial

23 payments between now and the 13th, but again hopefully because

24 we received trade terms.

25          THE COURT:  Right, and I want to make it clear that I

1  do largely agree with Mr. Eckstein's comments, and in another

2  business or another industry in other circumstances I would

3  either limit the amounts that you are authorized to pay or

4  impose a more substantial vetting process.  But I have a

5  measure of experience with this industry, and it's a difficult

6  industry --

7          MS. MORGAN:  It is, Your Honor.

8          THE COURT:  -- and I don't think it would afford

9  itself of the more routine protections that Mr. Eckstein would

10 ask for, and I think he acknowledged that there are these

11 issues.  So my goal here is to balance I'm confident that

12 you're not going to just unleash -- open the floodgates to

13 money going out the door, and that you will participate in

14 those negotiations, and that you'll communicate the status of

15 that process to Mr. Eckstein.

16         MS. MORGAN:  We will certainly do so, Your Honor.

17         THE COURT:  Okay.  PACA.

18         MS. MORGAN:  PACA.  Your Honor, Number 11 in the

19 binder is the motion authorizing payment of claims under PACA

20 and state statutes of a similar effect.  This dovetails with

21 the prior motion we heard in that a large portion of the PACA

22 claimants will actually have 503(b)(9) claims, but there is a

23 portion, and it is not capped, because I'm not sure we can cap

24 it.  We can't know exactly.  Many of our vendors, Your Honor,

25 supply both goods that are subject to PACA and other goods that

1  might not be -- not always easy to discern the difference, but

2  we have tried to, and our estimate is that the amount that

3  would not be covered by the 503(b)(9) is $2.6 million.

4       Your Honor, as Your Honor knows, PACA imposes a trust

5  on the proceeds of our sales, so this is not property of the

6  estate. The PACA claimants, I think we've already heard from I

7  think close to a dozen already. I don't know. I think some of

8  them are here today and may want to address the Court, but we

9  tried to again design these by telling the PACA claimants that

10  we understand what the law says. We understand they have a

11  trust. We understand that they merely have to provide us a

12  notice. It's pretty loose requirements in order to obtain

13  rights in the proceeds of PACA goods, and it is our intent to

14  honor the statute, honor the law, and if someone presents us

15  with an appropriate PACA claim, we would like the authority to

16  pay it again so that we have salad in the salad bar and all of

17  the things that go on top of the salad at the salad bar, Your

18  Honor.

19       THE COURT: Does anyone else wish to be heard

20  regarding the PACA motion? Mr. Hazeltine.

21       MR. HAZELTINE: Good morning, Your Honor. William

22  Hazeltine of Sullivan, Hazeltine, Allinson LLC representing

23  several PACA claimants, Adams Produce, Ambroggi, Daylight

24  Produce, Grand Avenue, Metro Produce, Phoenix Wholesale, Sim

25  Brothers, Syrna, CISCO, and Thomas Brothers. And I'd like to

1 introduce my co-counsel, Kate Ellis of the McCarron Deiss firm,

2 and she has not yet -- we have not filed a motion for

3 admission.  We will do so, but I'd ask for her approval to --

4           THE COURT:  I'm happy to hear from her.

5           MS. ELLIS:  Thank you.

6           MR. HAZELTINE:  Thank you, Your Honor.

7           MS. ELLIS:  Thank you, Your Honor.  Good morning.

8 For the record, Kate Ellis from McCarron and Diess for the ten

9 PACA trust creditors listed by my co-counsel.

10           THE COURT:  I assume you're not objecting.

11           MS. ELLIS:  No, I had -- I spoke with Mr. Barry about

12 a reservation of rights, because it wasn't completely clear

13 from the proposed order.  It seemed to be very much left up to

14 the discretion of the debtor regarding timing and the amount of

15 payment in the manner in which payments are made.  And we've

16 come to an agreement to insert language into the order which

17 states that the order does not impair the rights of the PACA

18 trust creditors to enforce their rights under PACA consistent

19 with the applicable law and to seek redress from the Bankruptcy

20 Court in the event that there are disputes as to the PACA

21 claims.  That was our primary issue.

22           THE COURT:  Okay.

23           MS. ELLIS:  And it's my understanding that the -- the

24 debtor's been in contact with I believe it was nearly 70

25 percent of the PACA trust -- potential PACA trust creditors to

1 try to resolve the outstanding amount of the PACA trust debt,

2 so they can get that taken care of. And I don't know if you

3 want me to address this now where the PACA trust creditors also

4 had comments regarding the proposed DIP order?

5    THE COURT: We'll deal with the DIP when we get to

6 it.

7    MS. ELLIS: Okay. Thank you, Your Honor.

8    THE COURT: Thank you.

9    MS. MORGAN: Your Honor, we did have discussions with

10 Ms. Ellis and Mr. Hazeltine, and we have agreed to add language

11 in the order, and I'll just read it for the record. "Nothing

12 in this order impairs the rights of the PACA claimants to

13 enforce their rights under PACA consistent with applicable law

14 or to seek redress from the Bankruptcy Court with respect to

15 their rights under PACA."

16    THE COURT: Okay.

17    MS. MORGAN: And again the debtors find that

18 acceptable.

19    THE COURT: Well, let me ask you one question about

20 the relief you're requesting. Your estimate is that it's $2.6

21 million of liabilities, and I realize that's probably a

22 difficult number, but --

23    MS. MORGAN: That's the amount that's over and above

24 503(b)(9).

25    THE COURT: Okay, and are you proposing that as a

1  cap?

2  MS. MORGAN: Your Honor, we're not, because we're not

3  sure of the number, and we're not sure what claims are going to

4  come forward. And our view is that if someone makes a valid

5  PACA claim, it's not property of the estate, and there's not

6  much we can do about it. So we estimated the number the best

7  we could. I think I explained some of the difficulties with

8  coming up with the estimate, but we were hoping that we would

9  not be bound by a cap.

10  THE COURT: Okay. I understand. Mr. Eckstein, do

11  your comments apply to this motion with equal force?

12  MR. ECKSTEIN: Yes, our comments apply.

13  THE COURT: Very good. Okay. I will treat this

14  motion much as the last. I will -- I'm prepared to grant this

15  motion. I'm going to treat this as an interim order, and I

16  realize and recognize that the debtor will be making payments

17  under it. I would -- my inclination would be to impose the

18  $2.6 million number as a cap. I'm not going to do that in this

19  circumstance, because I'm satisfied that there will be

20  meaningful communication between the debtor and the informal

21  committee, and I'm confident as well with your secured lenders

22  as well. If there are PACA claims that are outside of the

23  scope of anybody's expectation, either your -- I'm sure we'll

24  hear about it. So I'm not going to impose the $2.6 million as

25  a cap.

1        In addition, I am sensitive to or I recognize that it
2   probably is difficult to identify what's a PACA claim and
3   what's a 503(b)(9) claim.  It's actually probably more a
4   question of timing than anything else.  So based upon the
5   reservations and comments that I made in respect to the
6   503(b)(9), I will grant this motion.  I don't think you need to
7   modify the order again to provide that I want you to
8   communicate with your information committee as well as with
9   your secured lender, which I'm sure you'll do, but I do want it
10  to be interim relief, and Judge Walrath will have an
11  opportunity to consider this matter.  But again I want the
12  record to be clear that the Court understands that many or all
13  of the projected payments will be made by the time that the
14  debtors get to that final hearing.

15          MS. MORGAN:  Very well, Your Honor, and we'll make
16  some modifications to the order.

17          THE COURT:  Okay.

18          MS. MORGAN:  And, Your Honor, that brings us to Item
19  12 which is the critical vendor motion.

20          THE COURT:  Okay.

21          MS. MORGAN:  And, Your Honor, if I may approach, I
22  can hand you that --

23          THE COURT:  Please.

24          MS. MORGAN:  -- list of 12.

25          THE COURT:  Thank you.


**J&J COURT TRANSCRIBERS, INC.**

1        MS. MORGAN:  Your Honor, the 12 vendors that the

2    debtors have identified are essential to their business

3    operations, and these vendors have provided us terms that are

4    long enough to mean that they have claims that will be outside

5    of the 503(b)(9) motion.  And again we estimate in the motion

6    that that is $3.8 million that would over and above the

7    305(b)(9), and these particular vendors, we would be concerned

8    if they would refuse to ship based on even that small piece

9    that remained outstanding.

10        As mentioned earlier, Your Honor, we have the

11    shipments that come two to three times per week.  Each of these

12    12 vendors, Your Honor, are primary distributors that service

13    many restaurants, anywhere from 11 to 56 restaurants.  For most

14    of these particular vendors the goods they supply constitute

15    the majority of food supplied to those particular restaurants

16    that they service.  So if they were to stop or delay

17    deliveries, it would not mean that one or two items would be

18    missing from the buffet.  It would mean that there would be

19    perhaps no meat or no bakery items or no Coke.  And as you

20    pointed out, you know, one day when the customers come in and

21    there is no meat or Coke, it will be the last day they come to

22    our restaurants.

23        Because of the large quantities of food delivered by

24    these vendors, they cannot be easily replaced.  Mr. Wall would

25    testify that setting up new distributors to replace a major

distributor such as one of these 12 would take at least 45 days
to implement, and, of course, that's time that we do not have.
Obviously, Your Honor, Mr. Wall would testify that the debtors'
business would be immediately and irreparably harmed without
these large deliveries from these large distributors, and the
debtors are concerned that the deliveries could be disrupted if
we did not have authority to pay what we deem the -- what we
deem is critical vendors of the up to $3.8 million identified,
so that we can have a full complement of food at the
restaurant.

Your Honor, the motion also includes a modest amount
for freight claims. Most of our distributors distribute
directly, but we do have some that use third party shippers,
and, Your Honor, as you know, they may assert a lien on the
items on their trucks if not paid their pre-petition claims,
and the pre-petition amounts are not expected to exceed
$100,000. Your Honor, we believe that again with respect to
both the food and vendor claims identified on that chart and
the freight claims and that immediate and irreparable harm
would exist if we were not authorized to pay them. So we
believe that the Necessity of Payment Doctrine is satisfied as
well as Rule 6003, and we ask that this motion be approved.

THE COURT: Okay. Anyone else wish to be heard
regarding the critical vendor motion?

(No verbal response)

**J&J COURT TRANSCRIBERS, INC.**

1        THE COURT:  And again presuming, Mr. Eckstein, that
2    your comments apply.

3        MR. ECKSTEIN:  It does.  Thank you, Your Honor.

4        THE COURT:  With respect to this motion, my treatment
5    will be the same.  I will approve this on an interim basis.  It
6    will be back in front of Judge Walrath.  I am satisfied by the
7    record that's been established that as to this, as well as the
8    other motions that I've just considered that contemplate
9    payment, that there is a meaningful risk of immediate and
10   irreparable harm to these debtors in the event that services
11   are suspended or the claims themselves are not paid.

12        Again, in making that determination, I rely upon the
13   affidavit of Mr. Wall as well as the representations of counsel
14   regarding the nature of this business and the debtors' need to
15   maintain operations and inventories without interruption.  So
16   based upon that, I am satisfied, and again my earlier comments
17   with respect to communication and exchange of information as to
18   payments that are made apply here with full force and effect.

19        MS. MORGAN:  Very well, and thank you, Your Honor.  I
20   believe that takes us to Item 13 in the binder, which is the
21   motion for an order confirming the grant of administrative
22   expense status to obligations arising from post-petition
23   delivery of goods or services.  Your Honor, this is merely a
24   confirmation of what is already in the Bankruptcy Code, but it
25   seems that --

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  I appreciate your --

2          MS. MORGAN:  -- having a short and simple order that

3 says that is meaningful to people.

4          THE COURT:  I appreciate your not calling it a

5 comfort order.

6          MS. MORGAN:  Thank you.  I understand that you don't

7 care for that reference.  It's a very nice shorthand way of

8 explaining it, but I think Your Honor understands the point.

9 We believe this order would be helpful to our communications

10 with our vendors and suppliers.

11          THE COURT:  Okay.  Does anyone wish to be heard

12 regarding the debtors' application for authorization to grant

13 administrative status to obligations arising under 503(b)(9)?

14                    (No verbal response)

15          THE COURT:  I have reviewed the motion, and I'm

16 satisfied with the record, and I also find that this is fairly

17 routine relief that facilitates the order of the operation of a

18 Chapter 11 debtor, so I will grant the motion.

19          MS. MORGAN:  Thank you, Your Honor.  With that we are

20 left with the motion to authorize post-petition financing and

21 use of cash collateral --

22          THE COURT:  Okay.

23          MS. MORGAN:  -- and I will yield the podium to my

24 partner Mr. Waite.

25          THE COURT:  Very good.

**J&J COURT TRANSCRIBERS, INC.**

1      MR. WAITE:  Good morning, Your Honor.  Joel Waite

2   from Young Conaway on behalf of the debtors.  The last motion

3   before the Court today is the motion for interim approval of

4   use of cash collateral and granting of adequate protection to

5   the pre-petition lenders for interim approval of a senior

6   secured debtor in possession financing facility and the

7   scheduling of a final hearing.  Your Honor, notice of this

8   motion was given with the other first days, and we also had

9   served out by fax or e-mail a copy of the motion and the order

10  itself on those parties.

11      Your Honor, we did receive a response by Mr. Eckstein

12  from the noteholders.  I believe Your Honor has seen that, and

13  we will address that later on in the presentation.  I have

14  spoken with Mr. Eckstein, and I think for today's purposes

15  there are some -- there are a few issues on the order.  There

16  are some reservation of rights and some issues I think that are

17  more second day issues, but we will get to that a little later

18  on.

19      THE COURT:  Okay.

20      MR. WAITE:  Your Honor, as stated in the motion, the

21  debtors desperately need the use of cash collateral and the

22  financing provided by the DIP facility in order to continue

23  operating their businesses in the ordinary course.  The debtors

24  do not have unencumbered cash with which to operate their

25  business, therefore, the use of cash collateral is necessary.

**J&J COURT TRANSCRIBERS, INC.**

1   As we've indicated in the motion, the use of cash collateral
2   alone is not sufficient.  The debtors need additional
3   liquidity, and that's why we're seeking interim approval of the
4   DIP facility.

5           Your Honor, through negotiation with the debtors'
6   pre-petition secured lenders, the debtors have obtained their
7   consent to use cash collateral only on those terms which were
8   set forth in the proposed interim order.  And in connection
9   with the DIP facility, they have agreed to have their pre-
10  petition liens primed by the DIP lenders.

11          Now, the debtors typically receive substantial
12  deliveries of food on Thursdays to supply their restaurants for
13  the weekend.  Those trucks, I understand, are typically loaded
14  on Wednesday nights, so that they can start making deliveries
15  to the restaurants on Thursday mornings, and that's why it's
16  critical that we get interim approval today of the DIP
17  facility, so that we can get that funded today and get the
18  wires out to our vendors, so there's no disruption in our
19  supply of food.  I think Your Honor already indicated the
20  importance of our trade relationships in this case.

21          Your Honor, the debtors are borrowers -- actually
22  Buffets, Inc. is a borrower, and the other debtors are
23  guarantors under a pre-petition credit facility.  It's a $640
24  million facility dated as of November 1st, 2006 with Credit
25  Suisse as the administrative agent and lender and other lender

**J&J COURT TRANSCRIBERS, INC.**

parties thereto.  There are essentially three components of the
pre-petition facility which Ms. Morgan went through earlier on
in her comments including the term loan, a revolving facility,
and a second revolver which is used for letters of credit.

Your Honor, prior to the commencement of these cases
back in early December, debtors became aware that they were
going to be facing certain defaults under their pre-petition
credit agreement.  Those included -- they were going to miss
their interest coverage ratio, their maximum leverage ratio,
and they also anticipated missing the bond interest payment
that was due on January 1st.  In light of those anticipated
defaults, the debtors entered into negotiations with their
lenders regarding a forbearance.  You've heard earlier there
was also discussions that began with the noteholders regarding
potential restructuring of the debtors' business.

Those forbearance negotiations continued over the
next couple weeks, and, ultimately, after long and protracted
negotiations, the debtors entered into a forbearance agreement
and second amendment to the pre-petition facility.  In
connection with that amendment, the interest rate on the pre-
petition loans was increased by four to four and a quarter
percent depending on the loan over the non-default rate that
existed prior thereto.  As part of that, the two percent
default rate was eliminated, so the net effect after the
amendment is the interest rate was two percent higher than the

1   default rate would've been but for the forbearance.

