UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                        .    Case No. 08-10141 (MFW)
                              .
                              .
                              .
BUFFETS HOLDINGS, INC.,       .
                              .    824 North Market Street
                              .    Wilmington, Delaware 19801
                              .
                              .
          Debtors.            .    February 22, 2008
. . . . . . . . . . . . . ..        10:41 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE


APPEARANCES:

For the Debtors:          Young, Conaway, Stargatt & Taylor, LLP
                          By:  PAULINE K. MORGAN, ESQ.
                               JOSEPH M. BARRY, ESQ.
                               IAN S. FREDERICKS, ESQ.
                          The Brandywine Building
                          1000 West Street, 17th Floor
                          Wilmington, DE 19801


For LLCP:                 Fox Rothschild, LLP
                          By:  ANTHONY M. SACCULLO, ESQ.
                          Citizens Bank Center, Suite 1300
                          919 North Market Street
                          Wilmington, DE 19801




Audio Operator:           Leslie Murin


Proceedings recorded by electronic sound recording, transcript
              produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (cont.):

For Korman:                    Womble Carlyle
                               By:  KEVIN J. MANGAN, ESQ.
                               222 Delaware Avenue, 15th Floor
                               Wilmington, DE 19801

For West Chester Fire         Ballard, Spahr, Andrews & Ingersoll
& ACE USA:                     By:  LESLIE C. HEILMAN, ESQ.
                               919 North Market Street, 12th Floor
                               Wilmington, DE 19801-3034

For Inland Real Estate:       Connolly, Bove, Lodge & Hoetz, LLP
                               By:  MARC J. PHILLIPS, ESQ.
                               The Nemours Building
                               1007 North Orange Street
                               P.O. Box 2207
                               Wilmington, DE 19899

For WP East End:              Blank Rome, LLP
                               By:  JASON W. STAIB, ESQ.
                               Chase Manhattan Centre
                               600 New Hampshire Avenue NW
                               Wilmington, DE 19801

For the US Trustee:           Office of the U.S. Trustee
                               By:  JANE M. LEAMY, ESQ.
                               J. Caleb Boggs Federal Building
                               844 King Street, Suite 2207
                               Lockbox 35
                               Wilmington, DE 19801

For US Bank National          Ashby & Geddes, P.A.
Associates:                    By:  AMANDA M. WINFREE, ESQ.
                               500 Delaware Avenue, P.O. Box 1150
                               Wilmington, DE 19899

For DDRC, Greenfield,         Kelley, Drye & Warren, LLP
Turnberry & Weingarten:        By:  GILBERT R. SAYDAH, JR., ESQ.
                               101 Park Avenue
                               New York, NY 10178-0002

For CRI Easton:               Sullivan, Hazeltine, Allinson, LLC
                               By:  WILLIAM A. HAZELTINE, ESQ.
                               The Brandywine Building
                               100 N. West Street, Suite 1200
                               Wilmington, DE 19801

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (cont.):

| | |
|---|---|
| For Realty Income Corp.: | Stevens & Lee<br>By:  JOSEPH H. HUSTON, JR., ESQ.<br>1105 North Market Street, 7th Floor<br>Wilmington, DE 19801 |
| For the Committee: | Otterbourg, Steindler, Houston & Rosen<br>By:  GLENN B. RICE, ESQ.<br>    JENETTE A. BARROW-BOSSHART, ESQ.<br>230 Park Avenue<br>New York, NY 10169-0075 |
| For the Committee: | Pachulski, Stang, Ziehl & Jones LLP<br>By:  CURTIS A. HEHN, ESQ.<br>919 North Market Street, 17th Floor<br>Wilmington, DE 19899 |
| For WPC: | Reed Smith LLP<br>By:  KURT F. GWYNNE, ESQ.<br>1201 Market Street, Suite 1500<br>Wilmington, DE 19801 |
| For Credit Suisse: | Latham & Watkins<br>By:  MICHAEL RIELA, ESQ.<br>885 Third Avenue<br>New York, NY 10022-4834 |
| For Credit Suisse: | Duane Morris LLP<br>By:  MICHAEL R. LASTOWSKI, ESQ.<br>1100 North Market Street, Suite 1200<br>Wilmington, DE 19801-1246 |

Appearing Via Telephone:

| | |
|---|---|
| For US Bank National Associates: | Faegre & Benson LLP<br>By:  STEPHEN MERTZ, ESQ. |
| For Sankaty: | Ropes & Gray LLP<br>By:  STEPHEN MOELLER-SALLY, ESQ.<br><br>Morgan, Stanley<br>By:  CLAY SHANER, ESQ.<br><br>DebtWire<br>By:  HEMA OZA, ESQ. |

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Good morning.

2          MS. MORGAN:  Good morning, Your Honor.  Thank you

3  very much for conducting this hearing today even though the

4  courts are closed on this -- the last day on which we can get a

5  final order and still be in compliance with our -- our interim

6  order, Your Honor, and our credit agreement.  We really

7  appreciate it.

8          THE COURT:  Okay.

9          MS. MORGAN:  Your Honor, as indicated in the agenda,

10  the first matter is withdrawn, that was the Committee's motion

11  to extend.

12          The second matter is the -- the Committee's motion to

13  file under seal their objection.  Your Honor, I've been advised

14  that since the Committee has -- since the Committee's objection

15  to the DIP is resolved, they do intend to withdraw this motion

16  to file under seal and also eventually when the Court order --

17  hopefully enters an order today, withdraw their objection.  So

18  I think we can pass over this as well.

19          THE COURT:  Okay.

20          MS. MORGAN:  And, Your Honor, the last item on the

21  agenda is the hearing to consider final approval of the

22  debtor's motion for use of cash collateral and the granting of

23  adequate protection to the pre-petition secured lenders, and

24  for final approval of the debtor's post-petition debtor in

25  possession financing.

1    As Your Honor is aware, we filed this motion on the
2  first day of the case.  An interim hearing was held on January
3  23rd before Judge Shannon.  The motion was supported by the
4  affidavit of Keith Wall in support of Chapter 11 petitions and
5  first day motions.  And in addition at that hearing the debtors
6  proffered the testimony of Saul Burian of Houlihan Lokey, the
7  debtor's investment banker.

8    And based upon that evidence and after resolution of
9  some objections that were raised orally at the first day
10 hearing, the interim order approving the financing was -- was
11 entered on January 23rd.

12   On the next day, Your Honor, we filed and served our
13 amended and restated motion making some clarifying changes.
14 And we also served notice of entry of the interim order as well
15 as -- as this hearing on all parties who were required to be
16 served under our interim order.  The -- that order set an
17 objection deadline of February 6th which the debtors extended
18 for the Committee until the 15th.

19   Your Honor, we received 18 objections, some of which
20 were mere joinders to other objections and the vast majority of
21 which were filed by certain of the debtor's landlords.

22   We're pleased to report that I think, there were some
23 last minute discussions, but I think we're -- we have 15 of the
24 18 resolved including the objection of the Creditors Committee.
25   The three objections that still remain outstanding, I

believe there's one or two landlord objections as well as the vendor objection, the Shapco objection, but none of those take issue with the debtor's need for the financing or the basic terms of the financing. They primarily object to certain provisions of the order that they find objectionable.

So as we stand now I don't think there's any objection to the debtor's need for entering into a debtor in possession financing on a final basis.

Your Honor, the terms of the DIP facility were set forth in fairly significant detail in the motion. I know that at the last hearing Your Honor indicated that you had read the first day transcript.

If acceptable to the Court, I would -- since we do have so many resolutions -- I would propose to summarize really just the more significant terms and -- and highlight for the Court things that have changed as a result of negotiations since entry of the interim order?

THE COURT: All right. That's fine. Does anybody object to incorporating the first day hearing into the record? All right. We can do that with the --

MS. MORGAN: Thank you, Your Honor. I was going to ask actually that you do that later, but we -- Mr. Burian is in the courtroom. We would ask that his -- the proffer of his testimony be incorporated for purposes of today's hearing.

THE COURT: Okay.

 1          MS. MORGAN:  All right.  Your Honor, with respect to

 2    the -- and again, Your Honor, we have -- we'd like to thank the

 3    Committee first of all and other parties who have worked with

 4    us.  And we, as you know, we extended this hearing one time to

 5    try to come to agreement with our objectors, most especially

 6    the Committee.  We met with the Committee and its advisors and

 7    its representatives and, you know, we explained a lot about the

 8    background of the company and our need for the financing and

 9    our efforts to obtain the best financing possible.

10          We also would like to thank the lenders because they

11    assisted in our efforts and I think, again, I hope that you

12    will agree that the changes that are made are favorable for the

13    debtors and obviously acceptable to the Committee and many of

14    the other objectors.

