**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

IN RE:                          )   Chapter 11
                                )
BUFFETS HOLDINGS, INC., et al., )   Case No. 08-10141(MFW)
                                )
            Debtors.            )   Jointly Administered
                                )
                                )

**OPINION**[1]

Before the Court is the Motion of the Debtors[2] for approval of the assumption and assignment of an unexpired lease of non-residential real property located in Warrington, Pennsylvania, (the "Assumption Motion") and the Debtors' First and Third Motions for authority to reject certain non-residential real property leases, including property located in Moline, Illinois, and Muskegon, Michigan (the "Rejection Motions").  The Motions are opposed by FP1 LLC and FP2 LLC (collectively "FP"), which assert that the leases are not separate but are integrated into master leases which must be assumed or rejected in toto.  For the

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, which is made applicable to contested matters by Rule 9014 of the Federal Rules of Bankruptcy Procedure.

[2] The Debtors are Buffets Holdings, Inc.; Buffets, Inc.; Buffets Leasing Company, LLC; Buffets Franchise Holdings, LLC; Fire Mountain Restaurants, LLC; Fire Mountain Leasing Company, LLC; Fire Mountain Management Group, LLC; HomeTown Buffet, Inc.; HomeTown Leasing Company, LLC; OCB Restaurant Company, LLC; OCB Leasing Company, LLC; OCB Purchasing Company; Ryan's Restaurant Group, Inc.; Big R Procurement Company, LLC; Ryan's Restaurant Leasing Company, LLC; Ryan's Restaurant Management Group, LLC; Tahoe Joe's, Inc.; Tahoe Joe's Leasing Company, LLC.

reasons stated below, the Court will deny the Motions.

I.   <u>BACKGROUND</u>

The Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code on January 22, 2008.  The Debtors comprise the nation's largest steak-buffet restaurant chain and the second largest restaurant company in the family-dining segment of the restaurant industry.  As of the filing of their bankruptcy cases, the Debtors had more than 600 company-operated restaurants and 16 franchise locations in over 40 states.

Prior to their bankruptcy filings, in 2002 and 2003 the Debtors sought to recapitalize, replace their expensive secured debt, and issue a dividend to shareholders.  (Duncan Tr. 17:17-18:12, 19:12-19.)[3]  This was accomplished in three stages.  In stage one, the Debtors entered into a sale/leaseback transaction in which they sold certain restaurants and the ground on which they stood and then leased them back.  This resulted in cash to pay part of the secured debt and took the restaurants and the debt off their balance sheet.  In stage two, the Debtors entered into a sale/leaseback transaction with respect to twenty-nine restaurants where they owned the building but not the land on which it stood.  In that transaction, which is the subject of

_____

[3]  References to the record of the April 14, 2008, hearing are to: "Tr. [page:line]".  References to the deposition designations of the parties are to: "[deponent's name] Tr. [page:line]".

this dispute, the Debtors assigned their ground leases and sold
the buildings constructed thereon to FP.[4]  The Debtors then
subleased from FP the grounds and buildings pursuant to four
Master Leases.  The Debtors received a sum of cash (approximately
$35 million) and removed the restaurants and debt from their
balance sheet.  The conclusion of the first two stages permitted
the Debtors in the third stage to refinance their secured debt at
more reasonable rates and to issue a dividend to shareholders.

On the petition date, the Debtors filed their First Motion
for authority to reject certain non-residential real property
leases, including a lease with FP1 in Moline, Illinois.  On
February 22, 2008, the Debtors filed their Third Motion to reject
certain other non-residential real property leases, including a
lease with FP2 in Muskegon, Michigan.  On March 25, 2008, the
Debtors filed the Assumption Motion with respect to the
Warrington lease they have with FP2.  The Debtors have ceased
operations at each of the three locations and want to reject or
assign the leases in order to cut costs.  (Tr. 100:15-101:6.)  FP
filed objections to the three Motions, and a joint evidentiary
hearing on the issue of whether the individual leases were
severable from the Master Leases and could be assumed or rejected

---

[4]  Originally the sale/leaseback was negotiated and executed
by American Commercial Capital ("ACC") which thereafter assigned
all its interests to FP.

separately was held on April 14, 2008.[5]  The parties have briefed the issues and the matter is ripe for decision.

## II.   JURISDICTION

This Court has jurisdiction over these matters which are core proceedings pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), (M) & (O).