2        Your Honor, in connection with the discussions with

3   the pre-petition lenders regarding the forbearance, we also

4   engaged in discussions with them regarding providing a debtor

5   in possession facility in the event the debtor should need the

6   file, and those discussions have resulted in a DIP facility

7   that we're seeking interim approval of today.

8        Your Honor, let me just -- what I'd like to do is

9   kind of run through some of the basic terms of the facility.

10   I'm not going to go through all of them in detail.  I'll try to

11   highlight the important ones.  I think we tried to in the

12   motion set forth a fairly detailed listing of the provisions

13   and tried to highlight those provisions that I know the Court

14   likes to focus on.  But for the record, the borrower under the

15   DIP facility is Buffets, Inc.  The guarantors are each of the

16   other debtors.  Credit Suisse Cayman Islands is the agent and

17   one of the lenders, and there will be other lender parties to

18   the facility.

19        The total facility under the DIP is 385 million.

20   That consists of two components.  One is -- we refer to it as

21   the new money facility, and that has --

22        THE COURT:  That's the 85 million.

23        MR. WAITE:  That's the $85 million new money

24   facility, and that has two sub-components.  There's an initial

25   -- it's -- this is not a revolver.  It's a delay draw term

1 loan, and that is as a result of the nature of our lenders.

2 They are offshore hedge funds, so they're the underlying

3 lenders, and because of the way they're structured and certain

4 restrictions on their operations in the United States, we have

5 to structure this with minimum numbers of draws.

6 Your Honor, the first draw which we were seeking

7 approval of today is an initial interim draw of $30 million,

8 and if the Court enters the interim order today, we plan to

9 make that draw promptly after this hearing and should have the

10 money in our accounts by the end of the day. There is also a

11 delay draw loan, which is in the amount of 85 million less the

12 amount of the initial draw, which would be 55 million in light

13 of the amount we intend to draw today. The debtors have until

14 April 30th to make that second draw. We are not seeking

15 approval of that piece today.

16 THE COURT: Okay.

17 MR. WAITE: There's also a rollover facility. That's

18 a $300 million facility that will be used for purposes of

19 converting a corresponding amount of the pre-petition lenders

20 obligations in the post-petition DIP obligations. We are not

21 seeking approval of the rollover today. I know --

22 THE COURT: That's on for a final.

23 MR. WAITE: That's on for a final. I know Mr.

24 Eckstein's clients have issues with that, and I'm sure there

25 will be discussions between now and then, but I wanted to lay

**J&J COURT TRANSCRIBERS, INC.**

1  out the terms for the Court --

2          THE COURT:  Sure.

3          MR. WAITE:  -- but we are not seeking approval of

4  that today.  Now, the maturity under the facility, it's 12

5  months from the closing date.  It does provide for an automatic

6  six-month extension if the amount of the new loan -- new term

7  loan has been paid down to below 50 million at the end of that

8  year or below 40 million if the debtors have recovered on

9  excess of $10 million from sales of assets.

10          The interest rate on the facility is the LIBOR rate

11  which shall not be less than four, no more than five percent,

12  plus seven and a quarter percent.  Essentially, that means the

13  interest rate will be between 11 and a quarter and 12 and a

14  quarter percent.  That interest is payable monthly in cash.

15          There's also a default interest rate of an additional

16  two percent.  To be clear, the default interest rate would only

17  be applicable to the new $85 million facility.  It would not

18  apply to the rollover loans which are not being approved today.

19  The facility is to be used by the debtors to finance their

20  working capital needs and for general corporate purposes and

21  including payment of the Chapter 11 expenses.  The debtors have

22  prepared and the lenderes have approved an interim 13-week

23  budget.  It's actually 14 weeks.  It's attached to the motion.

24          THE COURT:  I have it.

25          MR. WAITE:  And the debtors are permitted to use the

1  cash collateral and the DIP funds for the purposes set forth in

2  those budgets.  We are not bound by individual lines item

3  restrictions or variances.

4         Your Honor, the debtor is also required to submit a

5  final 18-month budget to the administrative agent by February

6  7th, and that final budget is subject to approval by the

7  required lenders.  This is a defined term.  It refers to a

8  certain percentage of the new money lenders under the facility.

9         Your Honor, in return for the financing, the lenders

10 are being granted super priority administrative expense claims,

11 priority over all other administrative expenses, including the

12 507(b) claims to be granted to the pre-petition secured lenders

13 as adequate protection and excluding the carve out, which I'll

14 get to shortly.

15        Your Honor, for the record, in the draft -- the draft

16 order we attached it did reflect that that super priority claim

17 would have the ability to look to avoidance actions as part of

18 the interim order.  Based up discussions with the U.S.

19 Trustee's Office, we have made that provision subject to a

20 final order.

21        Your Honor, the DIP lenders will also receive a first

22 lien on all unencumbered property of the estate.  Again the

23 lien as to avoidance actions will be subject to entry of a

24 final order.  The lenders are also receiving a priming lien on

25 all collateral on which the pre-petition lenders have a first

priority lien.  That is subject to any other permitted liens which are currently in existence.

THE COURT:  All right.  It's consensual priming.

MR. WAITE:  Exactly, Your Honor.  The only party that's being primed are the pre-petition secured lenders who have consented.

Your Honor, the lenders are also receiving a junior lien as to all other assets in which there exists a current lien.  We're also providing for the payment of the DIP lenders' professional fees and expenses as provided for in the credit agreement.

THE COURT:  Well, let me ask you a question, and whether you want to deal with this or if Mr. Seider wants to touch on it or anybody, I saw a reference to a Blackstone fee --

MR. WAITE:  Yes, Your Honor.

THE COURT:  -- and didn't see anything beyond the reference other than that it gets paid.

MR. WAITE:  Well, Your Honor, we did have a footnote in the motion.

THE COURT:  I don't read footnotes.

MR. WAITE:  There was a footnote in the motion that the -- that indicated the amount of the success fee, but with respect to that issue regarding the Blackstone success fee, we have agreed with the U.S. Trustee's Office, as have the

1  lenders, that that success fee component will be subject to

2  entry of a final order.  I know that Mr. Eckstein has asked to

3  see a copy of that engagement letter, and we were working with

4  the lenders' counsel to get that made available and get further

5  notice out to have that subject to a final hearing.

6        THE COURT:  Yes, that's where we were headed.

7        MR. WAITE:  I assumed so, Your Honor.  Does Your

8  Honor have any further questions about it at this point?

9        THE COURT:  No, not -- I just -- since you had

10  touched on the fee question, I do have a note on the Blackstone

11  fees.

12        MR. WAITE:  Okay.

13        THE COURT:  Okay.

14        MR. WAITE:  So, Your Honor, as to the carve out, the

15  carve out applies to all retained professionals of the debtors

16  and the Committee.  There are not separate buckets for each

17  group.  The carve out includes all fees and expenses that are

18  accrued up until an even to default which are ultimately

19  allowed.  There's not a specific dollar cap.  It's whatever is

20  allowed through an event of default.  And if an event of

21  default is waived or cured, those fees get swept into that

22  bucket.  There is a separate carve out of $400,000 that would

23  apply to post-event of default fees and expenses for those

24  events of default which are not cured or waived.

25        THE COURT:  Okay, so I want to make sure I understand

**J&J COURT TRANSCRIBERS, INC.**

 1  this.  So the mechanic is that prior to an event of default,

 2  the fees are accrued.  Whether they're billed or not billed, et

 3  cetera, that doesn't affect the default -- the carve out.  This

 4  is a post-default carve out.

 5            MR. WAITE:  Exactly, Your Honor.  All fees and

 6  expenses accrued through the event of default, which are

 7  ultimately allowed by the Court, are carved out, and then

 8  there's an additional bucket for after --

 9            THE COURT:  The carve out kicks in when the music

10  stops.

11            MR. WAITE:  Well, we -- yes, we like to think of it

12  as all the fees approved through the event of default are part

13  of the carve out.  There's just no number on that.

14            THE COURT:  Right.

15            MR. WAITE:  And then there's a -- there's a limited

16  bucket for post-event --

17            THE COURT:  Okay.

18            MR. WAITE:  -- default.

19            THE COURT:  I understand the mechanics.  All right.

20            MR. WAITE:  Your Honor, of course, the U.S. Trustee's

21  fees are carved out as well, and that's a bigger number than it

22  used to be, Your Honor.

23            THE COURT:  I got the memo as well.

24            MR. WAITE:  Your Honor, with respect to fees, there's

25  a commitment fee of two percent of the new money loans, the 85

**J&J COURT TRANSCRIBERS, INC.**

million that's payable at closing.  There's an administrative

agent fee of $100,000 per year.  The first payment is due at

closing.  And there's an unused commitment fee of a half a

percent per annum on the daily unused amount of the new money

commitment.  That would only really accrue on the $55 million

piece until it's actually paid -- until it's actually borrowed

by the debtors.

THE COURT:  Okay.

MR. WAITE:  Your Honor, there are certain what we

call milestone covenants in the credit agreement.  By June 1st

the debtors have to submit a reasonably detailed bona fide term

sheet of a restructuring for the debtors to the required

lenders which must be acceptable to them.  There's some

qualifications on part of it has to be acceptable in their

discretion with respect to their treatment, otherwise,

reasonable discretion.  And the debtors are required to use

their best efforts to file a plan and disclosure statement by

August 15th and to obtain approval of the disclosure statement

within 60 days thereafter.  It's not an event of default,

unless the plan and disclosure statement are not filed until

September 15th and then 60 days after for approval of

disclosure.

Your Honor, certain other covenants just of note.

There are many routine covenants in this facility.  There is a

minimum cash balance requirement.  The debtor is required after

the second draw to maintain a minimum cash balance of $20

million until July 2nd, which is the end of a quarter, and

thereafter, $10 million, and then we'd have to go back to the

lenders to get their consent to use the remaining balance.

THE COURT:  Well, your budget through the end of

April reflects a cash position of about 35 million --

MR. WAITE:  Yes.

THE COURT:  -- so you've got a $15 million cushion on

that number.  Right?

MR. WAITE:  That's correct, Your Honor.  Your Honor,

there's a minimum EBITDA covenant, which will be 85 percent of

the projected EBITDA which will be in the final budget which is

to be submitted on February 7th.  And then there are other

normal routine affirmative and negative covenants and financial

reporting requirements.  We highlighted many of them in the

motion.  If Your Honor has any questions about them, I'm happy

to answer them, but I don't propose to read them all --

THE COURT:  No, I've reviewed them.

MR. WAITE:  -- into the record.  Your Honor, with

respect to events of default, they are set forth in detail in

Article 7.  Those routine events of default are failure to pay

interest and fees.  If there is -- the interim order ceases to

be valid, the final order is not entered within 30 days.  It

shouldn't be a problem in light of the hearing date we have.

If a Chapter 11 Trustee is appointed, if a 506(c) claim is

asserted against the lenders, if the debtors' exclusivity

period expires. There's an event of default if more than 10

percent of the aggregate number of restaurant leases are

terminated. Basically, if the landlord's -- more than ten

percent would be entitled to terminate those leases. We don't

see that as an issue, because the automatic stay will prevent

that from happening.

And there is, as I mentioned before, an event of

default if a plan and disclosure statement are not filed by

September 15th or a disclosure statement is not approved 60

days thereafter. There is no event of default with respect to

the deadline to confirm a plan or for a plan to go effective.

And that is designed so that we get a full year of our

financing and the additional six months, if we need it, to line

up financing or to go effective. As Your Honor's aware, in

this market a number of plans are being confirmed but then have

difficulty or delays in going effective, and we wanted to make

sure we had the full benefit of our bargain in terms of our

period of maturity.

THE COURT: Sure.

MR. WAITE: Your Honor, there are provisions in the

order. It's at Paragraph 8(c). It provides for automatic

vacation of the automatic stay upon notice -- five days'

notice. That has been amended, based upon comments from the

U.S. Trustee's Office, to five business days' notice, written

1  notice, and notice will also be given to the U.S. Trustee and

2  the Committee.

3        Your Honor, with respect to use of cash collateral,

4  the debtors have consented in exchange for certain adequate

5  protection.  One, we are providing them with replacement liens,

6  which will be junior to the DIP liens and subject to the carve

7  out.  The replacement liens do not include liens on avoidance

8  actions.

9        There's a super priority 507(b) claim to the extent

10  that the adequate protection is insufficient.  That claim will

11  have the right to look to proceeds of avoidance actions but

12  only after entry of a final order.

13        THE COURT:  Okay.

14        MR. WAITE:  We are making adequate protection

15  interest payments.  Those payments are being made -- will be

16  made on a monthly basis at the LIBOR rate plus seven and a

17  quarter percent.  We are, for purposes of the adequate

18  protection payments, putting a collar around the LIBOR rate.

19  It won't go below four or above five.  That is slightly

20  different than the terms of the existing agreement under the

21  forbearance agreement which provides for the LIBOR to float,

22  but what we were doing here is setting our adequate protection

23  payments.  That is not going to be binding in terms of what the

24  ultimate claims of the lenders are.

25        So if currently the LIBOR rates, as I understand it,

**J&J COURT TRANSCRIBERS, INC.**

1  that are in effect for the loans -- they reset on a period

2  basis.  The current rates are in excess of four percent.  I

3  understand recently the rates have fallen, and when those

4  reset, it's possible the rate will be set at a lower rate, but

5  this just sets our adequate protection payments, all rights on

6  the underlying claim, and how the adequate protection payments

7  get applied would be reserved.

8          Now, I want to -- with respect to the roll up, again

9  we're not seeking approval of that today.  I do want to make

10 one note though for the record.  I am going to be filing an

11 amendment to the motion.  In reviewing it last night and

12 preparing for the hearing and the discussions, I realized that

13 a statement that I had made in there may have been a little

14 broad, and I wanted to clarify it.  We had made reference to

15 the fact that in the roll up -- the interest rate on the

16 rollover piece would be the same as the pre-petition rate,

17 because the DIP facility has this built-in collar around the

18 LIBOR.  That statement was not entirely correct if, in fact,

19 the LIBOR rate floats above or below four or five percent.  So

20 the rollover piece could have a rate that's slightly higher or

21 slightly lower depending where the LIBOR --

22          THE COURT:  On where LIBOR lands.

23          MR. WAITE:  -- is at a different time.

24          THE COURT:  Okay.

25          MR. WAITE:  So just to avoid any doubt, I wanted to

1  let the Court know that we're going to file a correction and

2  make that clear.

3          THE COURT:  Okay.

4          MR. WAITE:  Your Honor, there's additional adequate

5  protection we're providing that we're going to pay the fees of

6  the pre-petition lenders' professionals again with respect to

7  the Blackstone success fee piece.  That is being deferred to a

8  final hearing.

9          THE COURT:  And those fees are subject to submission

10  of an invoice to the U.S. Trustee and the Committee once

11  appointed.  Correct?  And the debtor.

12          MR. WAITE:  Yeah, I'll have to -- we made some

13  changes to the order to clarify the rights of the U.S. Trustee

14  to receive invoices for both the DIP lenders fees and the pre-

15  petition lenders' fees.  I believe we've added the Committee.

16  If not, I don't think there's any objection to adding the

17  Committee to receive notice of those invoices, but I'll let Mr.

18  Seider address that when we get to the order.

19          THE COURT:  Okay.

20          MR. WAITE:  Your Honor, the debtors have an immediate

21  need for the financing provided by this facility, and we're

22  asking the Court today to provide this interim relief, so that

23  we can calm the nerves of our vendors and make the payments

24  that the Court has just authorized and which the Court

25  recognized are critical to this debtor and normalize our trade

1 relationships.

2        Your Honor, given the substantial amount of existing

3 secured debt that is in the -- on this company, it was

4 unrealistic to expect that we would be able to find funding on

5 an unsecured basis on just an administrative priority basis or

6 even on a junior secured basis other than possibly from some of

7 our existing holders of the senior notes who were already up to

8 speed on the process and had a vested interest in the company.

9        Your Honor, as we mentioned in our papers, we did

10 receive a proposal from certain of the senior noteholders just

11 a few days before the filing to provide a junior DIP facility.