15          And, again, I'm pleased that we're here in this

16    posture rather than in a contested hearing.

17          Your Honor, the -- one of the most significant

18    changes to the facility is a change to the maximum borrowing

19    amount.  And I should ask first, did Your Honor receive a copy

20    of the black line order that was submitted yesterday?

21          THE COURT:  Yes, I did.

22          MS. MORGAN:  Okay.  Wonderful.  As -- as initially

23    proposed, the maximum facility was $385 million, 85 of which

24    was a new money facility, and 300 of which was a rollup of --

25    of pre-petition debt.  That has now been changed to 285

**J&J COURT TRANSCRIBERS, INC.**

million, a reduction of the rollup from 300 million to 200 million.

Your Honor, it's -- it's a bit of an unusual DIP facility and we think we'll probably see more of these in light of who is making up the lender community these days. But it is a delayed, a draw facility. It's not a revolver.

The new money facility had two pieces, the interim draw loan of $30 million which was fully drawn after entry of the interim order, and there's a delayed draw of another $55 million which we would be borrowing in one lump sum probably within the next month or so.

The rollover facility of 200 million now instead of three converts a corresponding amount of the pre-petition lenders obligations into post-petition DIP obligations. And, again, this change was agreed to by the lenders and by the Committee as a -- as a component of their overall agreement to resolve the Committee's objection.

Another significant change, Your Honor, is a change to the interest rate. As originally proposed, there was an adjusted LIBOR rate. The interest was an adjusted LIBOR rate plus 7.25 percent. It's being changed under the -- under the current deal such that the -- well I should say previously the new money facility, there was a collar on the LIBOR rate. It could be not less than four percent or greater than five percent.

1          And as -- as originally proposed, the LIBOR collar

2     would extend to the rollover facility as well as the new money

3     facility.  The revised credit agreement provides for the LIBOR

4     collar to apply only to the new money facility.  And this is a

5     significant change and, again, was one of the concessions

6     agreed to by the lenders in response to the Committee's

7     objection and other objections.

8          The LIBOR rate has dropped to below four percent

9     since the financing was originally negotiated so removal of

10    that LIBOR collar as to the rollover facility allows the

11    debtors to realize a significant benefit from the falling rates

12    and, again, significant benefit to the -- savings to the

13    estates.

14         Your Honor, the debtors have prepared and the lenders

15    have approved a final budget which was also filed with the

16    Court yesterday.  Under the DIP credit agreement the debtors

17    are given substantial flexibility to use cash collateral and

18    DIP funds for the purposes set forth in the budget.

19         The debtors are not tied to specific line item

20    amounts in the budget or -- or restricted variances as you --

21    you might be accustomed to seeing.  Rather the debtors are

22    subject to really one financial covenant test and that is being

23    tested by an EBITA covenant.  EBITA is determined for each four

24    week period and the debtors are required to hit 85 percent of

25    the EBITA projections set forth in the budget on a trailing

1 three period basis to avoid triggering a default.  The summary

2 of the final budget that was filed with the Court yesterday

3 includes the debtor's projected EBITA for the full term of the

4 DIP.

5      Your Honor, another change that was made was the

6 definition of a consolidated EBITA.  And it's a pretty

7 complicated definition, but consolidated EBITA is defined in

8 Section 1.1 -- 1.01 of the DIP credit agreement and it includes

9 certain add backs to EBITA related to various restructuring

10 activities that may be undertaken by the debtors.

11      The purpose from the debtor's perspective of those

12 provisions is to help ensure that -- that we're not -- the

13 debtors are not penalized by undertaking certain positive

14 activities associated with the restructuring.

15      For instance the debtors recently closed or -- or are

16 in the process of closing 52 underperforming stores which was

17 approved by the lenders.  And various costs associated with

18 closing those stores would not affect the debtors in a negative

19 way for purposes of calculating the EBITA.

20      The amendment to the credit agreement filed with the

21 Court includes a modification to that definition that is also

22 intended to clarify that if the debtors were to sell their

23 Tahoe Joe's restaurants -- and for the Court's information,

24 we've been trying to sell the Tahoes restaurant -- Tahoe Joe's

25 restaurants for some time pre-petition.

**J&J COURT TRANSCRIBERS, INC.**

1          The loss of any positive EBITA from the Tahoe Joe

2    restaurants would not be treated in a way to adversely affect

3    our ability to satisfy the EBITA covenants.  So that is the

4    purpose of that change.

5          Another change is to the security being given to the

6    lenders.  Pursuant to Section 364(c)(2), the lenders are being

7    granted a fully perfected first priority senior security

8    interest on unencumbered property and in the interim order that

9    -- it was contemplated that that would include at this hearing

10   avoidance actions.

11         But, again, as a -- as a component of the overall

12   agreement to resolve the Committee's objection, the lenders

13   have agreed to a change.  Their -- the DIP lenders would be

14   granted a lien on avoidance actions only until the new money

15   DIP facility is repaid in full.  And the DIP lenders have

16   further agreed to look to all other collateral before looking

17   to avoidance actions for satisfaction of that claim.

18         And if there should be proceeds of avoidance actions

19   that are recovered before the DIP facility is prepaid in full,

20   those proceeds would be held in escrow until the DIP facility

21   is paid.

22         And then once the DIP facility is paid, the lender's

23   lien on the avoidance actions would be released subject only to

24   their 507(b) claims if there's a diminution in the value of

25   their collateral.

1          Another change, Your Honor, has been through the

2    carveout provisions.  Your Honor, the carveout previously

3    provided that all fees and expenses accrued and incurred prior

4    to an event of default provided that they were ultimately

5    approved by the Court would be part of the carveout.

6          In addition there was a $400,000 carveout for post-

7    default expenses of the estate's professionals.  That has been

8    increased to 600,000, again as part of the resolution of the

9    Committee's objection.

10         There have also been some changes to the fee

11   structure, Your Honor, the fees paid to the administrative

12   agent.  There is a 200,000 per annum administrative agent fee

13   and that is increased from the 100,000 that was initially set

14   forth in the motion.

15         There will also be a work rescindication fee of

16   $250,000 for Credit Suisse.  And in addition the pre-petition

17   agent fee of 150,000 per year will continue.

18         Again the Committee has consented to the payment of

19   these fees as part of the overall agreement to reduce the

20   rollup and to otherwise resolve the Committee's objections.

21         The savings, Your Honor, to be realized by the estate

22   solely as a result of the removal of the LIBOR collar more than

23   pays for the additional fees that are being requested and

24   agreed to by the lenders and the Committee and the debtors.

25         Your Honor, there are also some covenants that have

changed since the interim order.  We had certain milestone

covenants that we agree with the lenders we would satisfy.  And

one of those was the delivery of a reasonably detailed bona

fide term sheet for a restructuring.  And as initially drafted

that was to be delivered on June 1st and it was to be

acceptable to the required lenders in their sole discretion.

That has been changed now to acceptable to the

required lenders and their reasonable -- I'm sorry --

reasonably acceptable to the required lenders and also the

deadline has been moved from June 1 to June 30.

Your Honor, the facility has other customary

affirmative and negative covenants that are set forth in

Articles 5 and 6.  One of those covenants is at Section 5.11

that has also been changed as a result of negotiations with the

Committee and this would now permit the debtors to pursue a

recharacterization of what's defined as the sale leaseback

documents.

And there's also been a corresponding change to the

events of default that would provide that if there is an order

approving such a recharacterization and that order doesn't

carryover the lender's liens on real property to the

recharacterized transaction, it would be an event of default.

Another event of default that was changed was the

requirement that the debtors file a plan disclosure statement

by August -- I'm sorry -- by September 15th was the initial

1  deadline.  That deadline has been extended to September 30 and

2  we have a corresponding deadline of 60 days thereafter to

3  obtain approval of the disclosure statement.

4          As for the adequate protection provisions, Your

5  Honor, the change, one of which -- the change I've already

6  highlighted really is the interest component.  The adequate

7  protection interest, again, will be LIBO -- LIBOR plus 7.25

8  percent without the collar.  And this is exactly what the pre-

9  petition facility provided, it was LIBOR plus 7.25, again

10 without a collar on the LIBOR.

11         With respect to the rollup itself, the lenders have

12 clarified that the DIP collateral does not secure the rollup

13 debt.  The rollup debt is secured only by the lender's pre-

14 petition collateral and as adequate protection a lien on the

15 DIP collateral junior to the DIP liens.

16         As additional adequate protection the debtors have

17 agreed to pay the reasonable monthly fees and expenses of

18 counsel to the administrative agent for the pre-petition

19 lenders and the financial advisors to the administrative agent

20 including a success fee of 2.25 million to Blackstone, the

21 lender's advisor, subject to reduction as part -- by part of

22 their monthly fees.