## III.  DISCUSSION

### A.   Review of Case law

Upon the filing of a bankruptcy petition, a debtor has the right to assume or reject an unexpired non-residential real property lease in accordance with section 365 of the Bankruptcy Code.  11 U.S.C. § 365(a).  See also N.L.R.B. v. Bildisco and Bildisco, 465 U.S. 513, 528 (1984) (noting that "the authority to reject an executory contract is vital to the basic purpose to a chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization."); In re Convenience USA, Inc., No. 01-81478, 2002 WL 230772, at *7 (Bankr. M.D.N.C. Feb. 12, 2002) (concluding that section 365 allows a debtor to "pick and choose among the debtor's executory contracts and unexpired leases and

---

[5]  The parties have agreed to defer presenting evidence and having the Court decide the other issues inherent in the Debtors' Assumption Motion until after the severability issue is resolved.

to assume those which are beneficial to the estate and to reject those that are not beneficial.")

If the debtor decides to assume a lease, however, it must generally assume all the terms of the lease and may not pick and choose only favorable terms to be assumed. "The [debtor] may not blow hot and cold. If he accepts the contract he accepts it cum onere. If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other." In re Italian Cook Oil Corp., 190 F.2d 994, 997 (3d Cir. 1951). See also In re Fleming Cos., Inc., 499 F.3d 300, 308 (3d Cir. 2007) (holding that debtor could not assume and assign store lease because an essential term of it required service from a warehouse whose lease had already been rejected); In re ANC Rental Corp., Inc., 277 B.R. 226, 238-39 (Bankr. D. Del. 2002) (holding that debtor may not assume only part of a contract but must assume the entire agreement).

Section 365(f)(1) states that a debtor's right to assume and assign a lease is enforceable notwithstanding any provision in a lease which prohibits, restricts, or conditions the assignment of that lease. Consequently, the courts will not enforce provisions designed solely to impair the debtor's ability to assume or reject leases. 11 U.S.C. § 365(f). See also Fleming Cos., 499 F.3d at 307 (noting that the Bankruptcy Code invalidates contract provisions that are so restrictive as to be de facto anti-

assignment clauses); In re Rickel Home Ctrs., Inc., 209 F.3d 291,
299 (3d Cir. 2000) (stating that section 365(f)(1) ensures the
"free assignability [of executory contracts or unexpired leases]
as a means to maximize the value of the debtor's estate . . . .
[T]o that end, [it] allows the [debtor] to assign notwithstanding
a provision in the contract or lease, or applicable law,
prohibiting, restricting, or conditioning assignment."); The Shaw
Group, Inc. v. Bechtel Jacobs Co., LLC (In re The IT Group,
Inc.), 350 B.R. 166, 179 (Bankr. D. Del. 2006) (noting that
"[c]ross-default provisions are 'inherently suspect' because they
interfere with the debtor's rejection power by saddling the
estate (albeit indirectly) with the burdens of unwanted executory
contracts."); Convenience USA, 2002 WL 230772, at *7 (concluding
that "cross-default provisions are unenforceable in bankruptcy
where they would restrict the debtor's ability to fully utilize
the provisions of § 365 . . . .  Thus, where a debtor is a party
to a number of unexpired leases, cross-default clauses that would
serve to prevent the debtor from assuming some of the leases
without assuming the others at the same time are unenforceable
under § 365(f).").

The fact that there is one document reflecting the parties'
agreements does not mean that it is one contract.  "The 'all or
nothing' requirement [of assumption or rejection under section
365] does not mean . . . that every document denominated a

6

'contract' or a 'lease' must be treated as a single, indivisible whole . . . .  If a single contract contains separate, severable agreements, however, the debtor may reject one agreement and not another."  2 William L. Norton, Jr. & William L. Norton, III, <u>Norton Bankr. L. & Prac.</u> § 39:11 (2d ed. 1999).