12 The debtors evaluated -- carefully considered that proposal.

13 Unfortunately, the proposal didn't provide sufficient funding.

14 The proposal when it came obviously indicated -- well, it did

15 indicate that they were willing to work with us on terms, and

16 we made ourselves available.  There just simply wasn't

17 sufficient time between the time we got that proposal and the

18 need to file these cases to advance those discussions.  So at

19 the time of the filing of this case the only facility that's

20 available to the debtors is the one that we're seeking approval

21 of today.

22        Your Honor, also in connection with our effects to

23 secure DIP financing, the debtors through their investment

24 banker, Houlihan Lokey, did contact multiple parties.  No

25 lender was willing to provide financing junior to the existing

financing. Those lenders who were contacted were large

institutional lenders who would've had the ability to

essentially take out the existing financing and provide new

financing. We thought that was required in light of the

existing lenders refusal to agree to be primed by a third party

lender, which is not uncommon, and the debtors determined that

it was not advisable to proceed down a path of a contested

priming fight on the first day of these cases when the goal

here is to stabilize our relationships with our vendors and not

spend the first two weeks of these cases engaging in a

valuation fight in connection with our priming DIP facility.

So, Your Honor, under the circumstances, the DIP

lenders proposal is the only option and the best option

available for the debtors. We negotiatd at arm's length the --

I can tell the Court discussions were long. They were

difficult. They went late into the night. There was give and

take on both sides, and at the end of the day the debtors'

believe that we had got the best terms we can under the

circumstances. We believe the facility provides a reasonable

amount of flexibility to the debtor. It provides the amount of

funding that it needs and will enable the debtors to move

forward and hopefully restructure the debt once we've

stabilized the vendor relationships.

Your Honor, I want to just briefly run through the

Local Rule 4001 requirements. We've set this forth in the

1  motion.

2          THE COURT:  I saw that.

3          MR. WAITE:  I'm happy to elaborate on it.  If Your

4  Honor's fine with the explanation in the motion --

5          THE COURT:  No, I've reviewed the motion, and,

6  obviously, I'm familiar with Local Rule 4001, and I saw the

7  disclosures regarding the items that require specific

8  disclosure to the Court.  So you don't need to walk through

9  each one of them.  I gathered that.

10          MR. WAITE:  Okay.  Your Honor, we -- as Ms. Morgan

11  indicated at the beginning, we did provide drafts of the DIP

12  papers to the U.S. Trustee's Office on Monday.  We had

13  discussions with Ms. Leamy yesterday morning, went through her

14  issues, and had further discussions with her last night

15  including with the lenders, and we've made a number of changes

16  to the order which I'd like to walk through shortly.  I know

17  the bondholders have some comments and some objections.  I know

18  there's some landlords here who have issues with certain

19  provisions in the order, and I understand there's a PACA

20  claimant who has come clarifications.

21          THE COURT:  Right.

22          MR. WAITE:  I don't know if there's anybody else.

23  Before we turn to the objections, what I'd like to do is make a

24  proffer based upon my discussion with the objectors that I'm

25  aware of.  None of them have any interest or expressed an

1 interest in cross examining Mr. Burian, and if that is the

2 case, I'd like to proceed with the proffer.  I just wanted to

3 check and make sure no one has any interest in cross examining.

4          THE COURT:  Okay.  Well, they'll have an opportunity

5 to cross examine after the proffer.  Does any --

6          MR. WAITE:  Exactly, Your Honor, but I --

7          THE COURT:  Does anyone oppose it?  Does anyone

8 object to a proffer?

9          MR. WAITE:  If anyone's planning out of the box, I

10 would put him on the stand to begin with, Your Honor.

11          THE COURT:  Okay.  Does anyone wish to cross examine?

12 Obviously, their rights are reserved pending the results of the

13 proffer.

14          MR. WAITE:  I understand, Your Honor.

15          THE COURT:  Okay.

16          MR. WAITE:  I understand.

17          THE COURT:  Why don't you proceed with your proffer?

18          MR. WAITE:  Okay, Your Honor.  Thank you.  Your

19 Honor, if Mr. Burian was called to testify, he would state that

20 he is currently employed by Houlihan Lokey as a Managing

21 Director in the Financial Restructuring Group.  He assists

22 clients with restructuring issues including finding sources of

23 financing in distress situations.

24          He graduated with honors in economics from Yeshiva

25 University and received his J.D. from Columbia University

1  School of Law in 1988.  Prior to joining Houlihan he was a

2  partner of the New York law firm of Kramer Levin and

3  specialized in the area of creditors rights in bankruptcy.

4  While at Kramer he represented a broad spectrum of clients in

5  both in and out of court restructurings and bankruptcies

6  including bank lenders, debtors, creditors committees, and

7  secondary purchasers of distressed paper.

8         Since joining Houlihan in 2001, Mr. Burian's clients

9  have included, among others, Timko Aviation, Avery Way

10  Electronics, High Voltage Engineering, HQ Global Workplaces,

11  Marcal Paper, Outsourcing Services Group, among others.  He's

12  also handled a significant number of creditor side engagements

13  including the Official Creditors Committee of Magellan Health

14  Services and Winn Dixie Stores.

15         He would testify that part of his on a day-to-day

16  basis includes regularly providing advice to clients, talking

17  to potential financing sources, monitoring other deals

18  involving distressed financing, and generally staying current

19  on what is happening in the distress lending market.

20         Mr. Burian would testify that he was retained by the

21  debtors pre-petition to assist with the restructuring issues,

22  including, among other things, seeking to restructure or

23  refinance the company's current debt facilities and to arrange

24  DIP financing to the extent ultimately required by the debtors.

25  He would testify that during his engagement by the debtors he

has become familiar with the debtors operations and financing

needs.  He would describe the debtors' business in general

terms as operating 600 plus family style steak buffet

restaurants in 42 states around the country with approximately

36,000 employees.  Each location prepares its own food for

service on site, and as a result, it is necessary to have

numerous vendors deliver product often -- often as four times

-- four or more times weekly.  If the debtors are unable to pay

their vendors, the debtors believe they will not be able to

received sufficient shipments of food supplies to adequately

operate some or all of their restaurants.

He would testify that Thursday and Friday are big

delivery days for the debtors' restaurants providing many of

the supplies that they need for the weekend business.  The

trucks that make deliveries on Thursdays are generally packed

Wednesday night, so that the deliveries can be made starting on

Thursday.  He would testify it is, therefore, critical to the

debtors' operations that interim DIP financing be approved as

soon as possible, so that the initial draw can be funded, and

the debtors can wire out necessary funds to their vendors.

Mr. Burian would testify that the debtors are

borrowers under the existing $640 million credit facility with

Credit Suisse as administrative agent.  He would also testify

that pre-petition -- the pre-petition lenders of certain liens

on all or substantially all of the debtors' assets, including

1  cash collateral, is his understanding that the debtors do not

2  have unencumbered cash with which to operate their businesses

3  and, therefore, need the use of cash collateral.  The debtors

4  also have an immediate need for additional liquidity which can

5  only be obtained through an additional secured debtor in

6  possession financing facility.

7          Late in 2007 he would testify that debtors determined

8  that one or more events of default were soon going to occur

9  under the existing credit agreement.  Those anticipated events

10  of default included violations of the interest coverage ratio

11  and the maximum coverage ratio -- actually, the maximum

12  leverage ratio, Your Honor.

13          In addition, he would testify that the debtors

14  determined there was a strong possibility that they would fail

15  to make the January 1st interest payment to the senior notes.

16  Mr. Burian would testify that the debtors entered into a

17  forbearance agreement as of January 7, 2008 following a

18  rigorous, protracted, and arm's length negotiations with the

19  pre-petition lenders.  The amendments to the pre-petition

20  credit agreement included an increase in the applicable

21  interest rate by four percent and four and a half percent

22  respectively, depending on the type of loan and eliminated the

23  two percent default rate provided that the debtors submitted a

24  business plan to the lenders no later than January 15th.  Such

25  business plan was timely provided.  As a result of the

amendments to the current interest rate under the existing is
LIBOR plus seven and a quarter, which is currently 11 and a
quarter, two percent above the previous default rate.

In connection with discussions with the pre-petition
lenders regarding the forbearance agreement, the debtors also
engaged in discussions regarding a debtor in possession
financing facility.  Mr. Burian would testify that he was
directly involved in negotiating the DIP financing along with
the company's management and the debtor's other professionals.
He would describe those negotiations as rigorous, protracted,
and at arm's length.

Mr. Burian would describe the DIP facility as
consisting of two loans of equal terms, and he would testify
that the description I previously gave the Court regarding the
breakdown of those loans is an accurate description.

Mr. Burian would testify the debtors have an
immediate need for the use of cash collateral and an immediate
need for the DIP financing.  He would testify that he was
involved with the preparation of the DIP budget together with
members of management and the debtors' restructuring advisors,
Kroll Zolfo Cooper.  He would testify that the budget was
prepared in light of recent trends and takes into account
anticipated impact of the Chapter 11 filing and potential
vendor disruptions.  He would testify that the debtors believe
that the $30 million interim DIP borrowings will provide the

1  debtor with sufficient liquidity to work through those

2  anticipated vendor issues and to sustain some degradation in

3  the business in the early days of the cases.

4       He would testify that it is his belief that the

5  debtors presently have no other viable option for adequate DIP

6  financing.  The difficulty of obtaining distressed debt in the

7  marketplace is reflective of current market conditions and

8  Buffets' recent performance.

9       Mr. Burian would testify that his firm contacted

10 numerous funding sources and investment banks to see if they'd

11 be interested in providing financing.  Those institutions were

12 selected because they were large enough and sophisticated

13 enough to be able to provide the size of the financing needed

14 in the time frame needed.  Of those contacted, he would testify

15 that four signed confidentiality agreements and conducted some

16 level of due diligence.  None expressed an interest in doing a

17 junior DIP or takeout financing except in the context of a plan

18 of reorganization and a large infusion of additional equity.

19      Additionally, based upon discussions, he believes

20 that none of the -- those parties were interested in lending

21 into a priming fight.  The current lenders, however, refused to

22 be primed by a third party lender.  He would further testify

23 that the debtors determined that entering these cases seeking

24 approval of a contested priming DIP was too risky and not in

25 the best interest of the estates.  He would testify that he

agreed with the debtors' conclusion in that regard.

In addition, he'd testify that prior to the petition date an unofficial noteholders committee was formed consisting of holders of approximately 84 percent of the outstanding senior unsecured notes. He would testify that the unofficial noteholders committee retained Alvarez and Marsal and Kramer Levin as financial advisors and counsel, and that the company agreed to pay the fees of those professionals. He would testify that the debtors and their advisors, including himself, provided substantial amounts of information and due diligence to the advisors, to the unofficial noteholders, and kept them apprised of the debtors' financial situation. Because the members of the unofficial noteholders committee were well along in the learning curve, they already had a financial investment in the debtors, and they represented a good cross section of investment funds. He believes that the best opportunity that the debtors had for an alternative DIP facility would've been from one or more of such lenders.

He would testify that a junior DIP facility proposal was made by certain of those holders. He would testify that he reviewed and evaluated that proposal along with the debtors' management and other advisors and determined that it did not satisfy the debtors' needs in terms of amount and duration. He would testify that the debtors appreciated the effort made by such noteholders and advised them that the debtors and their

1  advisors would make themselves available to discuss a revised

2  proposal that would satisfy the debtors' needs if one were

3  made.  In the short time remaining before these cases were

4  filed, no alternative proposal was forthcoming.

5        Finally, Mr. Burian would testify that he believes

6  that taken as a whole the terms of the DIP facility are fair

7  and reasonable under the circumstances, are reflective of

8  current market conditions in a distressed debt market.  It's

9  his belief that the debtors' entry into the DIP facility and

10 agreement to the terms of the proposed interim financing,

11 especially in light of the present unavailability of other

12 adequate financing and the potential devastating effects to the

13 debtors' business if it does not obtain financing, that

14 approval of the DIP facility and entry of the interim order are

15 in the best interest of the debtors and the debtors' estates.

16 that would conclude Mr. Burian's testimony.

17        THE COURT:  Okay.  Does anyone wish to cross examine

18 Mr. Burian?

19              (No verbal response)

20        THE COURT:  Very well.  I'll accept the proffer.

21        MR. WAITE:  Thank you, Your Honor.  At this point I

22 think we have the order to turn to, unless Your Honor has any

23 specific questions.

24        THE COURT:  No, I have comments on the order but --

25        MR. WAITE:  Maybe what may make sense is to hand up a

**J&J COURT TRANSCRIBERS, INC.**

1  black line of the order to show the changes that we've made

2  based upon discussions, and then we can proceed with the

3  objections one by one.

4         THE COURT:  Very good.

5         MR. ECKSTEIN:  Your Honor, before leaving the

6  evidence, I had indicated to Mr. Waite before the hearing that

7  given the fact that today was an interim hearing and given the

8  fact that, as we had just put it, the issues that we think are

9  really most contested are going to be deferred, that we were

10  going to not seek to --

11         THE COURT:  Can you get to the microphone, please?

12         MR. ECKSTEIN:  We were not going to cross examine a

13  witness today.  I didn't want the failure to cross examine to

14  be deemed a waiver of the rights that we are preserving for the

15  final hearing.  In the event this is ultimately not resolved

16  consensually, then we would expect that there would be an

17  evidentiary hearing, and at that point in time there wouldn't

18  need to be cross examination, whether it's of Mr. Burian or any

19  other witness, and I want to make sure that we're preserving

20  those rights.

21         THE COURT:  Sure.  Okay.  Anyone have a position with

22  respect to that?

23         MR. WAITE:  Of preservation of rights, Your Honor?

24  This is the nature of an interim hearing, and as is typical of

25  many of the issues that are in an interim DIP order are re-

**J&J COURT TRANSCRIBERS, INC.**

1 raised at a final hearing, we understand a number of the issues

2 he has aren't even provided for in the interim order, and we

3 recognize his reservation of rights.

4 THE COURT: And I think it makes sense as well. I

5 have accepted the proffer, but that obviously does not make

6 that the law of the case by any stretch, and I expect if the

7 issues are not resolved, that Chief Judge Walrath will have an

8 opportunity to conduct a fulsome hearing on a full evidentiary

9 record.

10 MR. WAITE: Understood, Your Honor.

11 THE COURT: Okay.

12 MR. WAITE: Let me get a black line copy of the

13 order.

14 THE COURT: Please.

15 (Pause)

16 MR. WAITE: Let me feed the masses, Your Honor.

17 THE COURT: Very well.

18 (Pause)

19 MR. WAITE: May I approach, Your Honor?

20 THE COURT: Please. Thank you.

21 MR. WAITE: I think Your Honor will find that most of

22 these changes are probably changes you've seen before in other

23 orders. Flipping through the black line, on Page 9 there's

24 just a couple cleanup typographical corrections.

25 THE COURT: Okay.

1    MR. WAITE:  On the top of Page 10 language has been
2  added to provide that the DIP lenders' professional fees
3  invoices will be sent also to the U.S. Trustee, and they'll
4  have ten business days to object, and there's language added
5  that makes it clear that Blackstone engagement letter of the
6  restructuring fee is subject to entry of a final order.

7    THE COURT:  Well, let me ask a question, because I
8  think I see a disconnect or it seems to be invoices go to the
9  debtors with copies to counsel to any statutory committee and
10  the Office of the U.S. Trustee, and that the debtor shall
11  promptly pay all reasonable fees and expenses not subject to
12  objection by the Office of the UST.  Obviously, a committee,
13  once appointed, is going to be getting copies.  Will they have
14  the right to object or to be heard with respect to the lenders'
15  counsel fees?

16    MR. WAITE:  One moment, Your Honor?

17    MR. SEIDER:  May I be heard, Your Honor?

18    THE COURT:  Certainly.  Mr. Seider, welcome back to
19  Wilmington.

20    MR. SEIDER:  Thank you, Your Honor.  It's a pleasure
21  to be here.  For the record, Mitchell Seider of Latham and
22  Watkins on behalf of Credit Suisse as administrative agent
23  under the debtors' proposed senior secured and super priority
24  debtor in possession lending facility.

25    In response to Your Honor's question, at this time it

1   is contemplated that only the UST would have the right to

2   object to the fees -- the reasonable fees and expenses of the

3   DIP lenders' professionals.  For the record, Your Honor, the

4   reason for that is we believe that in a credit agreement that

5   was done outside of the court where new money was being

6   provided, it would be standard for the borrower to pay the

7   fees, and that there would not be a right reserved for the

8   borrower to object to those fees.  Again, as Your Honor's

9   pointed out, this is an interim hearing.