23         And, Your Honor, this was not approved at the interim

24 hearing, this was put out on notice and scheduled for this

25 hearing, the approval of that particular fee.

**J&J COURT TRANSCRIBERS, INC.**

1          And the other thing I want to touch on is changes

2     that are referenced in Local Rule 4001-2.  As you know, the

3     Rule requires disclosure of provisions in a DIP order which

4     would bind the estate with respect to the validity amount of

5     the -- of the pre-petition secured lender's liens without

6     giving parties time to challenge.

7          The DIP order now provides a 99 day challenge period

8     to the Committee which is of course more than the Local Rule

9     requires.  And as part of the agreement to resolve the

10    objection and the increase in the investigation period of 99

11    days, the lenders also agreed that there could be extensions

12    for cause except in connection with the rollup which I'll get

13    to in a minute.

14         There are also carveouts from the 99 day deadline.

15    Challenges to the sale leaseback transaction, disputes

16    concerning evaluation of the company, and attempts at

17    recharacterization in connection with adequate protection

18    payments, but not in connection with the rollup, are not

19    subject to the 99 day limitation.  So those can be brought at

20    any time.

21         A challenge to the rollup, and that is limited to --

22    Your Honor may have seen in the Committee's papers and the

23    Committee has a certain -- has made certain assertions that the

24    lenders may not have a lien in substantially all of the assets

25    and if that was the case, it would affect the lender's ability

1  to be secured to affect its valuation.

2       So there -- there is a provision that would require

3  within the 99 day period the Committee to challenge their

4  assertions as set forth in their -- in their objection.  And

5  then it -- that again would be subject to the 99 day deadline

6  and that could take the form of a declaratory judgment action

7  or a challenge of some sort.

8       Local Rule 4001-2 also requires disclosure of

9  provisions that seek to waive 506(c) rights.  Your Honor, that

10 was -- that was reserved for this hearing.  The final order

11 does contain a 506(c) waiver.  The debtors have agreed to it,

12 the Committee has agreed to it as a part of negotiated

13 settlement.  And the 506(c) waiver actually only applies to the

14 DIP collateral.

15      Your Honor, I've already referred to the lien on

16 avoidance actions and the limitations that are on it.  Again,

17 it's only -- it's only until the DIP liens are paid out is

18 there a lien on avoidance actions to be released when there is

19 a payoff of the DIP.

20      I also wanted to highlight a couple additional

21 changes to the credit agreement that are not necessarily

22 reflected in the order.  Both are in the first amendment to the

23 credit agreement which was filed with the Court this morning.

24 I'm not sure whether Your Honor had seen that.

25      THE COURT:  I have it.

1          MS. MORGAN:  The first change is an amendment to

2    Section 5.12 of the credit agreement and that was revised to

3    give the debtors more time to satisfy the lender's obligation

4    that we -- that we get blocked account agreements in place and

5    also gives the debtors a limited waiver permitting at least a

6    small percentage of those bank accounts not to be maintained

7    subject to a blocked account agreement.  So that is a change

8    again for the estates benefit.

9          The second change, this is 6.1 of the credit

10   agreement, and there the lenders have authorized that up to 25

11   million of the facility may be used to issues letters --

12   letters of credit.  The previous cap was 20 million.  And,

13   again, that was at the debtor's request.

14         With respect to letters of credit, if I can take a

15   short tangent, Your Honor.  We will be filing with the Court

16   today a motion to approve an amendment to the debtor's pre-

17   petition letter of credit facility to allow the debtors to

18   rollover their letters of credit and for the approval of a new

19   post-petition letter of credit facility.

20         We'll be seeking an interim hearing on that at our

21   next omnibus next week on the 27th and scheduling it for a

22   final hearing at the mid-March hearing on the 12th.

23         I think the only other significant changes that I

24   haven't touched on yet are changes to the order made in

25   response to objections filed by the company's landlords.  There

1   are several pages of additions to the final order to address

2   the landlord's issues.

3          I'm not going to go read them through, but to

4   summarize them very briefly, the order confirms that liens

5   granted to the DIP lenders in the leaseholds does not extend to

6   those leaseholds in which the terms of the underlying lease,

7   mortgage or applicable state law would prohibit or restrict the

8   grant of a security interest in the leasehold without the

9   landlord's consent.

10         The order also provides that on an event of default

11  and after five business days notice to the landlords, the agent

12  shall have the right to direct the debtor's to pursue motions

13  to assume or assume and assign the leases.

14         Also after an event of default and five business days

15  notice, the agent has the right to enter the leased premises

16  for the purpose of exercising remedies with respect to their

17  DIP collateral for a reasonable period of time.  And the order

18  confirms that the debtors must satisfy their Section 365(d)(3)

19  obligations during that time and if they fail to do so that the

20  DIP lenders would have to make those payments.

21         These and the other landlord provisions are designed

22  to facilitate the DIP lender's exercise of their rights on an

23  event of default while also preserving the rights of the

24  landlords.

25         From the debtor's perspective, Your Honor, those --

**J&J COURT TRANSCRIBERS, INC.**

those changes are reasonable.  I know that they are acceptable
to most of the landlords as you'll hear in a minute.  I do
believe we have one or two that are still quite not satisfied
with the language that has been added.

Your Honor, as I indicated, the remaining I think two
or three objections do not challenge the Court's -- the Court's
approval of the financing, but they -- they are taking issue
with certain provisions of the order.

So before we get to the objections in the order and
just to conclude the debtor's evidence and presentation of the
record, I -- again, we've already incorporated the proffer of
Mr. Burian.  I would also like to proffer some very brief
testimony of Mike Andrews, the CEO of Buffets, who is present
in the courtroom and that would just be designed to supplement
the testimony of the first day primarily as it relates to the
changed provisions of the facility.

THE COURT:  All right.

MS. MORGAN:  If I may do that, Your Honor?

THE COURT:  You may do so.

MS. MORGAN:  Your Honor, if called to testify,
Michael Andrews would testify that he is the Chief Executive
Officer of Buffets, Inc., a position he's held since November
2005, and that he is an officer, manager, and/or director of
each of the debtors.  In such capacity he has a detailed
knowledge of the business and financial affairs of Buffets and

1   its affiliates.

2          He would testify that he was one of the officers of

3   the debtors responsible for devising and implementing the

4   debtor's business plan and strategies and overseeing the

5   financial and operational affairs of the debtors.

6          He has been extensively involved in the debtor's

7   restructuring process including analysis of the debtor's

8   financing needs and the negotiation and evaluation of the

9   debtor in possession financing facility and cash collateral

10  facility that is before the Court today.

11         He would testify that the financing proposal

12  presented in the motion represented the best terms available to

13  the debtors at the time and the debtors determined the exercise

14  of their business judgment that the terms of the financing were

15  fair, reasonable, and adequate to sustain the company's needs.

16         Mr. Andrews is aware that as a result of concessions

17  negotiated by the Creditors Committee and other objectors,

18  there have been further improvements to the terms of the

19  facility most notably the reduction of the rollover facility

20  from 300 million to 200 million and removal of the LIBOR collar

21  from the adequate protection interest payments on the pre-

22  petition facility and also to the interest payments to be made

23  on the rollover facility, again, other than with respect to the

24  new money DIP.

25         The revised terms of the financing do provide for

certain additional fees to be paid to the lenders, but Mr.
Andrews would testify that the other concessions given by the
lenders such as the removal of the LIBOR collar are expected to
yield more savings to the estate than the cost of those
additional fees.  Also he understands that the Committee has
agreed to the additional fees as part of its global resolution.

Mr. Andrews would testify that absent continued
access to the DIP facility in the amount proposed the debtors
may not have sufficient liquidity to fund their continued
operations including to maintain relationships with vendors,
suppliers, and customers to make payroll disbursements, to make
capital expenditures, and to satisfy other working capital and
operational needs.

He would testify that entry into the DIP facility as
modified represents a sound and prudent exercise of the
debtor's business judgment and that final approval of the DIP
facility in the amount and on the terms proposed is critical to
the debtor's restructuring efforts.

And that would conclude the proffer, Your Honor.

THE COURT:  All right.  Does anybody wish to cross
examine the witness?  All right.  I'll accept the proffered
testimony then.

MS. MORGAN:  Thank you, Your Honor.  Your Honor, that
would conclude the evidence in support of the -- of the DIP
facility from the debtors.  I'm not sure how you'd like to

1  proceed, Your Honor.  We could either go to the objections or

2  we could talk about the order.