The determination of whether a specific contract or lease is an indivisible agreement or is several agreements in one is a question of state law.  <u>See, e.g.</u>, <u>In re T & H Diner, Inc.</u>, 108 B.R. 448, 453 (D.N.J. 1989) ("The question of divisibility is a matter of state law.  In New Jersey the determination of whether a transaction constitutes one or several contracts is primarily based upon the intentions of the parties.") (citations omitted); <u>In re Adelphia Bus. Solutions, Inc.</u>, 322 B.R. 51, 55 (Bankr. S.D.N.Y. 2005) (holding that state law governs the interpretation of leases); <u>In re Wolflin Oil, LLC</u>, 318 B.R. 392, 397 (Bankr. N.D. Tex. 2004) ("Where a lease or contract 'contains several different agreements, and the lease or contract can be severed <u>under applicable non-bankruptcy law</u>, section 365 allows assumption or rejection of the severable portions of the lease or contract.'") (emphasis added) (<u>quoting</u> <u>In re FFP Operating Partners, LP</u>, No. 03-90171, 2004 WL 3007079, at *1 (Bankr. N.D. Tex. Aug. 12, 2004)); <u>In re Plum Run Serv. Corp.</u>, 159 B.R. 496, 499 (Bankr. S.D. Ohio 1993) (applying Ohio law to issue of whether contract was divisible).

7

Under Illinois law,[6] the test for severability depends on the intent of the parties.  See, e.g., Super Stop Petroleum, Inc. v. Clark Retail Enters. (In re Clark Retail Enters.), 308 B.R. 869, 888 (Bankr. N.D. Ill. 2004) (Illinois law requires a determination of "the intention of the parties as established by a reasonable interpretation of the terms and provisions of the contractual document itself, by the circumstances of the transaction at issue, and by the subject matter to which the contract has reference.").  The issue is whether the parties intended a single contract even though it may be expressed in separate agreements or whether they intended separate contracts even though they are "bundled" together in one agreement.

Illinois courts use the "four corners" approach to contract interpretation, under which the courts will confine their review to the four corners of the document itself if it is not ambiguous to ascertain the parties' intentions in executing it.  See, e.g., Neuma, Inc. v. AMP, Inc., 259 F.3d 864, 873 (7th Cir. 2001) (finding that if a contract is unambiguous, a court "will not look beyond its 'four corners' in interpreting its meaning."); Clark Retail, 308 B.R. at 884 ("Illinois courts use the 'four corners' approach to contract interpretation, confining their attention to only that which appears within the four corners of

---

[6]  In this case, the parties agreed that Illinois law would apply to the interpretation of the Master Leases.  (Exs. D-1 & D-2 at ¶ 39(m).)

the relevant documents."). A contract that is susceptible to only one reasonable interpretation is unambiguous, and a court must determine its meaning as a matter of law. See, e.g., Bourke v. Dun & Bradstreet Corp., 159 F.3d 1032, 1036 (7th Cir. 1998).

    B.   Application to the Facts

        1.   Express Terms of the Contract

The Debtors and Committee assert that the terms of the Master Leases clearly evidence that the individual leases incorporated within them were independent and separate agreements. The two Master Leases[7] at issue cover ten and eleven property leases, respectively. (Exs. D-1 & D-2.) The properties in the first Master Lease are in scattered locations in four states. (Ex. D-1.) The properties in the second Master Lease are in eight states. (Ex. D-2.) Both Master Leases have two tenants (OCB Restaurant Co. and HomeTown Buffet, Inc.). (Exs. D-1 & D-2.) Each underlying lease in the Master Leases covers a separate restaurant that operates independently of the other restaurants in the Debtors' chain and are required, under the Master Leases, to provide their financial reports separately to FP. (Tr. 96:20-97:12; Exs. D-1 & D-2 at ¶ 29.) Although the total rent due under the Master Leases was wired by the tenants to FP in a lump sum, Exhibit B to the Master Leases reflects the

---

[7] The parties executed two additional Master Leases, which are not at issue here, covering an additional eight properties. (Andrews Tr. 75:14-76:3.)

allocation of the rent among the underlying restaurants. (Tr. 97:13-22; Exs. D-1 & D-2 at ¶ 6(a) & Ex. B.)

The Debtors argue that the fact that the rent is apportionable is a critical factor mandating a finding that the Master Leases are severable. See, e.g., Altra Corp. v. Chemtoy Corp. (In re Chemtoy Corp.), 19 B.R. 475, 481 (Bankr. N.D. Ill. 1982) (stating that an agreement is severable "where one party's performance consists of several distinct and separate items and the price to be paid by the other party is apportioned to each of the items to be performed."); Kel-Keef Enters., Inc. v. Quality Components Corp., 738 N.E.2d 524, 539 (Ill. App. Ct. 2000) ("In determining the intention of the parties, useful factors include whether performance by one party consists of distinct and separate items and whether the price is apportioned for each item of performance."); Keeshin v. Levin, 334 N.E.2d 898, 905 (Ill. App. Ct. 1975) (stating that "[i]f a part to be performed by one party consists of several distinct and separate items . . . and the prices to be paid by the other is apportioned to each item to be performed, or if left to be implied by law, such a contract will generally be held to be severable; and the same rule holds where the price to be paid is clearly and distinctly apportioned to different parts of what is to be performed, although the latter is in its nature single and entire.") (quoting Amsler v. Bruner, 173 Ill. App. 337, 345 (Ill. App. Ct. 1912)).