10          THE COURT:  I understand.  Ms. Leamy.

11          MS. LEAMY:  Your Honor, Jane Leamy for the U.S.

12  Trustee.  I just wanted to make clear there were extensive

13  discussions with the debtor and the lenders regarding the

14  order, but I did request that the committee be added to this

15  provision, and there are certain other areas in the order where

16  I think there is still -- it's not clear that there's

17  agreement.  It may just be that the changes weren't made, but

18  how we -- I don't know if Your Honor would prefer to address

19  those at the end of the presentation of the order?

20          THE COURT:  Here's what I'd like to do, so that we

21  don't get bogged down.  I understand your point.  And why don't

22  we go through the order?  We'll note those issues that remain

23  at least in discussion or that may require some ruling by me

24  for purposes of today.  Those that can be held in abeyance for

25  a further hearing I think we'll be able to identify them.  But

1  I'm not going to walk through this and rule line by line,

2  because some of these issues I think -- I want to understand

3  the full order and the resolutions that have been made, and

4  then we'll walk through.  So we'll just note that we have an

5  issue on Page 10.  Okay?

6          MS. LEAMY:  Thank you, Your Honor.

7          THE COURT:  Mr. Eckstein.

8          MR. ECKSTEIN:  Your Honor, would you prefer me to

9  save my remarks on the Blackstone issue until I address the

10  motion generally or --

11          THE COURT:  Sure, I think that probably makes sense.

12          MR. ECKSTEIN:  Fine.

13          MR. WAITE:  I'm not trying to cut off anyone's

14  objections here.  I just thought I would go through the order

15  and get out the changes we've made, so we can --

16          THE COURT:  I have all day.

17          MR. WAITE:  You have all day.  We don't, Your Honor.

18  We want to get our --

19                  (Laughter)

20          MR. WAITE:  Your Honor, the next change appears on

21  Page 12, and this is just the change I mentioned earlier to

22  make it clear that with respect to the ability of the

23  superiority administrative claim to look to avoidance actions

24  that's subject to entry of a final order.

25          THE COURT:  Okay.

1          MR. WAITE:  I believe that language change was

2      satisfactory to the U.S. Trustee's Office.

3          Flipping back to Page 18, this is Paragraph 8(c).

4      This is the provision that provides for automatic relief from

5      the automatic stay upon an event of default.  We've made some

6      modifications at the request of the U.S. Trustee's Office

7      changing it to five business days, making clear that the notice

8      was written notice, and that in addition to the debtors, the

9      notice will go to counsel to a committee or -- and to the

10     Office of the United States Trustee.

11         THE COURT:  Okay.

12         MR. WAITE:  Your Honor, turnign over to Page 20 at

13     the bottom, Paragraph 9, again language has been added

14     regarding objection rights of the United States Trustee to fees

15     of the lenders' professionals, and also reference is made to

16     the Blackstone engagement letter.  I suspect that Ms. Leamy has

17     the same issue there as on the other provision back on Page 10.

18         THE COURT:  I understand.

19         MR. WAITE:  I apologize.  I keep pronouncing her name

20     incorrectly.  Your Honor, turning over to Page 27 --

21         THE COURT:  Okay.

22         MR. WAITE:  -- again there was language in the

23     original order that provided notice and an objection period

24     with respect to the fees and expenses of the pre-petition

25     lenders.  It was a five-day period.  That's been modified to

1    make it ten, as the others, and it applies to both the

2    Committee and the United States Trustee's Office.

3              THE COURT:  Okay.

4              MR. WAITE:  And, Your Honor, turning over -- turning

5    over to Page 39, and I apologize for the order being so long,

6    we've made a -- added language to provide that the provision

7    regarding the lenders not being deemed a responsible person is

8    subject to entry of a final order.  And then there's a minor

9    change in the -- Paragraph 22, which is a clarification.

10             Those are the changes that we have made thus far.

11   Again I know we do have some objections outstanding.  I believe

12   the objections, other than I know some reservations of rights

13   that Mr. Eckstein, largely relate to provisions in the order.

14             THE COURT:  Okay.

15             MR. WAITE:  And I don't know -- we can take them in

16   any order the Court would like.

17             THE COURT:  Why don't we -- Mr. Eckstein, shall we

18   take your comments and issues?

19             MR. ECKSTEIN:  Your Honor, thank you.  While I

20   appreciate Mr. Waite's attempt to characterize our comments as

21   reservations of rights, I'm not sure I would necessarily put

22   them in the same light.  Your Honor, I think any party in this

23   room who was unclear as to exactly where our economy stood

24   needs a little look at this case to really get a pragmatic

25   sense I think of where the economy has evolved to over the last

several months.  I'm not going to necessarily ascribe a word to it, but I think what's happened in this case is a very practical sort of result of a lot of events that have taken place over the last several years, and this case is an interesting indication of it.  I read in the Wall Street Journal yesterday that there's, in fact, estimated to be $150 billion of leveraged debt in the marketplace right now, and I would suggest that what we're dealing with today is a little bit less than one percent of that leveraged debt.  And I tihnk what's taking palce today may well be a roadmap for the way in which we deal with a mountain of leveraged debt that's outstanding, but I understand that what's relevant to Your Honor today is the Buffets' leveraged debt.

A little more than a year ago, as Your Honor understands, this company was projecting extremely robust health.  It was estimating it was going to have an EBITDAR of in excess of $200 million annually, and based upon those projections it entered into a merger of Buffets and Ryan's, and in connection with that merger undertook a series of far reaching financing transactions.  One was a financing transaction with the lenders for approximately $650 million of debt that included a revolver, a term loan, and $70 million of letters of credits, $300 million of senior notes that were issued into the public, and approximately $567 million of sale leaseback financing led by Fortress Drawbridge in which the

company transferred approximately 285 of its individual

facilities to Fortress as part of a complex transaction in

which it was leased back to the company for a 20-year period

with hell or high water leases that required the company in the

aggregate to pay $58 million a year in what are referred to as

lease payments.  Now those lease payments, in fact, happen to

provide, based upon the amount that was financed, approximately

10.15 percent of an annual rate of return fixed for 20 years.

Those various financing transactions provided the

funds to effectuate the Ryan's acquisition.  They paid

approximately $700 million to the Ryan's shareholders.  It

repaid a variety of Buffets' existing financing facilities.  It

involved the payment of about $46 million of fees including

approximately $18 million to the equity sponsor, all of which

was viewed as being appropriately reasonable based upon

projections that this company was going to operate in a robust

fashion and was going to have a platform for growth.

Unfortunately, only a few months after those transactions

closed it began to become apparent, at least to the company,

that the projections were not achievable.

And, as Your Honor heard, over a period of months,

the company decided that it needed to go out and engage outside

professional advisors who were expert in restructuring advice,

and that led to this November.  The company decided that it

needed to deal both with its lenders and with its noteholders

1 about the possibilities of restructuring the balance sheet.

2        As Your Honor correctly noted when we were talking
3 about the critical vendors motion, this case is a financial
4 restructuring case, and I think more than ever because of the
5 recent amendments to the Bankruptcy Code, that's going to be
6 true I think in many of our bankruptcy cases.  We're going to
7 be dealing with financial restructurings at the beginning of
8 the case.  We're going to be figuring out ways to by and large
9 resolve the rights of the trade, and we're going to be left
10 with a need for the financial parties in the case to come up
11 with a restructuring.

12        In my view, Your Honor, that puts tremendous burden
13 on the Court to determine what is the appropriate balance to
14 put in place on the first day of the case, so that the pre-
15 petition rights of the respective parties can be maintained
16 until the parties can embark upon an appropriate restructuring.
17 And the thrust of the concerns that we have with this DIP
18 transaction does not go to whether the company needs the money.
19 We are not contesting the fact that the company needs some
20 additional cash in particular to deal with the trade.

21        What you didn't hear in the proffer, Your Honor, was
22 any breakdown into exactly what the company needs the funds
23 for.  We do I think have a pretty clear sense that the
24 company's going to need to pay 35 or 36 million dollars over
25 the next several days in order to deal with critical vendors

**J&J COURT TRANSCRIBERS, INC.**

1  and 503(b)(9) claimants and PACA claimants and hopefully

2  stabilize the trade, and I think the goal of the company is

3  that in the next not several days, several days that the trade

4  will be restored, and much of that 35 to 40 million dollars

5  that has gone out the door will, in fact, come back to the

6  company once the trade is restored.  And, in fact, when Your

7  Honor looked even at the 13-week cash flow, Your Honor

8  correctly pointed out that, in fact, the projected balance of

9  cash grows quite significantly, so that there will be $35

10 million of cash balance 13 weeks out, and hopefully when Your

11 Honor sees or when the Court sees the updated budget, the Court

12 will see that there will be an even greater cash balance being

13 built with one exception.

14        There are two remaining problems that are going to be

15 left in this case when you think about it.  One is how much

16 interest is this company going to pay during the pendency of

17 the Chapter 11 case, and how much is this company going to pay

18 in fees and expenses?  And I don't mean to be simplistic, but I

19 think that's what this case is going to come down to but for

20 maybe the main event, which is ultimately the financial

21 creditors in this case sitting down and figuring out whether

22 they can come up with a negotiated restructure of the balance

23 sheet.

24        And as Your Honor heard, the bondholder group

25 actually had done its due diligence over a period of four to

1  six weeks, and recognizing that it needed to move actually made

2  an affirmative proposal to the company which delivered to the

3  lenders only a week -- maybe a wee/ten days ago in which the

4  bondholders offered to refuse significant new capital on the

5  junior level to this company which would've been used to pay

6  down the banks in part, coupled that with projected proceeds

7  from asset sales, and which would've provided for what we

8  believe was a basis to achieve a restructured bank facility.

9  And it contemplated that ultimately the bond debt was going to

10  have to be significantly restructured, and in all likelihood we

11  would anticipate converting the bond debt to equity in this

12  case or at least structured in the way that it was going to be

13  junior to the bank debt.

14          Now, I believe that that was viewed as a constructive

15  proposal.  In fact, a very significant proposal.

16  Unfortunately, it did not have the opportunity to mature.  And

17  so we -- the bondholders are now, as a practical matter, faced

18  with the fact that instead of having the ability to come into

19  bankruptcy with a timetable that was going to work and with a

20  structure that we could rely on, that would've ideally also

21  included hopefully an agreed upon debtor in possession

22  financing structure.  We are faced with a very different

23  situation.  We're faced with extremists now with the trade.  We

24  are faced with a mounting projection of new debt service

25  obligations, and that really causes us to have to turn now to

the issue of the DIP, because the question is what is the
impact of the DIP going to be on the ability to achieve a
consensual restructuring, because as a practical matter, if we
take too much value out of this company, it's going to make it
harder and harder for somebody to be motivated to make a new
investment in this company, which is really what's going to be
needed for everybody to achieve a consensual restructuring, and
I would submit the banks as much as the bonds are motivated to
have a successful restructuring that involves an infusion of
capital.

The other item that I'll point out, Your Honor, that
we all need, and if the banks and the bonds both need it, they
need a company that has the wherewithal to invest in itself.
This company relies upon capital expenditures.  You didn't hear
those details either from the proffer, but the fact of the
matter is one of the major variables for this company is does
it maintain the facilities.  Does it really vest in these 600
locations?  As Your Honor well knows, there's a lot of traffic
that goes in and out every day, and if you don't maintain your
facilities, your facilities run down, and if -- the same way if
the food is not good, people don't come back.  If the facility
is not kept up, there are other alternatives.  And so funding
capital expenditures is important in order to maintain this
franchise, and every dollar that goes out of this company is
going to be a dollar less that's going to be invested in the

1    capital expenditures that are needed to maintain let alone to

2    grow this business.

3         Now, with that having been said, one last point that

4    Your Honor's heard about that maybe is worth mentioning.  We

5    have an additional complication here, because in some respects

6    this DIP might have been easy or at least easier have we not

7    had sort of the injection of this forbearance agreement.

8    Unfortunately, ten days ago the company entered into a

9    forbearance agreement which was I'm assuming at least intended

10   or the hope was that it was going to give the company

11   significant running room in order to be able to stabilize,

12   negotiate, and either avoid Chapter 11 entirely or at least

13   come into Chapter 11 with a negotiated restructuring.

14        Now, Your Honor did not hear that that forbearance

15   really did not provide the company with new funding sources.

16   It was de minimis expansion of its availability.  There was a

17   fee of $1.5 million paid, but, essentially, the company agreed

18   to essentially timetables that maybe gave it 30 to 45 days as a

19   practical matter.  The problem with the forbearance agreement

20   is that it involved a radical -- a radical increase in the

21   interest rate.  The bank interest rate, as Your Honor has

22   heard, was LIBOR plus three or three and a quarter depending

23   upon the facility.

24        Overnight on January 10th all of a sudden the company

25   found itself paying LIBOR plus seven and a quarter.  That's not

a minor change.  That is four percent on $580 million of outstanding debt plus the letters of credit.  That is basically four percent on approximately $600 million.  Round numbers is about $25 million a year of additional interest for the privilege of letting the company try to have the banks and the bonds sit down and have a conversation.

As you heard from the debtors' presentation, the effect of a forbearance agreement was to ultimately accelerate the one on the trade, and by announcing the forbearance agreement, the ink had not dried when the company finally realized that whatever vestige of trade credit was there was gone, and the response that we received to our proposal was very interesting response, very constructive, but we don't have time to deal with it.  We have to file.

Aside from the frustration, Your Honor, that my clients feel, the fact of the matter is the forbearance agreement, whether we like it or not, was a distraction, and largely a waste of time and a waste of resources, because the fact of the matter is the pre-petition agreement that was in effect from November, 2006 until January 10th was LIBOR plus three or three and a quarter.  And it is our submission, Your Honor, that for purposes of determining what is the appropriate adequate protection -- and I'm not talking about what's the appropriate rate for the new money.  The new money is a negotiation.  There's an issue about what people will loan new

1    money is.  But the question is what is the appropriate rate for

2    adequate protection?  How much should the pre-petition lenders

3    receive in order to satisfy Section 361?  Three sixty-one says

4    one of the forms of adequate protection is periodic payments,

5    and the question is what is the appropriate periodic payment

6    here.  And the Court has discretion to determine the

7    appropriate periodic payment, and the case law on the issue --

8    the <u>Swedeland</u> case and others -- says that the Court looks to

9    the pre-petition contract rate.

10            It's our submission, Your Honor, that when this Court

11   looks at what is the appropriate payment to be made day one of

12   the case -- and that may be different from what the appropriate

13   payment would be at confirmation for purposes of satisfying a

14   payment in full.  But for purposes of paying adequate

15   protection, we would submit the appropriate payment is to look

16   to the rate that the parties had bargained for when the

17   original financings were put in place, and the forbearance

18   agreement that was inked ten days ago is not the appropriate

19   standard, and it's certainly not appropriate to increase the

20   bank interest rate on all of the pre-petition debt from what

21   essentially is $40 million a year, which is LIBOR plus three or

22   three and a quarter, to what effectively is going to become $75

23   million a year for the pre-petition debt plus the new money.

24            If you think about what's happening, this company

25   today, based upon recent results -- and again you didn't hear

all the details yet, but roughly speaking -- and I think at
this point in time we have a fairly good understanding of the
numbers -- the EBITDA that this company is reflecting is let's
call it between 95 and 100 million dollars a year.  Hopefully,
that is going to be significantly better once the trade comes
back in over the next 60 to 90 days.  We're hoping that this
company's going to be able to start to show significantly
better performance, but today it's between 95 and 100 million
dollars.

        And granted, the company's had a lot of issues with
weather, and the economy has been causing skittishness and the
like, but the fact of the matter is we still have a business
that's throwing off $100 million of EBITDA.  Now, we should
appreciate $100 million of EBITDA means they're paying all
their operating expenses.  They're paying $58 million a year in
respect of their sale leaseback financing.  After paying both
of those expenses, which are the major expenses, they're left
$100 million.  They're no longer paying the bonds a penny.  The
bonds are getting nothing right now.  So we're basically
sitting there.