3      THE COURT:  Well let's go to the objections and maybe

4  I should hear from the objecting parties.

5      MS. MORGAN:  Your Honor, I'm advised that the

6  Committee wants to make a clarification before we get to the

7  objections.

8      THE COURT:  All right.

9      MS. MORGAN:  I will cede the podium.

10     THE COURT:  Thank you.

11     MR. RICE:  Good morning, Your Honor.

12     THE COURT:  Good morning.

13     MR. RICE:  Glenn Rice, Otterbourg, Steindler, Houston

14 & Rosen for the Committee and on behalf of the Committee we

15 thank you as well for coming in today.

16     But I just -- just a point of clarification and Ms.

17 Morgan may have said this, but I'm not sure that I heard it

18 correctly.

19     The -- what needs -- what the Committee needs to do

20 within the 99 day investigation period and what gets carried

21 over and what it need not do is a bit confusing.  Hopefully it

22 is set forth correctly in Paragraph 19(d) on Page 44.

23     THE COURT:  Okay.

24     MR. RICE:  And it is the first sentence of 19(d) that

25 requires the Committee to commence an action with respect to

1 the methodology of the calculation of the lender's pre-petition

2 collateral whether it ought to be a -- an enterprise value

3 calculation or some other calculation.  That is the -- what

4 needs to be done by the Committee within the 99 days.

5        It is not an action that would in effect determine

6 the value of the pre-petition collateral, just what methodology

7 is to be used.  Whether or not that ever goes forward I can't

8 tell you.  But that was a requirement of the lenders.

9        MR. RIELA:  Good morning, Your Honor.  Michael Riela

10 of Latham & Watkins on behalf of Credit Suisse and the DIP

11 lenders.

12        What Mr. Rice had mentioned is absolutely correct

13 that Paragraph 19(d) the revisions there only relate to the

14 methodology of the valuation of the collateral, not the other

15 challenges.  Those other -- those other types of challenges

16 would be dealt with elsewhere in Paragraph 19 of the order.

17        THE COURT:  All right.  Thank you.

18        MS. MORGAN:  And, Your Honor, the debtors agree with

19 that interpretation as well.  I assume that the order is more

20 clear than the way I explained it.

21        THE COURT:  Or at least the record is.

22        MS. MORGAN:  Yes.

23        (Laughter)

24        MS. MORGAN:  Your Honor, I think turning to the

25 objections, Your Honor, I would I guess refer to them in the

order that they appear in the agenda.

And, again, just to clarify, agenda item A, 3A which was the objection by the 12 and a half percent senior noteholders. That is not being pursued today. It was overruled at the first day hearing.

B is the objection of Kimco Realty Corporation and I'm not sure if Kimco's counsel is here, but I am advised that Kimco is satisfied with the provisions of the order as modified and as Your Honor saw last night's version.

Item C, Your Honor, was the objection of CRI Easton Square. That objection is also resolved. But I understand that the landlord would like a representation on the record from the lenders I believe so I will -- I will let Mr. Riela back to the podium.

MR. RIELA: Thank you, Your Honor. Michael Riela again for the DIP lenders. And Mr. Hazeltine I believe is representing CRI Easton and I'm sure he can correct me if I had made a misstatement about the record.

There is a provision in the order that provides that if the agent or the DIP lenders come onto the leased property to take collateral, to sell collateral, whatever, they would only need to pay rent and other obligations on a per diem basis.

Basically what we have agreed with CRI Easton is if the agent and the DIP lenders agree with any other landlord to

1  pay say the entire monthly obligations rather than on a

2  diem basis while it's on the premises or if this Court orders

3  the agent or the DIP lenders to pay say the entire monthly

4  obligations rather than on a per diem basis, CRI Easton Square

5  would also receive the same treatment as to such other

6  landlord.

7       So rather than on a per diem basis we would be paying

8  CRI Easton Square whatever obligations we would have to pay the

9  other landlord.

10      THE COURT:  All right.

11      MR. HAZELTINE:  Good morning, Your Honor.  William

12  Hazeltine, Sullivan, Hazeltine, Allinson for CRI Easton Square.

13      Your Honor, Mr. Riela's statements are correct.  Also

14  for the record I believe he wanted me to put on the record the

15  rent.  Monthly rent is $7,083.33.

16      And, Your Honor, just a point of clarification.

17  Obviously it's in the order that the lender's obligation to pay

18  the per diem rent does not in any way relieve the debtor's

19  obligations under 365(d)(3).

20      THE COURT:  Okay.

21      MR. HAZELTINE:  Thank you, Your Honor.

22      MS. MORGAN:  Your Honor, the next objection on the

23  list is the objection of Shapco Printing, one of the debtor's

24  vendors.  And Shapco asserts that it is a claimant under

25  Section 503(b)(9).

1          Shapco objects to the carveout provisions of the

2     order alleging that it somehow prejudices the distributions to

3     other administrative creditors.

4          THE COURT:  Well let's --

5          MS. MORGAN:  Should we hear from --

6          THE COURT:  It's not settled.

7          MS. MORGAN:  It is not settled.

8          THE COURT:  Well why don't we go through the ones

9     that are settled --

10         MS. MORGAN:  Fine, Your Honor.

11         THE COURT:  -- and then we can come back if you need

12    to make any representations.

13         MS. MORGAN:  Your Honor, items E, which is Macerich

14    Company, that is resolved; objection F, U.S. Bank, that's our

15    letter of credit issuing bank, that objection is resolved by

16    language in the order; G, the objection of the landlord Leo

17    Kahn is resolved by, again, all of these are in light of

18    changes agreed to by the lenders.

19         Same applies for H which is Serve (MN) QRS; I, Centro

20    Properties Group; J, Drawbridge Entities.  Your Honor, K is the

21    objection of Levine Leichtman Capital Partners Deep Value Fund,

22    which is one of the Committee members.  And my understanding is

23    that that objection is resolved based on the revisions to the

24    order.  But I would ask counsel for Levine Leichtman to confirm

25    that.

**J&J COURT TRANSCRIBERS, INC.**

1    MR. SACCULLO:  Good afternoon, Your Honor.  Anthony
2  Saccullo of Fox Rothschild on behalf of Levine Leichtman and I
3  can represent to the Court that that is correct.  Our objection
4  has been resolved.

5         THE COURT:  All right.  Thank you.

6         MR. SACCULLO:  Thank you.

7         MS. MORGAN:  Your Honor, item L in the agenda was the
8  objection of Granite Village West, another landlord, and that
9  is resolved.  M is the objection of Weingarten Realty
10 Investors.  Your Honor, that objection is not resolved so that
11 will be going forward.

12        THE COURT:  Okay.

13        MS. MORGAN:  The objection listed at N, Simon
14 Property Group, is resolved.  Objection at O, Inland American
15 Retail Management, is also resolved.  P, WP East End
16 Associates, also resolved.  Q is the joinder of HSBC to the
17 objection of Levine Leichtman and I've been advised by HSBC's
18 counsel that that is also resolved.

19        S, Your Honor, is the objection of Korman Commercial
20 Properties which joined into several other landlord objections.
21 I believe that one may be resolved, but I will give the podium
22 to Mr. Mangan.

23        MR. MANGAN:  Good morning, Your Honor.  Kevin Mangan
24 on behalf of Korman.  Ms. Morgan is correct, we are resolved
25 with the changes that have been made.  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.  Thank you.

2          MS. MORGAN:  Your Honor, that concludes the list so

3   that leaves us with D, the objection Shapco Printing, and M,

4   the objection of Weingarten Realty.  Would Your Honor like to

5   hear from the objectors?

6          THE COURT:  Yes, let me hear from the objecting

7   parties.

8          MS. MORGAN:  Thank you, Your Honor.

9          THE COURT:  Thanks.  Is there anybody here for Shapco

10  Printing?  All right.  Then how about Weingarten Realty

11  Investors?

12         MR. SAYDAH:  Good morning, Your Honor.  Gilbert

13  Saydah of Kelley, Drye & Warren here today on behalf of

14  Developers Diversified Realty Corp., Weingarten Realty

15  Investors, Gregory Greenfield and Associates, and Turnberry

16  Associates.

17         Your Honor, I'm glad that one other person is still

18  unresolved so I wasn't the one who ruined everyone's snow day.

19                      (Laughter)

20         MR. SAYDAH:  Your Honor, that being said, my clients

21  objected based on two fundamental grounds.  The first is the

22  objection with respect to liens on leases.  As represented by

23  Ms. Morgan and Mr. Riela that's been resolved and we appreciate

24  the debtor's and the DIP lender's cooperation in getting that

25  resolved by creating the excluded leases carveout.