10

The Court disagrees with the conclusion of the Debtors and
the Committee.  The ability to apportion the consideration to
different parts of the contract is one factor to be considered in
determining the intent of the parties but it is not conclusive.
There are many cases where, although the payment is apportioned
among many items, the Illinois courts have still found an
integrated, non-severable contract.  See, e.g., City of Chicago
v. Sexton, 2 N.E. 263, 264 (Ill. 1885) (holding that contract to
furnish the ironworks for a multi-story building was not
divisible even though the consideration was "made up by stating
the estimated cost of each story separately, and the roof, and
then adding the whole together."); Meredith v. Knapp, 211 N.E.2d
151, 153 (Ill. App. Ct. 1965) (holding that double indemnity
coverage in insurance policy was not separate contract even
though a separate premium was charged for it).

The Seventh Circuit has noted that the intention of the
parties is critical and "[e]ven if the parties entered a multi-
part contract, that contract cannot be severed after the fact if
the parties entered it 'as a single whole, so that there would
have been no bargain whatever, if any promise or set of promises
were struck out.'" In re United Air Lines, Inc., 453 F.3d 463,
468, 470 (7th Cir. 2006) (applying Colorado law and concluding
that agreement to lease airport space and to repay bond issue for
building on that space were not independent agreements, though

11

separate payments were made for each, because "the parties' bond
arrangement . . . is not and could not have been a lone-standing
bargain.  In other words, the parties would not have entered the
bond-related portion in the complete absence of the leasing
portion.").  See also Plum Run, 159 B.R. at 499 (applying Ohio
law and finding contract indivisible because "the parties
intended to consider the [contract] as a single, interdependent
contract, not as eleven divisible contracts.").

     Even the cases cited by the Debtors acknowledge that the
determination of whether a contract is severable depends on the
intention of the parties and is fact-intensive.  See, e.g.,
Chemtoy Corp., 19 B.R. at 481 ("[W]hether a contract is severable
depends on the intent of the parties.  This intent is ascertained
by the terms and the subject matter of the contract."); Kel-Keef
Enters., 738 N.E.2d at 539 (stating that "[w]hether a contract is
severable depends on the intention of the parties" and that
apportionment of the price is only one useful factor); Keeshin,
334 N.E.2d at 904 ("Whether a given contract is or is not
severable cannot be determined by any precise rule; each case
must depend in large part upon the specific terms of the contract
involved.").

     The Debtors and Committee argue nonetheless that several
other provisions of the Master Leases demonstrate that the
individual leases should be separated from each other.  For

example, they note that FP has the ability to divide and consolidate individual leases and create new Master Leases. (Exs. D-1 & D-2 at ¶¶ 25(b), 31 & 36(a).)  FP also has the right to sell the underlying property relating to any of the individual leases (subject to the tenants' right of first refusal), which will result in the severance of that lease from the Master Lease. (Exs. D-1 & D-2 at ¶ 36(a).)  If an individual property is condemned, the Debtors can substitute another property for it. (Exs. D-1 & D-2 at ¶ 7(b).)  Any of the individual leases can be assigned or substituted for another by the Debtors, with FP's consent.  (Exs. D-1 & D-2 at ¶¶ 17(a) & 31.)  The Debtors and Committee argue that these provisions demonstrate that the Master Leases could be severed.[8]

FP argues that all of the cited provisions are exercisable only by FP or require FP's consent.  Therefore, FP argues that rather than proving the agreement is divisible, the provisions evidence that it is not.

The Court agrees with FP.  The fact that the Master Leases could in certain circumstances be severed by their terms does not mean that the parties intended them to be separate agreements for all purposes.  In fact, it demonstrates the opposite: that the parties intended each Master Lease to be an integrated agreement

---

[8]  In addition, the Debtors and Committee note that FP did not even care which individual lease was in which Master Lease. (Tr. 89:15-17.)

except for certain specifically identified circumstances.
Further support for this conclusion is found in other provisions
of the Master Leases.  For example, the Master Leases expressly
provide that the individual leases shall not be merged with each
other, even if the landlords are the same and the tenants are the
same.  (Exs. D-1 & D-2 at ¶ 24.)