        The banks under their contract would've gotten
approximately $40 million a year.  Now that would leave the
company under that -- and let's assume you add $10 million a
year for the new money.  I'm using round numbers just for
illustrative purposes.  That would be $50 million a year.  That

would be $50 million a year of cushion. That's the amount of additional cash over and above the bank interest that is available either to protect the banks and to pay capital expenditures. That's a pretty decent amount of money to operate with.

All of a sudden you say, well, what -- how much does this company really need to borrow going forward. And the fact of the matter is once the company has restored its trade and it's gotten back its $35 million that it paid out over the first couple of days, most of that $35 million is going to get repaid, and you'll pay down the bank loan. And then what do you have to pay back? You're either going to pay the excess interest that the banks are going to require for adequate protection to the extent its awarded, and you're going to pay professional fees and expenses to basically operate this Chapter 11 case.

Now, not to make the Blackstone issue the primary issue, because it's not the primary issue, but we are concerned about making sure that we don't knee jerk into excessive fees. We understand Blackstone is clearly not working for free, and we know that they're going to have a monthly fee, and the monthly fee is going to have to be determined at the end of the day. I believe the Committee's going to know it. The Court's going to know it, and once we all know it, and unless people are going to be objecting, we're assuming Blackstone, as is

other professionals, will be getting a monthly fee, and we

assume it'll be subject to a final application to the

Bankruptcy Court.  But once the fee is established, that's

normally not controversial, but understanding what kind of,

quote, success fees are going to be paid in this case -- and,

you know, success is an interesting word, because when we got

into this case, I don't even want to say where the bonds are,

and I don't want to say where the banks were, but I can promise

you they were dramatically higher in value than they are today.

So the question is where do you measure success from maybe is

the interesting question.

But I think it's appropriate at least to know that

the right focus of potential investors in this case is how much

excess interest is paid and how much fees are paid.  That's

really what we -- that's all we can control right now, because

we've all I think agreed that the company needs to operate its

business, and we want it to operate its business, and that's

not where they should be skimping.  Where they need to be

vigilant is on excess interest and on expenses.

Now, the reality is the excess interest is where the

action is.  A little change -- let's take, for example, the

little change that was made over the weekend, because we had

not seen it even in a forbearance agreement, as you've heard.

All of a sudden, it's not good enough to pay LIBOR plus seven

and a quarter.  That's no longer good enough, because realize

1  ah hah, LIBOR is going to go down.  So we're going to fix LIBOR

2  now at four.  Now that's a change.

3          THE COURT:  Let's collar it between four and five.

4          MR. ECKSTEIN:  Collar it between four and five, but

5  in all due respect --

6          THE COURT:  It's going down.

7          MR. ECKSTEIN:  -- knowing full well exactly the

8  thought process that goes into the computation, the collar is

9  being created, because people understand that there's a real

10 significant chance that by the time the company gets to the

11 adjustment at the end of February, LIBOR is not going to be at

12 3.3, which is where it is today.  It'll be at 2.3 or maybe at

13 1.75.  That's a benefit that the company has in its contract,

14 and if we think about it, every single percentage point is five

15 to six million dollars.  That little adjustment -- that little

16 collar could cost the company five to six million dollars

17 percentage point.  That means if LIBOR drops to two and a half,

18 that's almost $10 million there, just that little adjustment.

19          Respectfully, Your Honor, we don't have the ability

20 to just move $10 million around, because it was there to be

21 done.  Now, the problem is -- I respect the company.  The

22 company says we tried, and nobody agreed.  Okay.  I -- and

23 that's -- that's not the first time we heard that in a DIP

24 hearing.  In fact, I've never been to a DIP hearing where

25 that's not the predicate for the motion.  That's the predicate

for the motion, and that's the reason why we have this process.

And I recognize this is not an easy situation, and that's the

reason why I decided today was not the day to ask for final

rulings, because I've done enough of these cases to understand

that we need to try to negotiate a final DIP order.

But, candidly, Your Honor, I think we need some

guidelines for how this is going to be done, because the DIP

that's in place right now is essentially taking -- between the

additional interest and the collar and the fees and the

expenses is probably taking north of $30 million excess, out of

this company, over what was in the contract that was in place

through ten days ago and is essentially transferred out of the

company to the lenders. And I understand the lenders would

like to get it. I would like to get it, also.

And maybe they're entitled to it at the end of the

case based upon whatever arguments are going to be made, but

our view is the time to raise those issues is the end of the

case rather than today. This company should not be operating

with only $20 million of excess funds, because the reality is

this company, if it had its druthers, would like to invest 35

to 40 million dollars in cap ex, and if all you have is $20

million, and you have to maintain $20 million of minimum cash,

how much do you spend on cap ex, and you're close to the line?

And the company's going to always be on the brink of not having

enough cash. This is not a losing -- this company makes money.

1 This company has a significant EBITDA. It should not be pushed

2 to the point where it's running out of cash or violating

3 covenants.

4          The right standard, in our view, Your Honor is to pay

5 a reasonable interest rate. The reasonable interest rate is at

6 or about what was in the contract at the time, which is LIBOR

7 plus three or three and a quarter. We understood. The debtor

8 said, oh, it's not that big a deal, because it would've been

9 the default rate anyway, and so we only gave them two points

10 above the default rate. I'm not sure that -- I'm not sure that

11 this Court is so quick to pay adequate protection at a default

12 rate where pre-petition there was no payment default. There

13 was no payment default to the banks in this case. They got

14 paid everything that they were required to be paid. There was

15 a potential covenant default that was anticipated for which a

16 fee was paid last week, and a fee is being paid again today for

17 the privilege of doing the next transaction. It's not as if

18 this is going uncompensated.

19          So there may or may not be an entitlement to default.

20 I respectfully would suggest that the entitlement to default be

21 deferred to the conclusion of the case. If the banks are being

22 paid in full, and they want to argue that they're entitled to

23 the default rate, they ought to make that argument, and that

24 gets negotiated or litigated if you have to litigate it at the

25 end of the case. You don't presumptively have to pay the

default rate up front, and it doesn't mean that by paying

adequate protection at the contract rate that in any way the

lenders should be waiving their right to default. But all that

means is the company has a little more cash today that it can

operate with. The company has a budget anyway. The banks are

imposing a budget on the company, and that's probably a healthy

thing.

So I'm not suggesting that the company should flitter

away its cash, but I'm suggesting that the company should not

be paying all of its cash out today at rates over and above any

conceivable contract level. These numbers are very

significant, and I could go on, but I think I can -- people

appreciate the magnitude of issues that are out there. The

interest rate that this Court ultimately sets in place is going

to have a direct impact upon this company's financial health

and ultimately the willingness of parties to make an

investment.

The second point of prominence that I'll -- that I

need to address, because it's not a hypothetical issue that

maybe we'll take up later. This case involves a roll up of

$300 million of pre-petition debt. Now, you have to ask

yourself why. I understood it's because it was asked for. But

other than the fact that it was asked for, why is this company

taking $300 million of pre-petition debt and rolling it into an

administrative claim?

1          THE COURT:  Let me ask you.  I think the record's

2    clear that that's not happening today.  I'm certainly not

3    approving that today.

4          MR. ECKSTEIN:  I understand that, Your Honor, and,

5    therefore, I'm going to simply refer to the issue.  We're not

6    going to be making a record on it, but I want to make it clear

7    on the record that we object to a roll up in this case.  This

8    is not a case where there is inventory that is disappearing.

9    This company does not have items that are running off the

10   shelf.  By maintaining the trade in place and by paying the

11   vendors, we are insuring that there's going to be a continued

12   operation.  I would, in fact, submit that the more capital

13   expenditures the company can pay, the more value this company

14   is going to have to protect the bank claims.  And there's no

15   need nor is there a contemplation in the Code that in addition

16   to current pay of interest that the pre-petition lenders are

17   entitled to or need to be paid or are entitled to be paid a

18   roll up.

19         The practical effect of a roll up in this case, I

20   think we all understand, is to essentially mean that as a

21   matter of law, in order to confirm a plan you need consent, or

22   you must pay that claim in cash in full on the effective date.

23   It's that requirement that fundamentally changes the equation.

24   Needing to pay an additional $300 million in cash in full on

25   the effective date changes radically the rights of the parties

1  as they existed ten days ago and as of the petition date, and

2  that is objectionable.  And there is no explanation that I have

3  heard so far in the papers or in the argument as to why this

4  Court would approve a roll up.  I'm not suggesting there

5  shouldn't be adequate protection payments, and that's a

6  different issue from the rate, but I want it to be clear we

7  don't understand it, and we -- it's not justified in our mind,

8  and we believe that the Court's going to have to grapple with

9  it if it's not resolved effectively.

10         Without taking too much more of Your Honor's time, we

11  did list out in our objection a variety of issues.  We think

12  all of them are ultimately going to be taken up, but the lien

13  on the avoidance actions is not consistent with the standards

14  in this district, and we don't see a rationale for why the lien

15  on avoidance actions should not be available with unsecured

16  creditors.

17         The milestones, Your Honor, we don't object to

18  milestones.  We do object to the milestones in a sense

19  requiring that it be on terms acceptable to the lenders.

20  That's very different from milestones, and we believe that

21  that's an inappropriate lever over the company that effectively

22  takes away exclusivity and effectively reduces the term of a

23  one-year facility to -- I believe it was August 15th for the

24  proposal of an acceptable plan.

25         The Blackstone fee, we believe that the entire

arrangement should be disclosed.  We should have an opportunity
to review it, and there should be no confusion, and the Court
should determine what the -- what are the appropriate bases
upon which both monthly fees and completion fees should be
paid.  We understand that those are not unusual, but at the
same time they're appropriate to be reviewed by the Committee
as well as by the U.S. Trustee and the Court.

Your Honor, we believe that this case has the
potential to be successful.  We believe that it can be
successful for the banks and the bonds and the real estate
parties, but we believe that in order to achieve that, there
needs to be a level playing field that does not provide undue
advantage to one party over the other.  We think that each of
the issues that we raised in our objection are the kinds of
issues that the parties should be urged to deal with in a
negotiation failing which we'll have to come back to court and
have an evidentiary hearing on February 13th.

The bondholders will revisit whether or not an
alternative DIP is available and appropriate.  As a practical
matter, our preference would be to arrive at a consensual DIP
arrangement with the lenders, and I think once a committee is
appointed next week, that will be the first and most important
focus of attention, but we thought that whatever guidance the
Court could provide today to help those negotiations would go a
long way to increasing the prospects that we may actually

1 arrive at a place where both parties can at least be

2 comfortable letting this company -- this case proceed the way

3 it should.

4         THE COURT:  Thank you.

5         MR. ECKSTEIN:  Thank you, Your Honor.

6         THE COURT:  Mr. Waite, before you respond, why don't

7 we go through the objectors, unless you've got something in

8 particular to add?

9         MR. WAITE:  No, I didn't know if you wanted me to

10 respond briefly to each as you hear them.  I don't want to be

11 long, because, as I told the Court earlier, we don't have all

12 day.

13         THE COURT:  Why don't we go through the objectors?

14         MR. WAITE:  Okay.

15         THE COURT:  And we'll try to keep track of the open

16 issues that we have.  I think that that just makes more sense.

17         MR. WAITE:  Okay, and then I know Mr. Seider has some

18 comments he wants to make as well.

19         THE COURT:  I confident.  Mr. Minuti.

20         MR. MINUTI:  Your Honor, Mark Minuti again for the

21 Levine Leitchman Capital Partners, Deep Value Fund.  I guess I

22 beat everybody else to the podium.  I rise only to support the

23 objections and the comments of Mr. Eckstein.

24         THE COURT:  Very good.

25         MR. MINUTI:  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          MR. DREBSKY:  Good afternoon, Your Honor.  Dennis

3   Drebsky from Nixon Peabody.  I represent the Successor Trustee,

4   HSBC, in this matter for the 300.  And I'll refrain from doing

5   what every attorney likes to do, to talk at length, but just to

6   say that we haven't had the opportunity to do as much work as

7   the Ad Hoc Committee on it, but we reviewed the objection that

8   has been put, and we've done our own research on it, and I

9   recognize that many of the objections that had been raised by

10  the counsel for the Ad Hoc Bondholders are reserved for the

11  final hearing.  But we wanted, at least for the record, to say

12  that we do support.  We have very similar concerns to the Ad

13  Hoc Bondholders Committee, and we join and fully support the

14  objections they raise, and we'll be in a better position on the

15  13th if there isn't a negotiation to respond.

16         THE COURT:  Okay.

17         MR. DREBSKY:  Thank you.

18         THE COURT:  Thank you.

19         MS. LEAMY:  Jane Leamy for the United States Trustee.

20  I just had a number of issues with respect to the order, and I

21  can run through those.

22         THE COURT:  Why don't we do that?

23         MS. LEAMY:  Your Honor, the first area concerns the

24  attorney fee and financial advisor's fee.  I think the first --

25  there's a couple references in the order.  The first place it

1 appears is Page -- my copy Page 9, Paragraph 5.  Specifically,

2 Paragraph 5(b) about seven to eight lines down.  This provides

3 for the reasonable fees and expenses, expense reimbursements of

4 attorneys, financial advisors, and other professioals for the

5 administrative agent, but also the fees and expenses of the

6 attorneys for each of the DIP lenders.  I just wanted to raise

7 that issue, because it's not just the administrative agent.  We

8 don't know how many DIP lenders there will be, so it does have

9 the potential for --

10          THE COURT:  Piling on.

11          MS. LEAMY:  Correct.  That's essentially what I

12 wanted to say, Your Honor, on it.  And carrying on to the top

13 of the next page, 10, I just wanted to reiterate the objection

14 that was made before.  It only says not subject to objection by

15 the U.S. Trustee.  It should also say the Committee.

16          I also wanted to note that the U.S. Trustee has not

17 seen the Blackstone engagement letter, but -- and to the extent

18 that this provided further clause was added to the end of the

19 sentence, we expect that any fees are still subject to the

20 reasonable standard that's set forth in the earlier part of the

21 paragraph.

22          The comment I have with respect to the -- keeping

23 with the attorney fee issue is Page 20, Paragraph 9.

24          THE COURT:  It's the same principle?

25          MS. LEAMY:  Yes.  I think just so it's clear the

1  Committee should be added there.  And then the final reference

2  there is on Page 27, Paragraph 14(a)(5), additional adequate

3  protection.

4          THE COURT:  Okay.

5          MS. LEAMY:  Again the reference for attorneys for

6  each of the DIP lenders.  And here I had a concern.  It's about

7  seven lines up from the bottom of that paragraph.  Only the

8  debtors and the Committee -- well, "All three parties have the

9  right to object, but the debtor and the Committee's right to

10  object should only extend to services performed on behalf of

11  the pre-petition lenders in their capacity as such."  I don't

12  think that that's a proper limitation, so I'd ask that that be

13  stricken.

14          I'm just checking my notes here.  I had on Page 33,

15  Paragraph 18(b), I just wanted to note there's a -- kind of

16  half way down the paragraph provides, "If any order dismissing

17  any of the cases, such order shall provide," and then at the

18  top of the next page it indicates that, "the Court shall retain

19  jurisdiction notwithstanding such dismissal."  I don't know how

20  the Court could retain jurisdiction after the dismissal, so I

21  think that that would be appropriate to strike that last

22  clause.

23          And then my final comment, Your Honor, was on Page

24  37, Paragraph 19(c), just with respect to the investigation

25  period.  I note that there is a provision for 90 days after the

1  petition date, but simply would object to the language, "It
2  states to file and serve."  I think that the language to serve
3  and properly serve, which appears on that page should be
4  eliminated.

5          THE COURT:  I'm sorry.  I've lost you.  I have -- I'm
6  at the bottom of Page 37, Subparagraph (c).

7          MS. LEAMY:  Correct, Your Honor.  "The investigation
8  period is 90 days after the petition date to file and to
9  serve," and then at the second line on the top of Page 38 it
10 says, "challenges not properly served."  I suggest that it be
11 more appropriate to just have the limitation be to file with in
12 the 90-day period at this point.

13         THE COURT:  I understand.

14         MS. LEAMY:  And that's all I have with respect to the
15 order, Your Honor.

16         THE COURT:  Okay.

17         MS. LEAMY:  Thank you.

18         MS. ELLIS:  Good afternoon, Your Honor.  Kate Ellis
19 from McCarron and Deiss for the PACA Trust Creditors.  With
20 respect to the proposed interim order, it does raise a few
21 concerns for the PACA Trust Creditors regarding the language
22 that the DIP obligations are a super priority claim.  The
23 language with respect to that portion is fairly all
24 encompassing of -- I believe it states all claims against
25 debtors, and I'd like a reservation of rights which states that

1 does not include PACA Trust claims.