1          Your Honor, the second reason that my clients
2  objected is collateral access rights and specifically the
3  unlimited duration or potentially unlimited duration of such
4  rights and the provisions of the order providing that Section
5  365 of the Bankruptcy Code are inapplicable if the DIP lenders
6  seek to step into the shoes of the landlords and occupy the
7  premises for the purpose of disposing the DIP collateral.

8          Your Honor, as currently proposed upon a default by
9  the debtors the DIP lenders would have broad and virtually
10 unfettered access rights to enter into and remain on the
11 premises for a potentially unlimited time to dispose of their
12 collateral.  As drafted the order states that the period must
13 be reasonable.

14         Quite frankly, Your Honor, I'm not sure what that
15 means.  That could be reasonable to the Court, reasonable to
16 the debtors, reasonable to the DIP lenders to liquidate their
17 collateral in a market that might be saturated with restaurant
18 goods.  I don't know what that means.

19         So my -- intent my clients are faced with tenants
20 that -- potentially that aren't parties to the lease staying on
21 the premises for an undetermined time and which puts them in a
22 difficult position in terms of being able to relet the premises
23 or, you know, what the future is going to bring.

24         Essentially, Your Honor, we believe that the order as
25 currently drafted would allow them to conduct GOB sales or in

1   the context of a buffet restaurant that's perhaps a strange

2   concept, but asset sales to dispose of this DIP collateral

3   without having to return to court to obtain an order that would

4   provide for appropriate procedures and protections that are

5   common in GOB orders such as protections providing limitation

6   on the duration, limitations on sign walkers, the procedures

7   employed by whatever liquidation agent is used if there was one

8   used with respect to how the sales would be conducted.

9         As I'm sure Your Honor is aware you've probably seen

10   the worst case asset sale procedure where there's sign walkers

11   for miles and miles and the entire front of the store is

12   covered in neon.  My clients obviously would prefer to avoid a

13   situation where the world thinks their shopping centers are

14   going out of business.

15         Your Honor, my clients believe that it's appropriate

16   for if the DIP lenders seek to enter onto the premises that

17   they should either exercise whatever rights they may have under

18   state law which are what they are or seek consent of my clients

19   with respect to the duration and procedures for doing that or

20   simply return to court, file a motion, and obtain an order of

21   the court that sets forth what the procedures of those sales

22   would be.  Your Honor, that would satisfy them for the rest of

23   the duration and with regards to the procedures.

24         Your Honor, they believe that --

25         THE COURT:  So with respect to the duration there is

1 a provision that allows -- reserves the right to lessors to ask

2 that it be limited.  Is that not sufficient for your purposes?

3         MR. SAYDAH:  Your Honor, my clients object to that

4 provision because they believe it improperly shifts the burden

5 on establishing the reasonableness of the sales from the DIP

6 lenders or the debtors onto the landlords when there's really

7 no definition of what constitutes reasonable and they're not

8 sure what they would have to prove.

9         In the context of a traditional going out of business

10 sale the burden is on the debtors to establish that those sales

11 are necessary, that it's appropriate for the Court to

12 potentially squash some of the state law or local laws and

13 codes that might otherwise prevent those sales or the terms of

14 the leases.

15         But, Your Honor, that burden belongs to the debtor or

16 perhaps the DIP lenders in the event of a default.  But it

17 should not rest with my clients.

18         THE COURT:  Okay.

19         MR. SAYDAH:  Your Honor, it would also entail

20 expending funds in order to fight an indeterminate battle.

21         THE COURT:  Okay.

22         MR. SAYDAH:  Your Honor, we also object to the

23 explicit provisions in the order that say that Section 365 of

24 the Bankruptcy Code do not apply if the DIP lenders attempt to

25 enter onto the premises.

1        Your Honor, in a potentially unlimited duration

2  tenancy by the DIP lenders is tantamount to de facto assignment

3  of the leases.  And the Bankruptcy Code is clear that in the

4  Amenno Shopping Center there are provisions that have to be

5  protected in terms of occupancy, radius restrictions, use.

6  Your Honor is well familiar with those.

7        But this order provides that 365 doesn't apply and

8  that this is not explicitly an assignment.  It may not be in

9  name, Your Honor, but in practice it would effectively be an

10 assignment.  Thus, Your Honor, I don't believe under Section

11 364 under which they're moving for DIP financing that

12 justification or any basis exists for disregard of Section 365

13 of the Bankruptcy Code.

14       In summary, Your Honor, we would state that the

15 landlords or the DIP lenders have whatever rights they may have

16 under state law.  They're entitled to seek the consent of the

17 landlords where we believe they should be required to return to

18 court and obtain an appropriate order --

19       THE COURT:  I understand.

20       MR. SAYDAH:  -- following the motion.  Thank you,

21 Your Honor.

22       THE COURT:  Response by the lenders or the debtor?

23       MR. RIELA:  Thank you, Your Honor.  Michael Riela

24 again for the lenders.  If you indulge me for just one minute

25 as, you know, since the landlords have filed their objections

**J&J COURT TRANSCRIBERS, INC.**

1 to the DIP, the agency has been working assiduously to -- in an

2 effort to resolve the objections.  I think the results speak

3 for themselves.  There's only one landlord objector still

4 remaining.

5      It's been a very labor intense process, but

6 everybody's been working on it in a very constructive manner

7 and certainly appreciated by everybody I'm sure.

8      While we carefully considered each landlord's request

9 and granted, you know, a great majority of what they've asked

10 for, unfortunately, at least with a collateral access period,

11 you know, that is more of an issue that while it may make sense

12 in a vacuum, there are a few issues here that made us give

13 pause and not grant that one request although we granted many

14 others.

15      I think first of all the fact that there are over 600

16 leases involved, you know, you may have, you know, certain

17 debtors that have just, you know, say two or three leases.

18 Here if we have say 30 days to be on the property, 600, you

19 know, different properties, you know, that would create an

20 administrative issue perhaps for us.

21      The other -- the other reason we weren't able to

22 agree to that request, as Your Honor pointed out there is --

23 there are provisions in that Section 8(e) that say first of all

24 the period has to be reasonable and second of all that

25 landlords can come to court to shorten that notice period.

**J&J COURT TRANSCRIBERS, INC.**

1          Now I've looked at other DIP orders that have been

2     entered maybe in the not so, you know, distant past in which

3     collateral access periods did not have a specific set time

4     period and it didn't have a provision that said that somebody

5     can come into court later to try to limit the collateral access

6     but we're actually giving more rights to landlords than some of

7     these other DIP orders that I had seen provided.

8          THE COURT:  Well but it's less than they would

9     otherwise have under the Code.  Let me ask you.  There will not

10    be any notice given to the landlords and the landlord notice of

11    how long the collateral access period is going to be.  Is that

12    what I understand?

13         MR. RIELA:  There would be no specific time period in

14    the notice that says we will be off the premises in 30 days.

15         THE COURT:  Or any time.

16         MR. RIELA:  Or any time.

17         THE COURT:  Well then how --

18         MR. RIELA:  We have to --

19         THE COURT:  Is anybody going to determine whether

20    that lack of a time period is reasonable or not?

21         MR. RIELA:  I guess what, you know, it would be

22    obviously very difficult to figure that out exante of course.

23    But if we are -- and by the way, of course, under the DIP order

24    either the debtors or the DIP agent or the DIP lenders would

25    have to pay at least, you know, the per diem obligations.

1         So it's not like they are providing these -- this,
2 you know, the landlord services for free.  They will still be
3 getting paid.

4         Let's take for instance, you know, we're on the
5 premises for 31 days and Mr. Saydah's client says, you know,
6 enough's enough, you know, you're on here long enough.  Which
7 by the way we're on 600 other, you know, I have 600 other
8 properties at the same time.  Come to court say, you know, time
9 is time, get off the property after day 45.  They can come to
10 court and get that order and, you know, we would have the right
11 to object for whatever reasons we may have.  But they would
12 have that right.

13        I think the issue for us is, you know, certainly not
14 to prejudice the rights of the landlords, you know.  But the
15 way we have resolved all the other landlord objections
16 certainly shows that we're not trying to do that.

17        I think the issue is more of an administrative issue.
18 First of all with 600 -- 650 leases how are we going to be able
19 to, you know, to conduct sales, you know, maybe go to court to
20 do a GOB sale as folks say we would need to do and I think
21 they're right.

22        THE COURT:  But normally --

23        MR. RIELA:  Sure.

24        THE COURT:  -- normally in a GOB sale there is a time
25 frame and it's not simply, you know, it really is because the

1  landlord --

2          MR. RIELA:  Sure.

3          THE COURT:  -- wants to know when the property is

4  going to be available because it takes a landlord more than one

5  day --

6          MR. RIELA:  I understand.

7          THE COURT:  -- to find another --

8          MR. RIELA:  I understand.  You know, and maybe the

9  real quibble may be with, you know, say 30 days.  Maybe that's

10 too short, you know, the way that I had, you know, thought

11 about it when I was, you know, working with the various

12 landlords on this was, you know, come to some happy medium

13 where obviously I understand their concerns.