The Debtors and Committee argue further, however, that the
conduct of the parties proves the severability of the Master
Leases.  Pre-petition, the parties had been negotiating to
substitute a lease the Debtors had in Cicero, Illinois, for the
Moline, Illinois, lease which was not performing well.  (Tr.
99:5-21.)  FP had agreed to the substitution, but it was not
completed by the time of the bankruptcy filing.  (Tr. 100:3-7.)
FP responds that the fact that the Debtors sought its permission
for the substitution demonstrates that they did not have the
power to sever the Master Lease under Illinois law.

The Court agrees with FP on this point.  The fact that FP
was willing to accept a substitution does not mean that the
Master Lease was intended to be divisible.  If the Master Leases
were severable, it is unlikely that the Debtors would have gone
to the trouble of negotiating the substitution with FP or would
have agreed to add another lease (that was free of the
restrictions in the Master Lease) for the Moline lease.  The
Debtors apparently recognized that the leases were not severable

14

under Illinois law.  Therefore, the Court concludes that the parties' prior conduct supports the conclusion that the Master Leases are not severable.

FP argues that many other provisions of the Master Leases evidence that they are intended as one agreement.  For example, the obligation to pay rent is joint and several; that is, each Tenant is liable for the entire rent.  (Exs. D-1 & D-2 at ¶ 25(a).)  FP argues that this proves that the Master Lease is one integrated agreement because the notion that one party is responsible for the payment of rent on a building it is not occupying is consistent only with the idea that this is one integrated contract.

FP also notes that all rent remains due, even if the Debtors are unable to use one or more of the properties because of condemnation, destruction, or termination of the ground lease.  (Exs. D-1 & D-2 at ¶¶ 6(e), 7(b) & 33(a).)  At the expiration of their terms, the Master Leases may only be extended if all the ground leases are extended.  (Exs. D-1 & D-2 at ¶ 5(a).)  Finally, on default of one of the individual leases, FP has the right to declare the entire Master Lease in default or to treat only the individual lease in default.  (Exs. D-1 & D-2 at ¶ 19(b).)

The Debtors and Committee disagree, arguing instead that these provisions are simply cross-default provisions that courts

15

typically find are not enforceable under section 365(f).  See,
e.g., Convenience USA, 2002 WL 230772, at *7 (concluding that
provision of master lease that would have terminated the entire
lease if six of the twenty-one locations were rejected was
unenforceable); In re Sambo's Rests., Inc., 24 B.R. 755, 758
(Bankr. C.D. Cal. 1982) (finding that cross-default provisions
linking multiple restaurant leases were unenforceable).  The
Committee also argues that the fact that FP can exercise its
default rights against only one property proves the divisibility
of the contract.

    The Court disagrees with this last argument of the
Committee.  It is typical in contracts to give a party
flexibility in exercising its remedies on default, allowing it to
exercise some remedies without waiving any other remedies it may
have under law.  The Court views the default provision here as
similar and not indicative of the severability of the Master
Leases.  In fact, if the Master Leases were intended to be
severable, it is more likely that they would have limited FP to
exercising its remedies on default to the defaulting property
only rather than permitting it to exercise remedies against all
the properties.

    Further, contrary to the suggestion of the Debtors and the
Committee, cross-default provisions are not per se invalid under
section 365.  Rather, as this Court noted in The Shaw Group:

16

> The "critical feature" of decisions which do not
> invalidate cross-default provisions is "that the
> agreements linked by a cross-default clause were
> economically interdependent: the consideration for one
> agreement supported the other." United Air Lines, 346
> B.R. at 470 (emphasis added), citing Lifemark Hosps.,
> Inc. v. Liljeberg Enters. (In re Liljeberg Enters.),
> 304 F.3d 410, 445 (5th Cir. 2002) (upholding cross-
> default provision in one agreement where non-
> enforcement "would collapse the [other] agreement" and
> "thwart [non-debtor party's] bargain in agreeing to
> enter into the [other] agreement"); Kopel, 232 B.R. at
> 67 (enforcing cross-default clause in lease and
> collateral note where they were "contemporaneously
> executed as necessary elements of the same transaction,
> such that there would have been no transaction without
> each of the other agreements").