2       And that's the same -- it's a similar issue for the

3 DIP liens.  That to the extent those liens would encompass PACA

4 Trust assets, the lien would not be placed over PACA Trust

5 assets which would subordinate PACA trust claims.  And this is

6 especially with respect to ongoing produce sales or any pre-

7 petition produce sales which are subject to the PACA, which are

8 not paid within the next couple of weeks.

9       THE COURT:  Okay.  Let me ask you a question on that.

10 And I don't want to get ourselves off track, but assuming that

11 the lender is not going to consent to exactly the language that

12 you're looking for, it would seem to me that we could at least

13 craft language that would provide that subject to whatever

14 superior -- essentially saying that a priority fight could come

15 in down the line, but whoever has -- they get a 507(b) super

16 priority.  Whether or not PACA gives you statutory rights

17 superior to that is a question that may not be before me today.

18 How's --

19       MS. ELLIS:  Right.

20       THE COURT:  Conceptually.  So that essentially it's

21 nothing more than a reservation of rights, and the issue can be

22 disposed of if it comes up.  If it doesn't come up, then --

23       MS. ELLIS:  Right, the --

24       THE COURT:  -- no harm, no foul.

25       MS. ELLIS:  The DIP obligations may constitute super

priority for the Bankruptcy Code, but to the extent that that

conflicts with PACA trust rights for assets that are not part

of the estate, I think that some of the lien language includes

cash, which may be proceeds from the sale of produce or

produce-related items, which would be encompassed within the

PACA trust. And I don't know that this necessarily needs to be

decided today, but, hopefully, we can agree to some sort of

language that either includes PACA -- outstanding PACA

obligations within the carve out provision or has language that

allows PACA to assert its claims at a later date if that -- if

it becomes necessary.

        THE COURT:  Okay.  I understand.

        MS. ELLIS:  Okay.  Thank you, Your Honor.

        THE COURT:  Mr. Pollack.

        MR. POLLACK:  Good afternoon, Your Honor.  David

Pollack, Ballard Spahr, for General Growth Management, Centro

Properties Group, and Federal Realty Investment Trust.  Your

Honor, just as Mr. Eckstein said, that he thinks in every case

you hear, well, we tried, but we couldn't agree, I think in

every case that we come to it's, well, we would like a lien on

your leases.  And no matter how many bankruptcy courts seem to

say you can't have a lien on the leases, it's there anyway, and

so that's why we're here today.

        I have a basic problem before I even get to that

issue, and that is I'm not sure what they are trying to take a

1  lien on even though I know what the order says.  I've looked at

2  the credit agreement, and the only thing that I've seen on

3  file, unless I'm missing something, is the 79-page credit

4  agreement.  And the 79-page credit agreement refers in the

5  definitions of collateral to, "shall mean all collateral as

6  defined that any security document shall include any mortgaged

7  properties," but I haven't seen any security documents, so I

8  don't know what the collateral is.  But I'm assuming because in

9  the order -- and I'm looking at the non-black line copy of the

10 order.  The order --

11           THE COURT:  At Page 31.

12           MR. POLLACK:  Well, at Page 15 where they first talk

13 about the liens, this is in Section 7(a).  They say, "Including

14 but not limited to all leasehold interests of the debtors."  So

15 I'm assuming that they're trying to take it, but I don't see it

16 in the backup documentation, and I'm not sure what, you know --

17 it looks to me like the order is trying to give some things

18 that aren't yet defined.  The same thing with the faults that

19 I'll get to in a minute.

20           THE COURT:  You know, why don't we hold that thought

21 for a moment on this particular point?  I'd like to hear from

22 either the lender or the debtor, and let me make an observation

23 before we go too far down this path.  I'm not restricting any

24 landlord's rights with respect to their ability to get into --

25 your ability to get into the property or a landlord's right to

refuse access to property.  As far as I can tell, for purposes

of this interim order, insufficient notice has been provided.

I recognize that you're here, but you're always here.

But -- and this does come up.  We deal with this with

some regularity.  Some of these provisions are I think more

appropriate for a final.  I understand the relief that's being

requested, but absent adequate notice on landlords, it is not

this Court's practice to provide for liens on leases that may

be subject to defenses of the landlords.

I'm happy to acknowledge that you can assert whatever

lien you may want, the DIP lender, but I don't think it's

appropriate in the context of this hearing to adversely affect

the rights of landlords.  And this is a provision particularly

with respect to an unfettered right of access.  It happens all

the time in these retail orders, and where we identify them, we

generally don't approve them at least at the outset of a case.

In addition -- and this is a principal that applies

to some of the other issues we're going to kick around.  This

is the interim order.  I have a very high level of confidence

that there is going to be a substantial dialogue that goes on

on all aspects of the financing, and you're going to be back in

front of Judge Walrath in less than three weeks.  And I don't

expect -- nothing in the record has indicated that the lender

is going to expect to be taking control of any DIP collateral

or any properties.  So I'd like to hear on that issue, because

1   there are a number of different pieces to this that I don't

2   think are going to go very far today, and I -- if we have

3   agreement on that, that's fine, and we can work the language.

4   But there is a measure of uncertainty that I have that I share

5   with Mr. Pollack about exactly what liens are being granted,

6   and I thought it would be helpful if I at least gave you what

7   my thoughts are on the issue.  Mr. Seider, do you wish to

8   respond?

9           MR. SEIDER:  Your Honor, I appreciate the opportunity

10   to be heard on the issue.  I certainly understand Your Honor's

11   concerns, and let me begin first by explaining what it is that

12   the DIP lenders are seeking and then move along to why it is

13   that in this exceptional case we need to have it and also --

14           THE COURT:  And we're only talking here about leases

15   and landlords.  I know that there are a whole bunch of

16   objections --

17           MR. SEIDER:  Correct.

18           THE COURT:  -- that have been raised.

19           MR. SEIDER:  And I will address those points later at

20   a time when Your Honor thinks it's appropriate and to an extent

21   that Your Honor think it's appropriate.  But now just on the

22   limited subject of the interest with respect to the leases,

23   what the DIP lenders are seeking here is a priming lien on the

24   debtors' interests with respect to those leases.

25           (Telephone interruption)

1          THE COURT:  Excuse me.  Can you turn your phone on

2     mute, please?  Just to be advised, if that happens again, the

3     Court will terminate the call.  Proceed.

4          MR. SEIDER:  Thank you, Your Honor.

5               (Telephone interruption)

6          THE COURT:  That won't happen again.

7          MR. SEIDER:  If he would've said the name of the

8     company, I might not feel so good about having the call

9     terminated.

10         THE COURT:  Call your broker.

11         MR. SEIDER:  Your Honor, what that means is that we

12    are not seeking a lien with respect to the landlord's interest

13    in its property.  Again, we are seeking only a lien -- a

14    priming lien with respect to the interest of the debtors in

15    these leaseholds.  And, as Your Honor I think has noted in the

16    context of this particular case, this is an exceptional case

17    given the nature of the debtors' business and also, Your Honor,

18    given the nature and way -- excuse me -- given the nature of

19    the way in which the debtors' business is structured as well.

20    And I'll get into that in a moment.

21         We did, Your Honor, of course, anticipate that the

22    notion of taking liens on the debtors' leasehold interests here

23    would cause concern for the landlord, and that Your Honor would

24    hear about it.  And that's why, Your Honor, we carefully

25    crafted what I think is a provision that gives the landlords

1  full protection with respect to what their rights are in their

2  fee and in their leases.  And that is set forth, Your Honor, in

3  -- on Page 18 of the interim order that was filed, and that's

4  Paragraph 8(d).  And at -- in the interest of saving time and

5  not hearing myself read, Your Honor, what that provision says

6  is that if it becomes necessary --

7        THE COURT:  But no, I don't disagree with that.  I

8  mean I think I read that, and I understood, and I've seen this

9  in many final orders, but they have the right to assume the

10 debtors' rights and privileges.  That's effectively an

11 assumption of the lease over to you by an order that I'm

12 signing today with no notice to any landlord.

13       MR. SEIDER:  Your Honor, we don't consider this, and

14 if the use of the word assumption was somehow misleading, then

15 I apologize.  We don't consider this to be a 365 assumption.

16 We consider this to be what these lenders would have on many of

17 these leases.  And I'll get into that in a minute, Your Honor.

18 What these lenders already have, the pre-petition lenders have

19 on a state law basis, and that is the right to step into the

20 debtors' shoes, to go into the property, and to perform all of

21 the obligations under the lease.

22       THE COURT:  And I think what I would say is that if

23 this language is not in here, I think that the lenders have

24 whatever rights they may have under state law.  You have pre-

25 petition liens, and presumably, you have post-petition liens,

but I am concerned that it is effectively an assumption. And

let me raise this further point that I understand that this is

a significant piece of a collateral package, as it would be in

a retailer, but I'm -- the provisions in here in Paragraph (d),

for example, which aren't inconsistent with the language that's

later in the order, provides for five days' notice to the

landlord of such assumption, provided that you shall be

required to assume any and all obligations under such lease as

of the date on which the rights and privileges of such lease

are assumed.

All of that is Section 365, and if it's not, then

you're not getting the benefit of the remedy that you're

looking for here, and I'm not comfortable providing for that

relief at this stage. Irrespective of whether this is my case

or Judge Walrath's case, my concern is sufficiency of notice

and a remedy that they may have under state law, but I'm not

going to -- this is a -- I'm not expanding anybody's rights

under state law. And so that's the concern that I have.

MR. SEIDER: Yes, I understand, Your Honor, and

here's the problem. The situation with this company is more

acute than the situation would be with a retailer that, for

instance, is selling clothes, and the reasons for that are

several. First, Your Honor, this is largely a cash business.

This is not a situation where people come into a store with a

piece of plastic, charge something, and then lenders have an

1 interest in the receivables that are generated as a result of

2 the sale.

3     THE COURT:  Right.

4     MR. SEIDER:  Secondly, the inventory in these stores

5 perishes very quickly.  The shelf life of a ham, once the power

6 goes off, is very short.  It's not like a dress.  Somebody

7 can't come in and combine it with a bunch of other dresses and

8 then have a liquidation sale and turn proceeds over to lenders

9 or, as we're probably all familiar, buy the right to conduct

10 the liquidation sale from the lenders.  So it's --

11     THE COURT:  But on the flip side, looking at the

12 peculiar nature of this case for this industry, I've read the

13 first days.  I have listened to Mr. Eckstein and taken the

14 first day affidavit.  This is an operating business.  I think

15 that your issue -- we don't usually allow this kind of relief

16 in a retail case, and yet in a retail case we often come in

17 with a request that there be GOB sales within ten days.  Things

18 like that, where the fact is that the desire to control any

19 asset not just inventory, but if I can lease this property off

20 to somebody else, then we'll go do that.  But I don't

21 necessarily disagree, and I want you to understand I understand

22 why you want the collateral, and I think that it may be at some

23 point that you -- that the rights or remedies that you're

24 looking for I think you could get, but I don't -- I'm hard

25 pressed to identify circumstances that would entitle you to

1 these kind of remedies under the -- from a U.S. Bankruptcy

2 Court on day one of a case without notice to the landlords.

3 MR. SEIDER: Your Honor, let me address the notice

4 provision or the notice issue, because I think it's causing

5 Your Honor some concern. It would certainly be usual at an

6 interim hearing for the Court to grant, for instance, liens on

7 deposit accounts to DIP lenders who are advancing fresh credit

8 as we are. The situation is somewhat analogous. Those deposit

9 accounts are housed at institutions -- the debtors' depository

10 institutions which may be different as they are in this case

11 from the debtors' DIP lenders. It's an analogous situation.

12 The interest of th debtors' property is housed within the four

13 walls that belong to somebody else. They are -- however,

14 courts are not necessarily troubled by granting DIP lenders at

15 the interim hearing a lien on the debtors' interest in that

16 property.

17 THE COURT: But they don't give you a lien to go --

18 or a right in the order to go into whatever financial

19 institution it is and say I'm going to take this particular

20 cubicle and deliver all of the records relating to this debtor

21 to me, and I'm going to review all these assets sitting in

22 here. What you're looking to do is to walk into property that

23 belongs to another person. The debtor certainly has leasehold

24 rights, and I think that the debtor has the ability to lien up

25 those rights, but I don't think that I can provide for that or

1 provide for the relief that you're looking for here today.

2 MR. SEIDER: I understand, Your Honor. I'd like to

3 continue with this. I don't want to try Your Honor's patience,

4 so when I wear out my welcome, please let me know.

5 THE COURT: I think -- I'll be candid. I think

6 you're pushing water uphill with this.

7 MR. SEIDER: I understand Your Honor's point.

8 THE COURT: And I'm just not comfortable doing it.

9 It is an issue that has risen many, many times, and I think our

10 practice has been consistent. I certainly don't -- I'm not

11 offended by the request. I understand the value of these

12 assets in the context of this case and why you want it, but I

13 am not comfortable authorizing that relief today.

14 MR. SEIDER: I understand, Your Honor. We will have

15 to consult with our client --

16 THE COURT: I understand.

17 MR. SEIDER: -- in that regard.

18 THE COURT: Okay.

19 MR. POLLACK: Your Honor, we did have a discussion

20 with Mr. Seider prior to coming into court, and we did say at

21 that point, as is typical, that we do not have an objection to

22 them taking a lien on the proceeds of any disposition of the

23 leases, and if that language needs to be entered into the order

24 today, that again that's not a problem with us. I'm not going

25 to beat a dead horse, especially since Your Honor has already

**J&J COURT TRANSCRIBERS, INC.**

1 made it pretty clear --

2        THE COURT:  Yes, you've --

3        MR. POLLACK:  -- pretty clear what --

4        THE COURT:  On that point you've won.

5        MR. POLLACK:  Right.  I understand.

6        THE COURT:  Nothing good is going to happen by

7 proceeding.

8        MR. POLLACK:  Yes, I don't want to do anything to try

9 and lose now.  If I might just point out to Your Honor the two

10 provisions in the order -- actually, the three provisions in

11 the order, but one we've already addressed with the definition

12 of the collateral, the other two that affect this issue that we

13 have a problem with -- and I'll just identify them, because I

14 think Your Honor has already seen what they are.

15        The first is on Page 18, as Your Honor noted, in

16 Subsection (d), giving the debtor -- giving the lender the

17 rights to enter the property, et cetera.  We would ask that

18 that provision be stricken.

19        The second one, Your Honor, appears on, again in the

20 non-black line and filed edition, Page 31, Subsection (d).

21 Again that provision -- and I'm not sure.  Part of my problem

22 with this section may be just in the drafting of the language

23 in that it's unclear to me whether or not the clause in

24 Romanette one, "consent or approval of one or more of the

25 landlords," if that is supposed to apply to what comes in the

1 next line at the end starting with the word for, "for any

2 debtor to pledge grant," or if it's really independent, because

3 there's no comma in there.  If it's any consent whatsoever,

4 then, obviously, we've got a bigger problem.  But even the part

5 here in the first part causes concern, and then again at the

6 end of that paragraph on that same page where it says that,

7 "Notwithstanding any provision to the contrary, the lender

8 shall not be required to enter into any access agreements."

9 Again gives us the same problem.  So I have a problem with that

10 Subsection (d) as well.

11         THE COURT:  Okay.  I have a similar concern, and the

12 issue is again with the last paragraph, and that -- last

13 sentence in that Subparagraph (d) simply providing an open

14 right for the DIP lender to enter into the property.  I don't

15 know what state law provides.  I have a pretty good idea.  I

16 have no idea what the individual leases provide, and I'm not

17 comfortable granting that type of relief in this interim order.

18         With respect to the prior sentence, which is, "any

19 provision of any other lease that requires the consent," given

20 my comment about the ability to lien up, I'm not certain

21 whether the debtor needs this.  If there's a -- I'm sorry --

22 whether the lender needs this relief.  I certainly don't want

23 whatever rights the landlords have, which I am acknowledging

24 and respecting here, to impair the lenders' ability to

25 essentially perfect or obtain the benefit of the liens that I

1 am allowing. So I don't think that they need this language if

2 they're not getting liens on the leases as of today. They will

3 clearly -- they're clearly entitled to the proceeds of any

4 disposition of their collateral. But I think I'm not certain,

5 and I would give the parties an opportunity to take a look at

6 that language and see whether or not they actually need that

7 language or if it needs to be tinkered with a little bit to

8 deal with a more appropriate remedy.