14         We have our concerns as well.  I hate bringing up the

15 600 number again but I'll do it here again.  That just may

16 cause a real issue and that's why I sort of baked into the

17 order this, you know, this mechanism where somebody can go to

18 court if -- if they think that we've been on the premises long

19 enough.

20         And I probably should also mention as well.  All the

21 other landlords have agreed to this provision.  Nobody else is

22 objecting to this provision.

23         THE COURT:  The Committee might chime in and --

24         MR. RIELA:  And the Committee may --

25         THE COURT:  -- help or hurt you.

**J&J COURT TRANSCRIBERS, INC.**

1      MR. RIELA:  Do you want to hear from the Committee on

2 this particular issue first?

3      THE COURT:  Sure.

4      MR. RICE:  Your Honor, I just want to add a dose of

5 reality and practicality to the situation.  These are

6 restaurants, they're not mass merchant retailers.  Nobody's

7 going to be running GOBs on these locations.

8      THE COURT:  I know.

9      MR. RICE:  The --

10      THE COURT:  What are they going to be doing?

11      MR. RICE:  Well, Your Honor, there is a whole slew of

12 restaurant Chapter 11s that have recently been filed and there

13 will probably be a lot more especially in the Castrolin

14 (phonetic) family restaurant business.  The economy is such

15 that these restaurants are suffering terribly.

16      The -- I happen to be involved in one personally in

17 the southeast and we've run into this situation many times.

18 The -- what usually occurs is if a restaurant shuts down, I'm

19 not talking about the whole chain shutting down, if a

20 restaurant shuts down nobody wants to pay administrative rent.

21 You take your -- the knives, forks, tablecloths, and chairs out

22 of the restaurant, if there's a head of lettuce you take that

23 out of the restaurant.  And what's left is a freezer, a stove,

24 and those fixtures.

25      And you make a decision or whether it's the lender or

**J&J COURT TRANSCRIBERS, INC.**

1   the debtor makes a decision within a day or two as to whether

2   or not the cost of removal and then the ultimate sale of these

3   fixtures is going to be more than the cost of removal or you

4   abandon the assets.  And this usually occurs within 24 or 48

5   hours.

6         You know I have never seen a debtor or a lender go

7   into a closed restaurant and stay there for a month when it

8   doesn't operate.  I mean it's you abandon those fixtures, you

9   get out of there or you take them out and you sell them and you

10   make some money.  But it's not a mass merchant retailer where

11   you're running GOBs.

12         THE COURT:  Right.  Now with that dose of reality

13   can't we come up with language that protects the landlords?

14         MR. RIELA:  Is Your Honor thinking about a specific

15   time period in which --

16         THE COURT:  Well time period and I --

17         MR. RIELA:  Sure.

18         THE COURT:  -- I also agree with I don't think you're

19   going to be having big GOB signs --

20         MR. RIELA:  Right.

21         THE COURT:  -- posted so.

22         MR. RIELA:  And any GOBs, Your Honor, I hope it would

23   be a very short one if we were talking about food.  But I

24   definitely understand --

25         THE COURT:  We're having a GOB sale on the food?

1  That could be interesting.

2        MR. RIELA:  That could be interesting.

3                    (Laughter)

4        MR. RIELA:  So if Your Honor, you know, has a

5  particular, you know, time period in mind obviously, you know,

6  we would go with that.

7        THE COURT:  Well my suggestion rather is that at

8  least you give some notice to this landlord how long you intend

9  to be there when you give the landlord notice.  And then if the

10  landlord disagrees, then he can bring it to the Court and the

11  Court can settle that dispute.

12        But I think rather than the length of the time I

13  think the landlord is more interested in knowing what that is

14  going to be.

15        MR. RIELA:  And for whatever -- and I think Mr. Rice

16  is right about, you know, how this works in, you know, in

17  practicality.  If we were to say in our notice we'll be on for

18  20 days and we ask for, you know, we determine that we want to

19  be there for longer, would we be able to either agree with the

20  landlord or come to court for a longer period of time?

21        THE COURT:  Absolutely.

22        MR. RIELA:  Okay.  Great.  And I think the other

23  issue that was raised in the objection may be a

24  misunderstanding actually.  I believe the objection is to

25  Section -- sorry -- Paragraph 7(e) as in egg of the -- of the

1  order which says that in connection with the agents and DIP

2  lenders foreclosure under security interests and the debtor's

3  leasehold interest in real property other than the excluded

4  leases Section 365 of the Bankruptcy Code wouldn't apply.

5         THE COURT:  Yes.

6         MR. RIELA:  I believe that Mr. Saydah's client may

7  only have excluded leases.  I could be wrong and he can correct

8  me if I am.  That wouldn't apply to him.

9         THE COURT:  And that's the only provision where the

10  365 does not apply language?

11         MR. RIELA:  I think it was Section (e) again and, you

12  know, I might have missed it as I scanned through it.  I've

13  dealt with this document for way too long.  But I do not see a

14  corresponding similar type of provision in Section 8(e).

15         THE COURT:  All right.

16         MR. RIELA:  So that's sort of a point of

17  clarification.

18         THE COURT:  Okay.

19         MR. SAYDAH:  Briefly, Your Honor.  With respect to

20  Paragraph 7(e) that was a misunderstanding.  I am not sure --

21  my clients have not gotten back to me as to whether or not each

22  of their 17 leases constitutes an excluded lease.

23         Perhaps there may be some discussion as to whether or

24  not the lease has provisions that are susceptible

25  interpretations to whether it is.  That's why I was concerned

**J&J COURT TRANSCRIBERS, INC.**

1  about Paragraph 7(e) that states that in the event that there's

2  a foreclosure and the DIP lenders -- and DIP lenders enter onto

3  the premises that Section 365 doesn't apply at all in the

4  protections for a shopping center lien.

5      THE COURT:  Well I think this, yes, it looks like

6  it's only foreclosure of leases in which they are getting a

7  lien.

8      MR. SAYDAH:  That would -- that's correct, Your

9  Honor.  I'm just concerned that perhaps my clients may have one

10 of those leases.  In any event you would still have a lease

11 where sections -- where the DIP lenders would be able to go

12 onto the premises and not comply with 365.

13     THE COURT:  Well I think what the -- they're saying

14 is if they foreclose on the lease it's not an assumption

15 assignment or rejection of the lease.  I think that's the

16 import.  Is that correct?

17     MR. SAYDAH:  I think that's true, Your Honor.  But if

18 they're foreclosing I'm not sure how long they're going to be

19 on the premises again or what such foreclosure entails.  It

20 comes back to the notice issue in terms of what -- how their

21 disposition of the collateral, what it would be once they

22 foreclosed.

23     THE COURT:  Well isn't that all subject to state law?

24 If they are -- as I understand it the non-excluded leases are

25 those leases which permit under state law the granting of a

1  lien in the leasehold interest.  So I think all of those issues

2  as to what rights the parties would have if they foreclose

3  would be governed by state law.  Is that the import of this?

4        MR. RIELA:  That was my intention in putting this

5  together, Your Honor, that, you know, 365 deals with

6  assignments, assumptions and rejections, state law deals with

7  foreclosures.

8        MR. SAYDAH:  Your Honor, that's fine to the extent

9  it's just whatever rights they have under state law in the

10 event of foreclosure.  That's okay.

11       THE COURT:  Okay.

12       MR. SAYDAH:  To the extent Your Honor would indulge

13 us for a little bit of a recess we might be able to reach an

14 agreement --

15       THE COURT:  Work on language.

16       MR. SAYDAH:  -- on some language.

17       THE COURT:  All right.

18       MR. SAYDAH:  I don't know if debtor's counsels and

19 lender's counsels are amenable to that but.

20       THE COURT:  That's fine with me.  Let's talk about

21 Shapco Printing.  Nobody is here.  Do you want to give me the

22 debtor's position on that then?

23       MS. MORGAN:  Yes, Your Honor.  We believe the

24 carveout provisions are customary, they're reasonable, they're

25 specifically contemplated by our local rules, and it does

1  nothing to disrupt the priority status of Shapco.

2          If it has an allowed 503(b)(9) claim, it will be

3  treated in accordance with the Code.  So we ask that it be

4  overruled.

5          THE COURT:  Well he raises an interesting argument.

6  The carveout does not reduce a secured creditor's claim.

7          MS. MORGAN:  Your Honor, the only way the carveout

8  comes into play I think one of two things happens.  One we have

9  a plan in which we don't have to worry about the carveout.  All

10 administrative creditors are being paid in full including a

11 503(b)(9) claimant.