350 B.R. at 179-80.

The Court concludes that in this case the individual leases incorporated into each Master Lease are economically interdependent. Although the underlying leases between the Debtors and the ground lessors were originally independent agreements, when the Master Leases were executed they became consolidated. Unlike the original landlords, FP had no real interest in each specific lease; its interest was in the total package. This conclusion is supported by the terms of the Master Lease: the total rent is due jointly and severally by all the tenants regardless of what happens to any of the individual leases. (Exs. D-1 & D-2 at ¶¶ 6(e), 7(b), 25(a) & 33(a).)  To allow the Debtors to reject one of the leases without continuing to pay the total rent would be to destroy the essence of FP's bargain.

17

The Debtors contend though that the provisions of the Master Leases at issue are merely skillful drafting to avoid the consequences of the effects of the Bankruptcy Code.  They contend that enforcement of those provisions would make it difficult for them to eliminate under-performing restaurants.  They argue that this could have a devastating effect on their efforts to reorganize.

The Court notes, however, that there is "no federal policy which requires severance of a lease condition solely because it makes a debtor's reorganization more feasible." Bistrain v. East Hampton Sand & Gravel Co., Inc. (In re East Hampton Sand & Gravel Co., Inc.), 25 B.R. 193, 199 (Bankr. E.D.N.Y. 1982).  Rather, the determination of whether a specific contract or lease is an indivisible agreement or is several agreements in one, which should properly be severable, depends on the application of state law.  See, e.g., T & H Diner, 108 B.R. at 453 ("The question of divisibility is a matter of state law."); Wolflin Oil, 318 B.R. at 397 ("Where a lease or contract . . . can be severed under applicable non-bankruptcy law, section 365 allows assumption or rejection of the severable portions of the lease or contract.'") (emphasis added).

The Debtors and Committee argue, however, that in similar circumstances courts have held that a single, master lease for separate retail stores or restaurants is severable.  See, e.g.,

18

FFP Operating Partners, 2004 WL 3007079, at *4-5 (finding lease
covering twenty convenience stores in ten cities to be severable
where each property was operated separately, the lump sum rent
could be apportioned among the properties, and two properties had
been severed from the lease previously without affecting the
other properties); Clark Retail, 308 B.R. at 888 (finding a
single purchase agreement for eighty-one gas stations was
severable into distinct agreements for each property when the
agreement priced the properties separately; each property had its
own due diligence information; the agreement contemplated
separate warranties, inspections, and closing for each property;
and environmental conditions and remediation obligations varied
among the properties); In re Cafeteria Operators, L.P., 299 B.R.
384, 390-92 (Bankr. N.D. Tex. 2003) (finding master lease of
forty-three restaurants to be divisible when rent was apportioned
among the properties, the leases had differing terms, and each
property operated independently); Convenience USA, 2002 WL
230772, at *2-4 (finding that master lease executed in connection
with sale-leaseback of twenty-seven convenience stores in
eighteen cities was severable where rent was allocated among the
properties, the landlord had the option to transfer properties
out of the lease, condemnation of one property would not
terminate the leases, and the properties operated separately).

The Court finds the cases cited by the Debtors distinguishable.  None of them involved the situation presented here where the Debtors, after entering into the leases, bundled them for purposes of monetizing them.  In many of the cases cited by the Debtors and the Committee, the party objecting to severance of the agreement was the original landlord or sub-landlord.  Cf. Adelphia, 322 B.R. at 53; FFP Operating Partners, 2004 WL 3007079, at * 1; Cafeteria Operators, 299 B.R. at 387-88. In those cases, it was reasonable to conclude that the landlord did, in fact, view each of the leases as a separate contract and that the bundling of the leases together in a master lease or the use of cross-default or similar provisions did not change that view.

The Wolflin Oil and Plitt Amusement cases are also distinguishable, because in those cases the leases were executed in connection with the sale of a business.  318 B.R. at 395; In re Plitt Amusement Co. of Washington, Inc., 233 B.R. 837, 839 (Bankr. C.D. Cal. 1999).  The Courts concluded that the leases were severable from the asset purchase agreements because they were in separate documents, with separate payment obligations, and were to continue long after payment for the business was complete.  318 B. R. at 399; 233 B.R. at 844.  The Clark Retail case is similarly distinguishable because it involved a bankruptcy auction of eighty-one properties and the bid

20

procedures expressly permitted bids on individual properties
although it required use of a standard asset purchase agreement
form.  308 B.R. at 881.