9           MR. POLLACK: Thank you, Your Honor.

10           THE COURT: Okay. Okay. Are there any other --

11           MR. SEIDER: Your Honor, I have one more point.

12           THE COURT: Sure. Can you get to the microphone,

13 otherwise, we can't pick you up?

14           MR. SEIDER: I apologize for not making this clear a

15 moment ago, Your Honor. The pre-petition lenders have liens on

16 the debtors' interests in hundreds of these stores.

17           THE COURT: Right.

18           MR. SEIDER: Can I understand Your Honor to be ruling

19 that it is not objectionable for the DIP lenders to take

20 priming liens on those particular interests?

21           THE COURT: Mr. Pollack?

22           MR. POLLACK: Your Honor, as I acknowledged to Mr.

23 Seider before the hearing, I am sure because of the nature of

24 this business that there are -- and I think I read in one of

25 the pleadings that approximately two thirds of these are

freestanding locations, not in shopping centers, not in malls.
That there are likely either no prohibitions in the leases or
their subordination agreements or whatever that would allow
them.  My only concern with his position is that if there was a
lien that was granted that was prohibited, that by the lease
that just the fact that the debtor did something that it wasn't
allowed to do shouldn't carry that lien forward.

THE COURT:  Well --

MR. POLLACK:  So --

THE COURT:  Agreed, and -- but I think that that's --

MR. POLLACK:  -- with that minor carve out, I don't
have any problem with that position.

THE COURT:  Okay, and noting that stipulation, that's
actually -- that's a provision that I would acknowledge and
agree with.  I don't know if that's specifically addressed
here, but I'm satisfied with the record as to that particular
point.

MR. POLLACK:  Thank you.

THE COURT:  Mr. Huston.

MR. HUSTON:  Good afternoon, Your Honor, Joseph
Huston of Stevens & Lee on behalf of Realty Income Corp., which
is a -- which owns a number of these locations.  I'm not sure,
but it's in excess of 10.  And I hesitate to stand up and say
me, too, but on this last point we own the leaseholds -- excuse
me -- the fee interests of a number of the leaseholds, and I

believe that they're mainly freestanding properties, and it is

a customary provision in the realty income lease that putting -

- attempting to put liens on the leasehold as opposed to -- the

leasehold itself as opposed to the proceeds of leases are

defaults under the lease --

THE COURT:  Well, I think --

MR. HUSTON:  -- and we generally don't enter into

subordination agreements.

THE COURT:  Well, the point raised by Mr. Seider I

think was if there is an extant lien held by the pre-petition

lenders on the property, then the post-petition lenders can

essentially climb onto those liens.  The point raised by Mr.

Pollack that Mr. Seider seemed to -- did agree with -- I'll

hold you to that -- that he did agree with was that if the

underlying lien of the pre-petition lender was improperly or

unlawfully obtained, that you would obtain the benefit of the

secondary lien that would be coming in, and if you're point is

that there may be liens -- if there are liens out there that

are unlawful, then I think all of your rights are reserved in

that respect.

MR. HUSTON:  Right, and we -- when we had this

discussion earlier, we were where Mr. Pollack said we were,

which was this is an interim order.  No problems with the

proceeds of leases from now until the final hearing, but I

think anything else -- I know Judge Walsh takes the position

1  that he did -- that this court does not have the power to grant

2  these remedies, because state law -- you know, they accede to

3  whatever the state law rights are to do what they need to do.

4  Thank you, Your Honor.

5          THE COURT:  Very good.  Okay.  Mr. Waite or Mr.

6  Seider?  Who wants to go first?

7          MR. WAITE:  Your Honor, let me go -- I'm going to try

8  to be quick here, because we --

9          THE COURT:  You're trying to get wired.

10         MR. WAITE:  I'm trying to get wired, and I am wired,

11 but not the type of wire we need, Your Honor.  Your Honor, let

12 me -- before we get to the issues on the order I want to back

13 up to the objections or comments and objections raised by Mr.

14 Eckstein.  He made a -- he went through a lot of history, made

15 a lot of comments.  I don't intend for today's purposes to

16 respond to all that.  Obviously, we reserve our rights on all

17 those comments, but --

18         THE COURT:  It's argument.

19         MR. WAITE:  -- particularly since Your Honor is not

20 going to be hearing the rest of this case, I propose --

21         THE COURT:  This well hasn't been very poisoned.

22         MR. WAITE:  Okay.  Thank you, Your Honor.  Your

23 Honor, I do want to though respond to the issues that he raised

24 with respect that I think are the issues for today and just

25 kind of run down through the list in his objection.  The roll

1  up, again it's not a today issue.  We set forth in our paper a

2  lot of reasons why we think we've limited the effects of the

3  roll up.  The debtor certainly had reasons for entering into

4  the roll up, but it's not a today issue.  We will obviously

5  address it in front of Judge Walrath at the final hearing if,

6  you know, there's not some agreement reached between now and

7  then.  That's all I'm going to say about it, unless Your Honor

8  would like some further explanation.

9         THE COURT:  No, the thrust of Mr. Eckstein's comments

10 was I think mostly directed to the interest rate.

11        MR. WAITE:  Yes.  Let me get to that last.  Just

12 quickly on the other items.  The 507(b) claim is taken out of

13 the interim order.  That's not a today issue.

14        As to the milestones, the debtors agree to them as

15 part of an overall package.  We believe that they were

16 reasonable under the circumstances.  I would note that the

17 first milestone is the term sheet by June 1st.  That's not

18 going to happen between now and the final hearing, and I

19 suspect this is an issue that will be discussed with the

20 Committee, and so again I believe that is not a today issue.

21        With respect to the Blackstone engagement letter,

22 again we've deferred that to the final hearing, and I know that

23 there are issues regarding getting copies of it to people, and

24 we will work with the lenders to do that.  And, obviously, if

25 people don't get notice, I'm sure they'll raise those issues

1  again at the final hearing, but we're not seeking approval of

2  that today.

3       I believe the interest rate issue is the primary

4  issue, and, you know, with respect to that, Your Honor, I think

5  part of his concerns was somehow we were affecting some rights

6  or claims that they or the Committee might have.  Clearly, they

7  have issues with the pre-petition forbearance --

8       THE COURT:  No, I think his point was you're just

9  spending too much money.

10      MR. WAITE:  Well, I understand that point, Your

11 Honor, but beyond that he raised issues regarding somehow we

12 would be -- I think he was concerned we were going to e

13 affecting peoples' rights, and I want to make sure the order is

14 clear.  This is an investigation period.  If they think there's

15 something improper about the forbearance agreement, the

16 forbearance agreement was entered into pre-petition.  The

17 debtors believed it was the right thing to do.  We understand

18 they have issues with that.  I don't suppose to try that in

19 front of Your Honor today.  Again, that's an issue we're going

20 to be dealing with later on.

21      But to borrow a phrase from Your Honor early on, we

22 are where we are.  Right now we have a contract that provides

23 them with an interest rate of LIBOR plus seven and a quarter,

24 and in negotiating an overall deal for DIP financing and

25 adequate protection it's not uncommon for the parties to come

1   to an agreement on what the adequate protection payments are

2   going to be to get into this case in a consensual manner, so we

3   can get payments out for our vendors and stabilize the

4   business.  We are not affecting peoples' rights down the line.

5   If for some reason someone can challenge the forbearance

6   agreement, and they've been paid more adequate protection

7   payments than the contractual interest they're entitled to

8   under the agreement, the Court can fashion a remedy.  That's

9   why we have those provisions in the order.

10          If they are entitled to the interest, as the contract

11  says, it's going to accrue whether we pay it or not.  And from

12  the debtors' perspective, getting an agreement for consensual

13  use of cash collateral, consensual priming, and debtor in

14  possession financing so that we could proceed on a smooth path

15  and pay our vendors and stabilize this case was appropriate,

16  and all rights are reserved with respect to the Committee and

17  other parties in interest down the line, again, if the adequate

18  protection payments turn out to be more than they may have been

19  entitled to under the contract.

20          So we'd ask the Court to overrule that objection and

21  authorize adequate protection payments be made in accordance

22  with the agreement we reached.  I will note for the Court that

23  the first adequate protection interest payment isn't even

24  scheduled to be paid until February 29th, which is -- that's

25  set forth in the order, which will be after the final hearing.

1  If Your Honor has any other questions about that, I'm happy to

2  respond.  If Your Honor has any further concerns about that --

3         THE COURT:  No, I don't have any other questions.

4  Thank you.

5         MR. WAITE:  I'm not sure where that -- I don't know

6  if Mr. Seider wants to have any comments on that, and then I

7  think we're -- we could address the PACA issue and then the few

8  remaining issues on the order.

9         THE COURT:  I think we just had a couple of issues.

10  I've heard you on the notice of your -- of the lenders'

11  invoices, so we've covered that.  We've covered, I think,

12  sufficiently the landlord issues.  I think we know where we

13  stand on that.  Is there a way to deal with the PACA issue?

14         MR. SEIDER:  Yes, Your Honor.

15         THE COURT:  What's been requested is a reservation of

16  rights.

17         MR. SEIDER:  If it's not the debtors' property, we

18  don't want a lien on it.

19         THE COURT:  Okay.  And I assume that --

20         MR. SEIDER:  Well, we'd like one, but we understand

21  that we don't get one.

22         THE COURT:  I think -- good point.  All right.  I

23  expect that the parties will be able to fashion that sort of

24  reservation language sufficiently, but it's my expectation that

25  that probably won't ever actually become an issue, but if it

**J&J COURT TRANSCRIBERS, INC.**

1 does, I think it's reasonable that those rights be reserved.

2 MR. SEIDER: Very well, Your Honor. There were a few

3 things that Mr. Waite said at the outset that I'd like to

4 clarify, perhaps expand upon for the benefit of the Court. I

5 won't take terribly long on this --

6 THE COURT: Sure.

7 MR. SEIDER: -- but I didn't want an incorrect record

8 to go forward, and I should note -- and I want to underscore

9 this -- I am not in any way faulting Mr. Waite for this. A lot

10 has happened in this case very quickly, and there are a lot of

11 facts he wasn't -- which he simply was not aware of, and I

12 wanted to just make some corrections there.

13 With respect to his description of the nature of the

14 lenders and why this credit -- the DIP credit has been

15 structured as a multi-draw term facility, what he said about

16 the lenders is not quite accurate. The discrepancies or the

17 inaccuracies are not really material to the lending agreement,

18 but nevertheless, I did want to point that out to Your Honor.

19 Secondly, Your Honor, with respect to the -- this

20 probably goes without saying, but with respect to the priming

21 here being on a consensual basis, nothing is for free, of

22 course, and that consent to the priming is contingent upon

23 grant of the adequate protection package as it.

24 With respect to the collar, Your Honor, that's been

25 the subject of some discussion today, that collar was set at a

time when LIBOR was 4.5 percent.  So what the collar does is it
essentially serves as a costless hedge for this company with
respect to interest rate fluctuations.  As Your Honor is
probably familiar, virtually all leverage finance lending
agreements require a borrower to go out and purchase interest
rate hedges for the benefit of the lenders.  Here the debtors
got one for free.

I think there's been clarification of the fee issue
that was raised by Ms. Leamy with respect to the notice on the
fees of the DIP lenders and their professionals, and I won't go
into that.  I did want to address a couple of the other points
that she made for purposes of clarifying this and perhaps
putting Your Honor's mind at rest with respect to one or two of
them.

First, on the extent of the jurisdiction in the event
that the case is dismissed, from the lenders' perspective, Your
Honor, we're coming here for Court approval of a contract, and
under that contract we're, of course, going to receive certain
property rights in exchange for providing this company with new
money.  What we want to be sure of is that if something happens
in this case, we will receive the benefit of our bargain, so
then if there is a dismissal, all of the protections that we've
been given with respect to our property interest will be
enforced in a centralized forum.

If the language that's in the order troubles, Your

1 Honor, because, I think as Ms. Leamy indicated, perhaps it

2 creates subject matter jurisdiction where none may lie, we're

3 happy to --

4          THE COURT:  Well, we have --

5          MR. SEIDER:  -- work with that.  We just want to make

6 sure that again we have a centralized forum to go to in the

7 event that there is -- that there's not return to the lenders

8 of the money that's being extended on the terms that are being

9 extended.

10          THE COURT:  Why don't we do this on that point?  I

11 understand the Trustee's point, and rather than reserving

12 jurisdiction, let's -- why don't we condition the language and

13 just put in a line that says subject to the provisions of

14 Section 350 of the Code which governs opening and reopening?

15          MR. SEIDER:  Yes.

16          THE COURT:  If the case is dismissed and closed, then

17 -- and you've got something you want to enforce, assuming that

18 you can invoke the jurisdiction of this Court, the standards

19 under Section 350 are pretty well established.  Come on in.

20 But that way I'm -- I think that that -- I would expect that

21 that would resolve the U.S. Trustee's concerns, because again

22 if I find -- if she's correct that there is no jurisdiction on

23 a post-dismissal basis for whatever reason, it's non-debtor

24 party, something like that, then Section 350 would actually --

25 would come into play and would government he extent of this

**J&J COURT TRANSCRIBERS, INC.**

1    Court's jurisdiction.

2              MR. SEIDER:  Thank you, Your Honor, that seems --

3              THE COURT:  Okay.

4              MR. SEIDER:  That seems certainly fine to me.

5              THE COURT:  Ms. Leamy, does that work for you?

6              MS. LEAMY:  Yes, Your Honor.

7              THE COURT:  Okay.

8              MR. SEIDER:  Your Honor, also Ms. Leamy raised the

9    question of whether the challenge period should be modified, so

10   that a complaint not only has to be filed and served -- well,

11   that a complaint would only have to be filed within the 90 days

12   not served within the 90 days.  We're certainly willing between

13   the interim and the final discussions with Ms. Leamy.  I would

14   like to point out, however, Your Honor, that the lenders were

15   being primed here who will be benefitting from the relief that

16   will go away at the -- well, that will be given to them at the

17   expiration of the challenge period.  Of course, they're being

18   primed, and they want to know with certainty that they're going

19   to be released on a date.  What we're concerned about is the --

20             THE COURT:  I don't think that that's unreasonable,

21   but here's the concern that I have and why I would be inclined,

22   at least for purposes of the interim, to sustain her concern

23   with respect to proper service.  And I think that you can make

24   that argument or have that discussion with her and presumably

25   with Judge Walrath.

**J&J COURT TRANSCRIBERS, INC.**

1        My understand is that there are a number of foreign

2   entities that are participants in the pre-petition or offshore

3   entities.  Is that correct, that are participants on a pre-

4   petition basis?

5        MR. SEIDER:  There are pre-petition lenders who are

6   offshore.  I don't know if all of them are under the management

7   of U.S.-based entities.

8        THE COURT:  Well, here's the point.  I don't know

9   exactly what -- I understand what the concept of service of

10  process is, but, for example, if you needed to serve some of

11  those entities under the provisions of The Hague Convention,

12  you'd probably have to start now.  So I think the idea of it

13  being filed, those parties are -- there's an Indentured --

14  well, the Indentured Trustee doesn't enter into this, but there

15  is an agent bank.  At least for purposes of -- and I'm not

16  trying to impair anyone's rights, but I think that you wind up

17  in a procedural bind if service must be completed by the expiry

18  of the 90-day deadline.

19       I may be wrong about that.  I never really thought

20  about it, but I am concerned, especially if it's not a question

21  of just serving Credit Suisse in New York or serving Bank of

22  America or somebody else wherever they're located.  But if you

23  have to find people in the Caymans or any number of other

24  islands, it's very difficult to accomplish service.  So that I

25  think could cause a measure of mischief, and I think that the

1  issue can certainly be revisited for purposes of the final.

2  Your clients are entitled to a measure of certainty, and that's

3  not unreasonable, but I think the 90-day deadline doesn't work

4  if you've got to perform and complete service on foreign

5  entities, so I think there ought to be a way to work around

6  that.

7         MR. SEIDER:  Your Honor, we certainly understand

8  that, and we'll work with Ms. Leamy to craft something that

9  protects her interest as well as ours on that point.  I think

10  that covers all of the points that were raised by the U.S.