12         If there is a meltdown scenario in which the lenders

13 are foreclosing and exercising their rights, the lenders we

14 believe, Your Honor, have liens on substantially all the assets

15 and there -- I believe there is case law including case law

16 cited by Shapco that says a secured creditor may -- carveout

17 permits collateral for the benefit of any party.  So that would

18 not disrupt the priority scheme either.

19         The other possibility --

20         THE COURT:  If it is -- if it is truly giving them --

21 giving the professionals part of their collateral that's true.

22 But in the scenario where they're giving something of their

23 collateral to you but not reducing their claim, I mean they

24 would have to reduce their claim if they're giving part of

25 their collateral to you.  Isn't that true?

1    MS. MORGAN:  Well, Your Honor, again if -- I guess if

2    there was enough collateral to go around, yes.  If there was

3    never -- if you never got to that point the lenders really

4    would be entitled to everything.

5         But it's a true carveout.  It is a true carveout

6    because the administrative creditors wouldn't be getting

7    anything anyway.  But I guess you're --

8         THE COURT:  Well then they're reducing their claim or

9    having them reduce their claim would not matter in that

10   instance because their secured claim would not be paid in full.

11        MS. MORGAN:  Well that's true and it would not

12   disrupt the priority of the administrative creditor who would

13   not stand to get any payment.

14        THE COURT:  But in the scenario where there's enough

15   to pay the secured lenders in full and your carveout, isn't the

16   carveout for professionals really disrupting the priority

17   scheme?

18        MS. MORGAN:  I guess, Your Honor, only to the limited

19   extent where you would have this situation where either

20   everyone would not be paid in full --

21        THE COURT:  Right.

22        MS. MORGAN:  -- or there would be -- there would be

23   enough to pay some administrative creditors but not all.

24        THE COURT:  There would be 400 -- $600,000.

25        MS. MORGAN:  Yes.  Yes.  We'd be in that small

1 window. Your Honor, I don't think for purpose -- I think we
2 can wait and see on that for one thing. I think on the
3 503(b)(9) we will know as this case progresses whether it will
4 be paid in full.

5 And, Your Honor, that trade creditor actually has
6 special protections now thanks to the changes to the Code.
7 Changes that of course professionals can't enjoy. Your Honor,
8 professionals I think are in a unique situation in that they
9 are forced to provided services to the estate, they cannot
10 demand COD terms, they cannot demand cash in advance, they
11 cannot stop their services.

12 So I think there are plenty of cases, Your Honor,
13 that say that it is in all of the creditors best interest
14 including administrative creditors to ensure that estate
15 professionals are protected through a carveout so that they can
16 adequately represent and undertake their fiduciary
17 responsibilities.

18 So for Your Honor's concern about that small window,
19 Your Honor, and I do think it's -- it is -- it would be a very
20 remote possibility, I do think the benefits of having
21 professionals of the debtor's choice who are qualified and that
22 is -- that would be the effect, Your Honor, if professionals
23 carveouts were at risk.

24 I think that should be preserved. I think it is
25 contemplated by virtually every Court in this jurisdiction and

1  others that the professionals for the estate should be

2  protected and, Your Honor, we certainly think we deserve the

3  protection here.

4          THE COURT:  Well it's an interesting argument.

5          MS. MORGAN:  That is being not prosecuted at this

6  point, Your Honor.

7                        (Laughter)

8          THE COURT:  Well do I have to take notice of the fact

9  that it's a snow day?

10                       (Laughter)

11         THE COURT:  I'd love not to decide it.  I'd love to

12  be able to reserve that and see where we are but the likelihood

13  of this ever being an issue --

14         MS. MORGAN:  Is very remote, Your Honor.

15         THE COURT:  -- is remote.  Well let's take our five

16  minute break and maybe the parties can talk --

17         MS. MORGAN:  Thank you, Your Honor.

18         THE COURT:  -- about that as well.

19         MS. MORGAN:  Thank you.

20                        (Recess)

21         THE COURT:  All right.  Where are we?

22         MR. RICE:  Your Honor, I'm going to try a little bit

23  more realty and practicality.  On the carveout issue, Your

24  Honor --

25         THE COURT:  Yes?

**J&J COURT TRANSCRIBERS, INC.**

1       MR. RICE:  -- and it is on Page 13 of the DIP order,

2  Paragraph 6(b).

3       THE COURT:  Yes.

4       MR. RICE:  Your Honor, notwithstanding the Shapco

5  objection, I really believe this is a true carveout and the

6  money does come out of the lender's collateral proceeds.  Just

7  as -- I wouldn't change any language that presently is in this

8  order.  I think the order works and it really reads as a true

9  carveout.

10       And, Your Honor, it is -- it is a carveout for unpaid

11  professional fees prior to a notice of default and then up to

12  $600,000 thereafter.

13       Now what this really means is in the event of a

14  liquidation or a conversion to Chapter 7, they stop funding,

15  lenders stop funding under the DIP and we have to liquidate

16  this company.  What happens is whatever collateral that the

17  lenders had pre-petition or post-petition -- I don't want to

18  get into any valuation arguments today -- but at that point in

19  time it's a liquidation value because that's all -- that's all

20  of us, any of us are going to have.  The change starts there.

21       What you end up with is 650 locations.  They only

22  carry on their balance sheet I think $33 million of inventory

23  which I think is about three days supply.  So there's no

24  inventory, there's virtually no receivables, the cash is gone,

25  and you have 650 locations, no employees.

1          In that event either somebody steps up to the plate

2     and puts in more money for insurance, custodial services, all

3     sorts of other things to preserve these locations in the event

4     there's value in the sale of leases or not.

5          And than whatever comes in, Your Honor, has to

6     satisfy the new money that is used to preserve the leases,

7     almost half of which are subject to what we -- the pre-petition

8     real estate financing sale leaseback transaction, the other

9     half I believe are unencumbered.  But you still have to

10    preserve those locations.

11         So at that point in time whatever is realized is

12    going to be liquidation value of collateral.  The lender's

13    secured claim at that point, I'm not sure how you could value

14    it.  The concern at the time of the filing, enterprise value or

15    otherwise, is going to be so much greater.

16         THE COURT:  So you're saying this is not going to be

17    the one scenario where it makes a difference?

18         MR. RICE:  Exactly.

19         THE COURT:  Then I don't have to decide the issue?

20         MR. RICE:  I think if you just leave -- I think the

21    objection is wrong because I think it really is a true

22    carveout.

23         THE COURT:  Okay.  And the lenders agree with that?

24         MR. RIELA:  Your Honor, I'll have to admit to be a

25    little lost.  Every time, you know, a true carveout versus, you

**J&J COURT TRANSCRIBERS, INC.**

1  know, maybe not a true carveout.

2        But, Your Honor, the lenders obviously will stick

3  with the order the way it's drafted.  I believe that Mr. Rice,

4  you know, has brought up a number of good points and I think

5  the issue is not really something that has to concern us at

6  this point.  I think the order's pretty clear the way it is.

7        THE COURT:  All right.  All right.  I won't decide

8  the issue at this point.  Have we resolved --

9        MR. RICE:  Does that mean the objection's being

10 carried, Your Honor?

11        THE COURT:  No, the objection is being overruled as

12 not applicable.

13        MR. RICE:  Thank you, Your Honor.

14        MR. SAYDAH:  Your Honor, with respect to the other

15 remaining objection of my clients with respect to collateral

16 access rights.  We thank you for the time.

17        We've come to agreement on the terms of language with

18 respect to providing notice.  My clients in the event of

19 default and with respect to the period.  In the -- during the

20 break I spoke with my clients and the one issue that they did

21 want to press is they believe that in light of the

22 circumstances of being a restaurant scenario, as the Committee

23 pointed out this is likely a decision that's going to be made

24 within a day or two as to whether or not the property is going

25 to be abandoned or if it's going to be sold.

1   They believe that the collateral access period should

2   be limited to 30 days with the burden on the debtor or the DIP

3   agent of coming before the Court and establishing

4   reasonableness in the event that they believe they need longer

5   than 30 days.  That's the one outstanding issue, Your Honor.

6   THE COURT:  Do you want to agree to that with respect

7   to Weingarten's leases?

8   MR. RIELA:  I guess, Your Honor, you know, I'm not,

9   you know, I don't want to, you know, take up the Court's time

10  with this particular issue.  I think kind of my concern is what

11  we're kind of, you know, thinking about what's going to happen

12  in the future and really who knows what's going to happen in

13  the future.