The Debtors argue, however, that the Master Lease structure
was motivated purely by financial considerations that served no
business purpose apart from providing FP with credit enhancements
(such as cross-default provisions).  They contend that such
credit enhancements do not integrate otherwise divisible,
separate agreements.

The fact that the Master Lease structure was used for
financial reasons is a red herring.  Presumably, all business
transactions are done for financial reasons.  In the absence of
the sale/leaseback, the Debtors would have been free to assume or
reject any of the individual leases.  The difference in this case
is that the Debtors entered into the sale/leaseback agreement
whereby the leases were bundled in exchange for one obligation.
FP agreed to pay the Debtors a substantial sum of money in
exchange, inter alia, for the right to bundle the leases into
four Master Leases and restrict the exercise of rights by the
individual tenants.  The Court concludes that the intent to treat
the Master Leases as integrated indivisible agreements is clear
from the face of those agreements.

21

2.  <u>Prior Dealings</u>

Even if the Master Leases were ambiguous, however, the
course of dealings of the parties demonstrates that the deal was
meant to be indivisible.  During the negotiations, the Debtors
expressed their preference for individual leases, but FP insisted
on the Master Lease concept.  (Tr. 87:3-14, 102:23-103:5, 104:15-
16, 105:25-106:7; Duncan Tr. 35:20-39:3, 44:18-50:9; Exs. FP-2 &
FP-3.)  FP's view prevailed and the deal was done that way.  (Tr.
87:20-24; Exs. D-1 & D-2.)  The Debtors agreed to the Master
Lease structure because they were more interested in the
favorable terms offered by FP (total proceeds and rental terms)
and in getting treatment of the transaction as an operating
lease.[9]  (Tr. 87:20-24, 109:7-12.)

The Court concludes that it is clear from the negotiations
that the use of a Master Lease, with the concomitant joint and
several obligation of all tenants to pay the total rent, was a
critical element of the parties' agreement.  <u>See, e.g.</u>, <u>Fleming
Cos.</u>, 499 F.3d at 308 (holding that debtor could not assume and
assign store lease because an essential term of it required
service from a warehouse whose lease had already been rejected);
<u>ANC Rental Corp.</u>, 277 B.R. at 238-39 (holding that debtor may not
assume only part of a contract but must assume the entire

---

[9]  In fact, some of the Debtors' rights to substitute one
lease for another contained in earlier iterations of the deal
were eliminated by the Debtors' accountant in order to meet the
test for operating lease treatment.  (Tr. 111:13-25.)

agreement).

The testimony demonstrates that FP would never have done the deal as individual leases. (Tr. 131:15-132:2; Shrewsberry Tr. 17:18-21, 56:17-58:3, 84:14-85:13.)  FP contends that this fact alone establishes the interdependence of the leases. <u>Bonner v. Westbound Records, Inc.</u>, 394 N.E.2d 1303, 1314 (Ill. App. Ct. 1979) ("A contract is not severable where the parties assented to all promises as a single whole.").  <u>See also</u> <u>Trapkus v. Edstrom's, Inc.</u>, 489 N.E.2d 340, 346-47 (Ill. App. Ct. 1986) (holding that profit-sharing portion of employment agreement was interdependent with stock buy-sell arrangement because "it is impossible to affirm that the plaintiff would have assented to any part [of the contract] unless he assented to all.").

The Debtors argue that FP's testimony that it would not have entered into the transaction without the bundling of the leases into Master Leases is self-serving and cannot be used to defeat the provisions of the Bankruptcy Code.  <u>See, e.g.</u>, <u>The Shaw Group</u>, 350 B.R. at 180 ("'[s]elf-serving testimony that [the non-debtor lessor] would not have entered into the leases . . . without the cross-default provisions [was] unconvincing' and insufficient to 'override the policy of the Code of allowing debtors to selectively assume or reject . . . divisible agreements.'") (<u>quoting</u> <u>Wolflin</u>, 318 B.R. at 399)).

23

Here, however, the Court finds the testimony convincing. Unlike the situation in <u>The Shaw Group</u> or in the cases cited by the Debtors which involve multiple leases, in this case there was no reason for FP to enter into the sale/leaseback transaction unless it could include the leases together in Master Leases. <u>Cf.</u> <u>Convenience USA</u>, 2002 WL 230772, at *1 (sale/leaseback done by seller as part of sale of business). In this case, FP was not the original lessor; it had no reason to do business with the Debtors on any of the leases. Instead, it was being asked by the Debtors to "monetize" their leases. In exchange for doing that at the price that it did, FP insisted on the leases being bundled.[10]

The Debtors and Committee argue that insistence on the Master Lease concept, however, does not mean that the deal is an integrated one. They contend that the leases were combined into Master Leases only to permit FP to later securitize them, not because they represented one agreement. (Tr. 129:25-130:4; Ex. FP-13.) They argue, further, that the structure of the deal should no longer be considered because the purpose for that structure (to securitize the leases) was never achieved. (Shrewsberry Tr. 46:6-24.)