11  Trustee.  I listened carefully to what Mr. Waite had to say and

12  also, of course, very carefully to what Your Honor had to say

13  about the points that were raised by the Ad Hoc Group of

14  Bondholders, and I'm not going to get into legal argument at

15  this point in time.

16         I do, however, again want to correct the factual

17  record, because it's important.  I know Your Honor said that

18  this is an interim hearing, and that the well is not going to

19  be poisoned for obvious reasons.  Nevertheless, frequently in

20  cases when --

21         THE COURT:  There will be a transcript.

22         MR. SEIDER:  When statements are made and they're

23  left hanging, they sort of become the l-o-r-e of the case, and

24  I don't want that to happen.

25         THE COURT:  Sure.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. SEIDER:  The forbearance agreement is not only a

2   forbearance agreement.  It's a forbearance agreement and an

3   amendment to the credit agreement.  The forbearance agreement

4   was signed on January the 7th as was the amendment.

5          Secondly, Your Honor, this company was going to be

6   shut down on January 15th if it didn't have a forbearance

7   agreement.  That was made very clear to the company that that

8   was the risk of not having forbearance.  So with respect to the

9   dates that were provided by counsel to the Ad Hoc Bondholders

10  -- by counsel to the Ad Hoc Bondholders to Your Honor, it's

11  just wrong.

12         Next, Your Honor, with respect to the terms and the

13  circumstances surrounding the negotiation of the collar, again

14  counsel's rendition of the facts, if you will, is misinformed.

15  If we need to have an evidentiary hearing on that at the final,

16  we will.

17         With respect to the debtors' cap ex, the lenders did

18  not impose a cap ex number on the debtors.  The debtors

19  provided a budget to the lenders.  The debtors came up with

20  their own cap ex numbers, and that cap ex number was not

21  negotiated by the lenders.

22         Lastly, I do want to point out, Your Honor, that

23  interest rates are a -- excuse me -- are a function of two

24  things.  They're a function of markets, and they're a function

25  of list profile.  To suggest that the risk profile of this

1  company is the same today as it was in November of 2006 when

2  the initial credit agreement was done is just simply wrong.

3  Nothing further on the point, Your Honor.

4        THE COURT:  Okay.  I'm going to approve the final DIP

5  financing subject to several comments and revisions I'm going

6  to make as well as we've already covered the landlord issue,

7  and I believe I've ruled on that.  I'm not going to revisit

8  that.  If there's any inconsistency in what I would say now,

9  then that would just create uncertainty.  I believe I've

10  satisfactorily ruled on the landlord issue.

11        Walking through the form of the order -- and I'm

12  looking at the black line now -- at Page 10 the threshold

13  question from the U.S. Trustee was whether or not an official

14  committee would have the opportunity to object.  Right now that

15  right is limited to the Office of the United States Trustee.  I

16  am not going -- I am going to overrule the U.S. Trustee's

17  objection in that regard with -- for one very simple reason.  I

18  the time frame that we are looking at, there will not be, I

19  expect, any submission of invoices or payment of invoices, and

20  the statutory committee will receive copies of any invoices.  I

21  expect that this issue will be held in abeyance pending the

22  final.  If this case were mine, I would require notice and then

23  opportunity to object by the official committee, but that's not

24  before me today.  And again I don't think that it's going to be

25  an issue for purposes of the -- of today's interim order and

1    the relief that I'm granting.

2            With respect to the Blackstone issue, I think that

3    the record is sufficiently clear that that issue is not before

4    the Court today and all rights are reserved for parties, so I

5    am not approving or allowing payment of any fees, authorizing

6    an engagement or paying a success fee under the terms of this

7    order, and I think that is enough to say with respect to

8    Blackstone.

9            With respect to the Trustee's request that I strike

10   language appearing on the black line on Page 27, that's the

11   parenthetical in the middle that starts with, "The debtors' and

12   any statutory committee's right to object shall extend only to

13   service performed on behalf of the pre-petition lenders in

14   their capacity as such."  I will overrule the U.S. Trustee's

15   objection in that regard, again because I don't think that it's

16   material for purposes of today, and at that point then it's

17   simply a coin toss whether I kept it in or knocked it out.

18   And, again, were this my case, I don't know how I would rule on

19   that issue, but I expect that the Committee will have something

20   to say about that, and I expect that Judge Walrath, if the

21   matter is not resolved, will also have something to say about

22   that as well.

23           We have dealt with the retention after jurisdiction

24   issue under -- at the bottom of Page 33, carry over to Page 34,

25   by the inclusion of a proviso subject to the provisions of

Section 350 of the Bankruptcy Code, and that should resolve
that issue.

I have dealt with the service issue as far as any
challenge to the liens. Any mention of service or proper
service should be stricken, subject, of course, to the right to
seek that relief in the context of the final. Again, my point
is that the concern raised by Mr. Seider is reasonable and
appropriate, but I think we need to balance procedurally the
90-day time frame and how that could be accomplished. My -- I
think that that covers the specific provisions of the DIP
financing order.

With respect to the Committee's objection to the
adequate protection, I am going to overrule that objection. It
is apparent that this is a financing that is fairly expensive
money, but that is often the case in these contexts, but the
adequate protection payments, the first one, is not scheduled
to be made until the end of next month. And again I have no
shortage of confidence that there will be a meaningful
discussion between the Committee, the U.S. Trustee, the DIP
lenders, and the debtor regarding both the economics of this
financing as well as the case implications. And I think that
Mr. Eckstein's comments about how these cases get going is well
taken. So I think that there is -- there's a lot of ground
that the parties are going to cover.

I'm going to walk through very briefly the points

1   that are raised -- the specific points that are raised in Pages

2   5, 6, and 7 of the Committee's objection.  The roll up is not

3   before the Court.  Obviously, they are -- this is a provision

4   that is not favored in the context of an interim and

5   procedurally requires a meaningful showing by the lenders

6   seeking that relief, and I expect that that will occur in the

7   context of the final.

8        With respect to adequate protection and the enhanced

9   interest rate, I have overruled that objection.  But to the

10  extent that they're overruled, they are overruled for purposes

11  of the interim with full rights to prosecute them in the

12  context of the final.

13       With respect to the Section 507(b) claims, I

14  understand that has been resolved.  There will be no 507(b)

15  attaching to the interest -- to proceeds of avoidance actions

16  prior to a final.  And, as a practical matter, there won't be

17  any avoidance actions or proceeds prior to a final order

18  anyway.

19       With respect to the milestone restructuring

20  covenants, I am -- I don't know that I was actually asked to

21  rule on them one way or the other, but to the extent that

22  there's an objection based upon those milestones, I will

23  overrule that for purposes of the interim, because I think that

24  -- again I think it goes with the discussion that is going to

25  occur, and I'm confident that the parties and that Judge

1 Walrath as well will have something to say about the extent to

2 which the lenders can dictate the future course of this case.

3      With respect to the carve out, I'm satisfied with the

4 terms of the carve out.  That's always the discussion, so that

5 will happen.

6      The DIP facility, as I said, I'm -- to the extent

7 that there's an objection to the size of the carve out, I

8 expect that discussion will occur.  I'm going to overrule that

9 objection for purposes of today, of course, without prejudice

10 to any rights to seek to expand that number.

11      The budget on the DIP facility investigation, I would

12 note that I think that that budget is light.  Thirty thousand

13 dollars on a -- on the financing and the investigation that's

14 contemplated seems light to me, but I don't expect that that

15 investigation's going to get up to speed by any stretch in the

16 next few weeks.  So again the parties will have those

17 discussions.

18      I believe that that substantially covers the issues

19 that are before the Court today, and subject to the rulings

20 that I've made and the objections that I have either sustained

21 or overruled, I'm satisfied that the debtors have made a

22 sufficient record under Rule 4001 that they have an immediate

23 need for the financing.  That they have done an adequate job of

24 attempting to market the financing.  I have accepted the

25 testimony of Mr. Burian, and I would be prepared to authorize

1  and approve the financing on the terms submitted by the debtors

2  subject to my comments.  Yes, ma'am?

3        MS. ELLIS:  Excuse me, Your Honor.  A point of

4  clarification on the DIP order with respect to PACA.  I believe

5  you mentioned that the parties would come to some sort of

6  agreement as to language.

7        THE COURT:  Yes.

8        MS. ELLIS:  Is that for today's order, or is that for

9  the final order?

10       THE COURT:  Well, I think all rights are reserved

11  with respect to -- as far as today goes, I think that we did

12  agree that we can come up with some sort of language.  If it's

13  PACA Trust -- if the assets are PACA Trust assets, as you know,

14  they're not the debtors' property.  The lender has acknowledged

15  on the record that if it's not the debtors' property, they

16  don't get a lien in it.  The question of whether it is or it

17  isn't is open, and they will fight you on it, and you will

18  fight them on it if it comes up, and I hope that it doesn't.

19       So I think if you're satisfied with the record for

20  purposes of the interim, we can go forward.  If you'd like a

21  line in there, you can talk to Mr. Waite about that.

22       MS. ELLIS:  Okay.  Thank you, Your Honor.

23       THE COURT:  Sure.

24       MR. WAITE:  Thank you, Your Honor.  We do want to get

25  an order entered as quickly as we can, and I think what makes

1  sense is to maybe either take a recess so we can mark it up and

2  let your chambers know when we're ready, or if we have an

3  agreement, we can submit it to chambers.  But we do desperately

4  need the order entered today and enter it on the docket.

5          THE COURT:  Here's what I'd like you to do, and the

6  only reason is because of my schedule.  I will not be here late

7  this afternoon, so what I would recommend is I can ask the

8  guards to open up the conference rooms to give you room, and

9  you can interlineate, or if you think that you can get this

10 thing back to me under certification by 3:30 this afternoon,

11 which would be your hard stop -- why don't you do it outside?

12         MR. WAITE:  Yea, I would prefer to interlineate.

13         THE COURT:  Okay.

14         MR. WAITE:  But before we recess, I think we have the

15 other orders that were going to be handed up at the end of the

16 hearing.

17         THE COURT:  Okay.  Mr. Barry.

18         MR. BARRY:  Your Honor, with respect to the PACA

19 503(b)(9) and critical vendor, we've provided a couple of

20 paragraphs -- handwritten paragraphs to counsel to the senior

21 notes.  We're hopeful that we can attached that to the back of

22 the orders and hand it up -- hand it to chambers with the

23 interim DIP order.

24         THE COURT:  Okay.

25         MR. BARRY:  May I approach, Your Honor?

1          THE COURT:  You can.  All right.  Mr. Hazeltine.

2          MR. HAZELTINE:  William Hazeltine.  I thought I heard

3    Mr. Barry mention PACA, and I hadn't seen -- if that relates to

4    PACA, I hadn't seen that yet, and --

5          THE COURT:  A PACA order?  I believe it's the order

6    relating to the authorization.  Mr. Barry.

7          MR. BARRY:  I'm sorry, Your Honor.

8          THE COURT:  I believe Mr. Hazeltine would like an

9    opportunity to look at the PACA order as well.  Is the

10   Committee reviewing that, or is the informal committee

11   reviewing the PACA order?

12         MR. BARRY:  They're reviewing the extra paragraph we

13   inserted regarding the interim approval and the sharing of

14   information with the senior notes and the debtors, which I'm

15   not sure impacts his client, but --

16         THE COURT:  You can give him a chance to look at it.

17         MR. BARRY:  Absolutely, Your Honor.

18         THE COURT:  Okay.  All right.  Does that cover the

19   items that we have?

20         MR. WAITE:  Yeah, I believe lenders' counsel wants to

21   go back and try to I guess type of these changes because of the

22   -- I guess the number of them, and I want to try to make sure

23   we can get back before the Court if we have any language issues

24   with any of the parties.  So I guess I'd ask the Court how you

25   would like to deal with that.  Should we set a time to come

1  back and present the order or --

2     THE COURT:  Do you want to do that?  Do you want to

3  come back at three?  I have a 2:00 hearing that I am hopeful

4  will be within the range of an hour.

5     MR. WAITE:  Let me -- I'm just --

6     THE COURT:  Sure.

7     MR. WAITE:  Can I check on our wiring deadline?

8     THE COURT:  Sure.

9         (Pause)

10     MS. MORGAN:  Your Honor, with respect to the other

11  orders, one of them that you've been handed is the cash

12  management order.  Could we have that entered as soon as

13  possible, so that we could at least get the accounts opened?  I

14  realize we can't really pay anything for a little while, but --

15     THE COURT:  All of these will be on the docket by

16  two.

17     MS. MORGAN:  Thank you, Your Honor.

18     THE COURT:  The ones you've handed me.

19     MR. WAITE:  Your Honor, we'll take you up on your

20  offer to come back by three.

21     THE COURT:  Okay.  Three o'clock.

22     UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

23     THE COURT:  And I think -- let me make one other

24  point.  I'm sensitive to the need for DIP financing and to have

25  your final order.  I expect that my 2:00 hearing I would hope

**J&J COURT TRANSCRIBERS, INC.**

1 would be done by 3:00. If it is not, I will break that hearing

2 and hear you at three to either finalize the form of the order

3 and get it signed in order to allow you to initiate your wire,

4 but if we're going at 3:00, you need to come on in. Okay?

5          MR. WAITE: We will do that, Your Honor --

6          THE COURT: Right.

7          MR. WAITE: -- and we we'll also be asking for

8 immediate docketing to the extent we could get that done.

9          THE COURT: I figured. Is there anything further?

10          MR. WAITE: Nothing further, Your Honor.

11          THE COURT: Very well. We stand in recess. Thank

12 you, counsel.

13                    (Recess)

14          THE COURT: Mr. Waite, can you tell me where we are?

15          MR. WAITE: We do have a form of order to hand up. I

16 believe all the parties who had issues that we were trying to

17 work out have signed off on the language, and we do have a

18 black lined. It's black lined against the version we handed up

19 earlier today. So if I may approach?

20          THE COURT: Sure. Okay. Noting that there is no

21 need for anybody who is actually reserving their rights to

22 stand up and reserve their rights on the record, is there

23 anyone who would wish to be heard regarding the interim order

24 that's being submitted to the Court right now?

25                    (No verbal response)

1        MR. WAITE: Your Honor, I could tell you the first

2  change appears on Page 15 of the black lined.

3        THE COURT: Okay.

4        MR. WAITE: The change at the top was to address the

5  PACA issue.

6        THE COURT: I see it. And then the lease issue.

7  Okay.

8        MR. WAITE: And we did it this way just so that it's

9  clear that we're asking for it in the final, so we're giving

10  proper notice to parties.

11        THE COURT: Sure.

12        MR. WAITE: I think the next change appears on Page

13  18.

14        THE COURT: Okay. I see it.

15        MR. WAITE: Then 19.

16                (Pause)

17        MR. WAITE: We jump back to Page 32 then.

18        THE COURT: We'd go faster with a shorter order.

19        MR. WAITE: I understand, Your Honor. The good news

20  is --

21        THE COURT: That's fine.

22        MR. WAITE: -- we didn't make it any longer than it

23  was when we started in terms of pages.

24        THE COURT: Well, I'm cognizant of the effort.

25        MR. WAITE: I think we -- the only thing we need to

1 do is fill in an objection deadline for objections, and I would

2 suggest the week before the hearing, which is customary.  The

3 6th --

4          THE COURT:  February 6th?

5          MR. WAITE:  Yes, Your Honor.

6          THE COURT:  Okay.  At the conclusion of the prior

7 hearing the Court noted that the debtor had satisfied its

8 evidentiary burden under Section 105, 361, 362, 363, 364, and

9 Bankruptcy Rule 4001, and I'm satisfied that ample cause exists

10 for the relief requested.  The order has been signed, and we

11 will make sure that it is on the docket within the next ten

12 minutes.

13          MR. WAITE:  Thank you, Your Honor.  We appreciate it.

14 That's all we have today.

15          THE COURT:  Very good.  Thank you, counsel.

16                    * * * * *

17          **C E R T I F I C A T I O N**

18          I, PATRICIA C. REPKO, court approved transcriber,

19 certify that the foregoing is a correct transcript from the

20 official electronic sound recording of the proceedings in the

21 above-entitled matter, and to the best of my ability.

22

23 /s/ Patricia C. Repko          DATE:  January 28, 2008

24 PATRICIA C. REPKO

25 J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**