14  I had thought that when, you know, we had dealt with

15  this issue a few minutes ago Your Honor had mentioned that the

16  notice should specify a period so that the landlord would know

17  how long to expect us and if the -- and if we can agree to a

18  longer or shorter period of time great, or if somebody has to

19  go into court, that's fine.

20  I'm still a little bit reticent, again I don't want

21  to spend a lot of this Court's time on this, to agree, you

22  know, exante at this particular time to any particular period.

23  You know, 30 days may very well be more than enough time.  I

24  just don't know at this point.

25  And I think the protections that we gave in the first

draft of the order that, you know, was circulated, you know,
well the current draft of the order that was circulated today
as well as the clarifications that we made, you know, after our
colloquy here should be more than enough protection for the
landlords.

THE COURT: All right. I agree. I will overrule the
landlord on that. I think that it's more appropriate that the
lenders give the landlord the notice closer to the time when
they are going to foreclose because it will be more realistic
for both parties.

MR. SAYDAH: Very good. Thank you, Your Honor.

THE COURT: All right.

MS. MORGAN: Your Honor, with that I think we would
like to walk through very few changes to the order from the
version that was filed last night.

THE COURT: Okay.

MS. MORGAN: May I approach, Your Honor?

THE COURT: You may. Thank you.

MS. MORGAN: Your Honor, we will have a nice clean
copy for you. We have all the equipment here. But the black
line is part black line and part handwritten.

THE COURT: Okay.

MS. MORGAN: I believe the first -- and, again, this
is black lined against what was filed with the Court last night
at approximately 4:00 -- the first changes come in at Page 21

1  of the black line.

2        THE COURT:  All right.

3        MS. MORGAN:  At Paragraph D.  And at the top, Your

4  Honor, the changes at the top in black lining it's clarifying

5  that the notice is to be provided to the landlord's counsel if

6  and only if known or if a notice of appearance has been filed.

7  That's the black line language.

8        And then I have handwritten down below a couple lines

9  down, it previously read the DIP lender shall have the right to

10 direct and require any debtor and any trustee appointed in the

11 cases.  At the request of Ms. Leamy we've changed that language

12 to read to require the debtors and their successors.

13       THE COURT:  Okay.

14       MS. MORGAN:  Further down the same page, Your Honor,

15 three or four lines down.  At the request of Realty Income, who

16 did not file an objection but requested some clarifications

17 this morning, we have changed the language beginning with

18 subject to Section 365 of the Bankruptcy Code and adding the

19 words and without limitation all of the affected lessor's

20 rights under the applicable lease and then we've added and any

21 related agreements.

22       And then, again, picking up that without limitation

23 language further on in the line.

24       THE COURT:  Okay.

25       MS. MORGAN:  At the next page, Your Honor, this is --

1  it will be a paragraph that goes on for almost ever.  But we

2  have now -- we add a subparagraph 4 so we're going to go 2, 3,

3  and then on Page -- top of Page 23, I think maybe it's at the

4  bottom of your page.

5          THE COURT:  Yes.

6          MS. MORGAN:  We're adding a new 4 and we didn't get a

7  chance to write that out, but we will have a clean copy and I

8  will read it into record.  And this is to deal with the

9  Weingarten objection that we just talked about today.

10          So the new provision 4 would read the landlord -- the

11  landlord notice to Weingarten Realty Investors, Developers

12  Diversified Realty Corp., Gregory Greenfield and Associates,

13  Turnberry Associates, and I believe we have a couple more.

14          MR. FREDERICKS:  Ian Fredericks for the record, Your

15  Honor.  It's WP East End Associates, Realty Income Corp., and

16  Serve (MN) QRS 14-38 Inc.

17          MS. MORGAN:  Okay.  So with respect to all of those

18  landlords the notice shall specify the collateral access period

19  which may be increased or reduced by an agreement of the agent,

20  the DIP lenders, and the applicable lessor, or by order of the

21  Court, with such dispute regarding the collateral access period

22  to be heard on short notice at the earliest convenience of the

23  Court.

24          THE COURT:  Okay.

25          MS. MORGAN:  Your Honor, the next black line changes

1  would be at Page 31 of the black line and this is in the

2  adequate protection section.  I hope we're on the same page

3  with our black lines.  I'm not positive we are.

4          THE COURT:  I have it, yes.

5          MS. MORGAN:  Okay.  Your Honor, this is clarifying

6  language.  The -- there is a lower rate of interest than LIBOR

7  for pre-funded LC commitment fee funds as defined in the later

8  part of that addition.  So this is just basically clarifying

9  what existed pre-petition, that is the LIBOR rate only applied

10 to the LCs that were actually drawn.

11         And with respect to those that are just funded but

12 not drawn, it is a lower interest rate.  So that is just

13 correcting what already existed.

14         And then we go to Page 44, Your Honor, of the black

15 line.  And first we are at the end of Paragraph C.  This change

16 was made at the request of the Committee that if there is a

17 challenge they do not have to seek a standing to assert it.

18         THE COURT:  Excuse me.  What page?

19         MS. MORGAN:  It's 44 of my black line.

20         THE COURT:  Okay.

21         MS. MORGAN:  It's at the end of subparagraph 19(c).

22         THE COURT:  Okay.  It is there.  All right.

23         MS. MORGAN:  It's just addition of the words without

24 further order of the Court.  Your Honor, it's actually moving

25 it to a different spot in the sentence.  But the purpose again

1    is to not require the Creditors Committee to come in and seek

2    standing.

3           And then later on at the end of subparagraph D, this

4    basically clarifies that the $150,000 that's being afforded to

5    prosecute a challenge could be used for -- for purposes of

6    19(d) and that is in connection with the issue of whether the

7    lenders have a security interest in substantially all of the

8    debtor's assets.  And that again was at the request of the

9    Committee.

10          I believe, Your Honor, those were the only additional

11   changes from the version of last night.  Is there more?

12          MS. BARROW-BOSSHART:  Your Honor, Jenette Barrow-

13   Bosshart on behalf of the Committee.  I think Ms. Morgan

14   slightly misspoke with respect to the subparagraph D in 19.

15   That challenge that -- that challenge on methodology that must

16   be brought within the 99 days, that is not a deduct from the

17   investigation funds, the 150, but cash collateral and

18   collateral may be used to satisfy the fees in connection with

19   that subject to Court approval.

20          THE COURT:  Okay.

21          MS. BARROW-BOSSHART:  Thank you, Your Honor.

22          MS. MORGAN:  Does Your Honor have any questions about

23   either the changes to the order or any of the changes that have

24   been made since entry of the interim order that we've gone

25   over?

1          THE COURT:  No, that's fine.

2          MS. MORGAN:  Your Honor, in that case on behalf of

3   the debtors we would ask that the Court approve the financing

4   today, the final form of the order.  The debtors, as you have

5   heard, need the financing so that they have sufficient

6   liquidity to run their businesses.  And, again, we believe that

7   we've satisfied the provisions of Section 363 and 364.

8          This DIP was negotiated in good faith at arm's length

9   and the terms on the whole are fair and reasonable under the

10  circumstances and we ask that it be approved.

11         THE COURT:  All right.  Well based on the testimony

12  presented and incorporated into the record and all objections

13  being resolved or overruled, I will enter the final order as

14  proposed.

15         MS. MORGAN:  Thank you, Your Honor.  And then as a

16  matter of procedure I think we are actually printing it now.

17  We brought a printer with us, Your Honor.

18         THE COURT:  Good.

19         MS. MORGAN:  So we do need the order to be entered

20  today.  Today's the last day for entry.  And I know that the

21  Court is short staffed, but we hope that we can get that

22  entered on the docket.  And I don't know, what would Your Honor

23  prefer?  We could knock on chambers door as soon as it's ready

24  or --

25         THE COURT:  Why don't you do that?

1     MS. MORGAN:  -- we could reconvene, whatever you
2  would like.

3     THE COURT:  Why don't you knock on chambers door.  I
4  will contact the -- somebody from the Clerk's Office so they're
5  here ready to docket it when I get it.

6     MS. MORGAN:  Thank you, Your Honor.  It should be
7  just a few minutes, Your Honor.  And thank you very much again
8  for your time today.

9     THE COURT:  All right.  Thank you.  We'll stand
10 adjourned.

11

12                    *  *  *  *  *

13

14          **C E R T I F I C A T I O N**

15     I, JANET D. PERSONS, court approved transcriber,
16 certify that the foregoing is a correct transcript from the
17 official electronic sound recording of the proceedings in the
18 above-entitled matter, and to the best of my ability.

19

20 /s/ Janet D. Persons            DATE:  February 29, 2008
21 JANET D. PERSONS
22 J&J COURT TRANSCRIBERS, INC.

23

24

25

                **J&J COURT TRANSCRIBERS, INC.**