---

[10] The Debtors' representatives who negotiated the deal also confirmed that FP insisted upon the Master Lease structure and would not agree to individual leases despite the Debtors' efforts. (Tr. 87:11-24, 102:23-103:5, 109:4-24; Duncan Tr. 37:24-39:7, 44:15-45:4, 46:1-10, 49:10-50:9.)

The Court disagrees.  From the testimony presented, the Court concludes that the leases were consolidated for a different reason: to permit the Debtors to "monetize" those leases and assure that FP would be repaid.  (Tr. 82:7-16, 83:18-85:1.) While FP might have wanted to securitize the Master Leases later, that was not a condition to the agreement.  (Exs. D-1 & D-2.) The securitization (or resale of the Master Leases) was a secondary goal of FP's; the primary goal was to assure that it would recover its investment.  (Tr. 129:25-131:7.)  The Debtors' purpose in doing the transaction with FP was achieved.  The Debtors received significant consideration (in the amount of funds received, a favorable cap rate, and operating lease treatment) precisely because FP was able to get Master Leases where each tenant was responsible for the total rent.  (Tr. 88:23-25, 130:16-131:14; Duncan Tr. 31:3-24, 35:11-13.)

Finally, the Debtors and Committee argue that the mere fact that the agreement is in one document at the insistence of FP does not mean that it is an integrated agreement.  They contend that it is not enough to put disparate things together and then say that they are one agreement.  <u>See generally</u>, 2 William L. Norton, Jr. & William L. Norton, III, <u>Norton Bankr. L. & Prac.</u> § 39:11 (2d ed. 1999) ("If a single contract contains separate, severable agreements, however, the debtor may reject one agreement and not another.").

The Court concludes, however, that the purpose of the Master Lease was not simply to consolidate several agreements that FP already had with the Debtors.  Instead, the purpose of the agreement was to assure FP that it would be repaid for the money given to the Debtors.  From FP's perspective this was akin to a financing and it sought to reduce its risk and assure that the "debt" was fully amortized by consolidating its collateral into Master Leases.  (Tr. 129:25-131:7; Shrewsberry Tr. 16:5-11, 38:12-39:25.)  Accordingly, FP's analysis of the economics of doing the deal was based on a determination of the average[11] of the terms of the leases and the total rent paid by the Debtors collectively.[12]  Thus, this case is dramatically different from the situation where the lessor has an independent reason to enter into each lease and then just seeks to reduce its risk by including cross-default provisions in each lease.[13]

---

[11]  The term of each Master Lease is close to an average of the terms of the individual leases.  Therefore, the obligation to pay rent under the Master Leases may extend beyond the end of an individual lease.  (Tr. 89:22-90:5; Andrews Tr. 34:21-35:10; Shrewsberry Tr. 76:7-77:20.)

[12]  In fact, the allocation of the rent among the properties was not negotiated by the parties but was determined by the Debtors' accountants in order to assure treatment as an operating lease.  (Tr. 92:17-24.)  FP was interested only in assuring that the total rent was paid, not how it was allocated.  (Shrewsberry Tr. 16:5-11, 18:22-20:11.)

[13]  The Debtors' CEO, Michael Andrews, admitted that FP's interests were different from the interests of the underlying ground lessors.  FP was only interested in getting the rent paid, while the ground lessors were also interested in having a restaurant operated by a national chain to enhance traffic and

Consequently, the Court concludes that the negotiations of the Master Leases confirm that it was the intent of the parties to have an integrated agreement in each Master Lease and that they are not severable into the individual leases.  As a result, the Court concludes that the Debtors may not assume and assign or reject an individual lease but must assume or reject each of the Master Leases as a whole.

IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Court will deny the Debtors' Motions to reject and to assume and assign the individual leases.

An appropriate order is attached.

BY THE COURT:

Dated:  May 16, 2008                Mary F. Walrath
                                    United States Bankruptcy Judge

---

sales at their strip centers.  (Tr. 113:3-115:21.)